UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------------------------X

JOHN M. DEWEY, et al.,                          Case Nos.: 07-CV-2249-FSH-PS
                                                                       07-CV-2361-FSH-PS
                             Plaintiffs,                        (Consolidated)

         -vs.-

VOLKSWAGEN AG, et al.,

                             Defendants
-----------------------------------------------------X
JACQUELINE DELGUERCIO, et al.

                             Plaintiffs,

         -vs.-

VOLKSWAGEN GROUP OF AMERICA, INC.,
et. al.

                             Defendants
-----------------------------------------------------X


## DEFENDANTS' BRIEF IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT AND IN RESPONSE TO CERTAIN ASPECTS OF PLAINTIFFS' SUBMISSION

CHASE KURSHAN HERZFELD & RUBIN
354 Eisenhower Parkway, Suite 1100
Livingston, New Jersey 07039-1022
(973) 535-8844
Attorneys for Defendants

and

HERZFELD & RUBIN, P.C.
125 Broad Street, 12th Floor
New York, New York 10004
(212) 471-8500
Attorneys for Defendants

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ......................................................................................... I

ARGUMENT ..................................................................................................................... 4

    I. ................................................................................................................................. 4

          NOTICE TO THE CLASS HAS BEEN PROVIDED IN THE "BEST
          PRACTICAL" MANNER, SATISFYING ALL DUE PROCESS
          REQUIREMENTS. INDIVIDUAL MAILED NOTICE HAS BEEN
          ADDRESSED BY FIRST CLASS MAIL TO ANY PERSON WHOSE
          NAME AND ADDRESS ARE KNOWN OR REASONABLY
          ASCERTAINABLE, BUTTRESSED BY TWO NATIONAL
          PUBLICATIONS AND A COMPREHENSIVE AND INFORMATIVE
          WEBSITE AND TOLL-FREE TELEPHONE SUPPORT ..................................... 4

    II. ................................................................................................................................ 5

          MEASURED AGAINST THE VIRTUAL CERTAINTY THAT THIS
          CASE COULD NEITHER BE CERTIFIED NOR PURSUED TO A
          PLAINTIFFS' VERDICT, THE SETTLEMENT PROPOSED IS
          VASTLY SUPERIOR TO THE LIKELY OUTCOME OF FURTHER
          PROCEEDINGS .................................................................................................. 5

    III. ............................................................................................................................... 16

          THE PARTIES' DISPUTE OVER FEES HAS NO IMPACT ON THE
          FAIRNESS OF THE SETTLEMENT, OTHER THAN CONFIRMING
          THAT THERE HAS BEEN NO IMPROPER TRADING OF CLASS
          RELIEF FOR ATTORNEY FEES ...................................................................... 16

    IV. ............................................................................................................................... 17

          THE EXTRAORDINARILY SMALL NUMBER OF EXCLUSION
          REQUESTS IS, LIKE THE MINUTE NUMBER OF OBJECTIONS,
          ITSELF PROBATIVE OF THE FAIRNESS OF THE SETTLEMENT AS
          IT APPLIES TO THE CLASS AS A WHOLE.  A PARTICULAR
          INDIVIDUAL'S OBJECTION THAT THE SETTLEMENT COULD BE

ii

BETTER AS TO HIM, IS NOT A VALID BASIS TO DISAPPROVE A
SETTLEMENT ................................................................................................... 17

V. .................................................................................................................................... 19

THE COURT SHOULD DISREGARD THE ONE-SIDED AND
LARGELY INACCURATE ALLEGATIONS IN SLATER
CERTIFICATION NO. 1, WHICH ARE NOT GERMANE TO ANY
ISSUE DETERMINATIVE OF THE FAIRNESS AND ADEQUACY OF
THE SETTLEMENT ......................................................................................... 19

CONCLUSION ............................................................................................................... 26

## **PRELIMINARY STATEMENT**

Defendants join in plaintiffs' motion for final approval of the settlement and are in general agreement with the points made in support as set forth in plaintiffs' Brief in Support of Motion for Final Approval of Settlement and Settlement Class, Dkt. No. 213-3, dated June 17, 2010. Defendants also tender the sworn certification of the settlement administrator, Rust Consulting, which establishes the extraordinarily thorough notice procedures utilized in this action.

The settlement in this case is inherently fair, adequate and reasonable. It makes manageable for settlement purposes a litigation which Defendants submit could not possibly have been certified for purposes of litigation and accords all members of the Settlement Class major and important relief, of a type and scope which could not have been achieved in litigation, if at all, without the utmost difficulty, expense and delay. Because it is being settled at an early stage, prior to summary judgment motions, class certification procedures, liability expert discovery and/or trial on the merits, major transaction costs and burdens on the parties and the judiciary have been avoided. It has been overwhelmingly accepted by the Settlement Class.

Compared to the 6.5 million Settlement Class members to whom Notice was mailed in this case, the number of objections and opt-outs is extraordinarily small. Moreover, a substantial portion of the objections are focused primarily on the size of the initial $30 million, now $22.5 million, fee application in this case, reflecting objectors' "sticker shock" which the Defendants fully share and will address in a separate brief addressing attorney fees. Defendants, in fact, will

vigorously oppose Plaintiffs' application due to Counsel's misreading of the law and overreaching in presenting the underlying facts.

Many of the rest of the objections are individual complaints that the settlement is inadequate as to a particular individual's situation. This is both an invalid basis for objection as to a settlement in its entirety and the classic instance in which a class member may preserve rights by opting out.

The litigation avoided by the proposed Settlement would have been protracted, hard fought, and in all likelihood would not have produced any favorable outcome for plaintiffs, certainly not one comparable to the benefits of the proposed settlement and certainly not at any time in the foreseeable future. In the first place, recent decisions following a leading decision in this District cast grave doubt on the chances of obtaining nationwide class certification as to the Plaintiffs' claims, which require the application of the divergent laws of all fifty states to a myriad of inherently individual circumstances and panoply of differing designs spanning numerous model years. (*Infra* at 7-13) In addition, the vast majority of the members of the Settlement Class, having experienced no failure or difficulty of any kind, are not in a position to even state a cognizable legal claim. (*Infra* at 16-17)

Even as to the component of the Settlement Class whose vehicles have been or are being modified, warranty claim rates hover in the approximate range of 1%. As to the vehicles which are being provided with reinforced maintenance instructions in the form of an owner's manual insert and are otherwise the beneficiaries of upgraded maintenance and servicing instructions, the

2

relevant warranty rates approach zero. The Settlement provides appropriate and generous relief to each category of vehicles and owners or lessees.

The avoidance of the insuperable management difficulties which would beset this proceeding were it litigated to a finish is not only a demonstrable benefit of the Settlement Agreement, but an essential component of its legal structure. As the United States Supreme Court has made clear, when an agreed settlement, as here, obviates state law variations or otherwise insuperable management difficulties, a court may certify, for settlement only, a class which could not otherwise be litigated. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997)("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.")

The short of the matter is that the proposed settlement "falls squarely within the range of fair and reasonable outcomes." *Hawker v. Consovoy,* 198 F.R.D. 619, 634 (D.N.J. 2001). Defendants submit that the record before the Court fully supports approval of the Settlement Agreement as presented. Defendants join in the motion in support of settlement, with the following comments and amplifications, preserving, the parties' major dispute on the unrelated issue of attorney fees, which will be decided by the Court, based on fully adversarial submissions,[1] and subject to full rights to appeal.

---

[1] As a last point, Defendants have no choice but to address, albeit briefly, the irrelevant, yet offensive, attempt to revisit, recast and, in many instances distort, the details of the litigation history of this case, set forth in the Slater Certification dated June 9, 2010 ("Slater Cert. I") with which the Court is in any event familiar. (See Argument, Point V)

3

## ARGUMENT

I.   **NOTICE TO THE CLASS HAS BEEN PROVIDED IN THE "BEST PRACTICAL" MANNER, SATISFYING ALL DUE PROCESS REQUIREMENTS. INDIVIDUAL MAILED NOTICE HAS BEEN ADDRESSED BY FIRST CLASS MAIL TO ANY PERSON WHOSE NAME AND ADDRESS ARE KNOWN OR REASONABLY ASCERTAINABLE, BUTTRESSED BY TWO NATIONAL PUBLICATIONS AND A COMPREHENSIVE AND INFORMATIVE WEBSITE AND TOLL-FREE TELEPHONE SUPPORT.**

Submitted with this Brief is the sworn report of the Settlement Administrator, Rust

Consulting, Inc., per Melissa Eisert, who has been responsible for the activities set forth. The

submission speaks for itself, detailing the careful and meticulous processing of a total of

approximately 6.5 mailing records of registered present and former owners and lessees of the

various subclasses of vehicles involved in this Settlement. This process has included follow-up

mailings to persons whose initial notices were not successfully delivered, in a process which was

not called for in the Settlement Agreement itself, but which was initiated by the parties and

disclosed to and approved by the Court, with extended objection, opt-out and claim dates

guaranteeing equally fair treatment and opportunity to be heard to all members of the Settlement

Class. Notice, which is recognized by the Supreme Court as a "the touchstone of due process in

a class action," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974), is not merely

constitutionally "adequate," but has been exemplary in this case.

4

## II.    MEASURED AGAINST THE VIRTUAL CERTAINTY THAT THIS CASE COULD NEITHER BE CERTIFIED NOR PURSUED TO A PLAINTIFFS' VERDICT, THE SETTLEMENT PROPOSED IS VASTLY SUPERIOR TO THE LIKELY OUTCOME OF FURTHER PROCEEDINGS.

The test for what is fair, reasonable and adequate in a given case is not an invitation to utopian second-guessing, but necessarily encompasses a range of possible outcomes:

> [T]he court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.

*In re Mexico Money Transfer Litigation (Western Union)* 164 F. Supp.2d 1002, 1014 (N.D. Ill. 2000) citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985):

> in considering the fairness of a proposed settlement of a class action, the court must remember that "compromise is the essence of settlement." *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984). See also, e.g., *Raines v. State of Florida*, 987 F. Supp. 1416, 1418 (N.D. Fla. 1997). "[A] 'just result is often no more than an arbitrary point between competing notions of reasonableness.'" *In re Chicken Antitrust Litigation American Poultry,* 669 F.2d 228, 238 (5th Cir. 1982). The court should consider the likelihood of success on the merits, the complexity, expense, and duration of litigation, the judgment and experience of trial counsel, and objections raised to the settlement. *United States v. Board of Public Instruction of St. Lucie County,* 977 F. Supp. 1202, at 1205 (S.D. Fla. 1997), *citing Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir. 1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

Accord, e.g., *Hawker v. Consovoy, supra,* 198 F.R.D. at 634 (approving settlement)

("Compromise involves the moderation of lofty and idealized hopes and the relinquishment of unyielding and absolute positions."), *In re Wash. Pub. Power Supply Sys. Sec. Lithog.,* 720 F.

Supp. 1379, 1387 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992).

Thus, the fairness of the settlement must be measured against class members' realistic potential recovery, discounted to account for the nature of settlement as a compromise and the fact that the proposed settlement provides immediate benefits to the class at large—without the risk, expense, and delay of continued litigation. *See, e.g., Officers for Justice*, 688 F.2d 615, 625 (9th Cir. 1982) *cert. denied* 459 U.S. 1217, 103 S. Ct. 1219, 75 L. Ed 456; *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) (settlement should be evaluated by "[w]eighing the uncertainty of relief against the immediate benefit provided in the settlement"). "[U]nless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Rodriguez v. West Publishing Corp.*, 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007) (quoting *National Rural Telecomms. Coop v. DirecTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

On two key points, the likelihood of class certification and of prevailing on the merits, plaintiffs acknowledge the difficulties they would face if these proceedings went past the early stages. (E.g., Br. in Support at 13, 29)  The Defendants see the same issues, but in a light which all but forecloses any meaningful prospect of success for their adversaries.

In a similar automotive defect case, this Court denied class certification in *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998).  Judge Lifland's thorough and lucid analysis would be a focal point of Defendants' opposition to class certification with respect to any causes of action which survived threshold dispositive motions as to the individual plaintiffs' claims.

We apologize for the length of the following quotation of the key points of that analysis.

However, the fact is that the considerations which Defendants would raise in opposition to class

certification in this case are exactly those which precluded certification in *Chin*, and it would be

difficult if not impossible to set them forth more succinctly than Judge Lifland did.

> . . . Plaintiffs have not satisfied either the common question (predominance) prong or the superiority prong of the rule. As described below, the principal reason for denying class certification is Plaintiffs' failure to demonstrate a suitable and realistic plan for trial of the class claims which arise under the differing laws of the 50 states as well as the District of Columbia and Puerto Rico. If the Court were to certify a class including those class members who have not experienced any ABS[2] problems, the Court would likely be compelled to create numerous subclasses taking account of the variations in state law concerning whether or not such plaintiffs have a remedy available under each of the asserted state law causes of action. For those proposed class members who have experienced problems with their ABS systems, the problem of applying the differing state laws is added to by the problem of proving that in each case the problems experienced were actually caused by the alleged defect in the ABS systems.
>
> 1. The Predominance of Issues Affecting Only Individual Class Members
>
> With respect to the certification of the proposed class, including members who have allegedly sustained ABS failure and members who have not encountered any such problems, the Court must examine whether class-wide issues are likely to predominate. These issues would be adjudicated under the relevant laws of the 50 states, pertaining to potentially each of the five causes of action arising under state law.
>
> For the reasons next discussed, the finding that class-wide issues do not predominate over issues involving only individual plaintiffs results from the following three conclusions reached by the court: (1) even the basic question of whether Plaintiffs' ABS systems are defective will depend on the application of the laws of all 50 states and perhaps upon facts particular to each individual Plaintiff; (2)

---

[2]       "ABS" is the industry shorthand for "Antilock Braking System."

7

Plaintiffs have failed to show that issues such as privity, reliance and Chrysler's affirmative defenses may be adjudicated on a class-wide basis; and (3) the Court is compelled to apply the law of each Plaintiff's home state to that Plaintiff's claims, and thus class-wide disposition of the claims would essentially be impossible.

A. Common Factual Issues Do Not Predominate

a. Proving a Class-wide Defect

\* \* \*

First, whether or not there is a defect would have to be decided according to the laws of each of the 52 applicable jurisdictions. Second, most of the potential class members have never experienced any problems with their ABS systems. Proving a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult. Even where the alleged defect has manifested itself, individual issues of actual cause must be adjudicated. Because of the plethora of Plaintiffs' causes of actions under divergent state laws, proving the existence of the alleged class-wide defect is not the simple task that Plaintiffs make it out to be and is a factor that weighs against a finding of factual predominance.

\* \* \*

While Chrysler does not argue that there are anywhere near the number of variables in question in this case, it does contend that, as described above, the common defect issue would require the application of the laws of the 52 applicable jurisdictions, as well as individual determinations of actual causation. Chrysler's Supplemental Br. at 2-3. Chrysler also argues that the record is devoid of any competent evidence of a common or class-wide defect. Chrysler points out that the Complaint alleges two different problems with the Bendix 9 and 10 ABS systems. The Complaint asserts that certain piston seals do not provide an adequate seal which may cause the system's pump to run, and this in turn may cause the pump to burn out in some cases if a repair is not made in time. Compl. ¶¶ 168-69. The Complaint also asserts that some brake systems may have a hydraulic bladder accumulator that is unable to store sufficient pressure, which may in turn cause problems for some brake systems. Compl. ¶¶ 170. Chrysler also points out that there is no allegation and no evidence that all or

8

even a majority of brake systems will manifest the alleged defects. Def. Supp. Br. at 3.

\* \* \*

b. The Adjudication of Secondary Issues such as Privity, Affirmative Defenses and Reliance on a Class-Wide Basis

An analysis of issues in this case other than the defect issue further reveals the lack of truly class-wide issues that are implicated by Plaintiffs' claims. For example, under the law of some states, for a plaintiff to prove an implied warranty claim, the plaintiff must demonstrate contractual privity with the defendant. See, e.g., *Flor. v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 633 P.2d 383 (1981); *Osborne v. Subaru of Am., Inc.* 198 Cal.App.3d 646, 243 Cal. Rptr. 815, 820-21 (1988). Plaintiffs from these states will have to prove that they purchased their Chrysler vehicle either from Chrysler itself or from one of its agents, as opposed to an independent car dealer or another individual. This will require the Court to undertake an inquiry that will turn on facts particular to such individual plaintiffs.

Similarly, with regard to Plaintiffs' fraud claims, Plaintiffs generally may not prevail without proving the element of reliance. See, e.g., *Hanson v. Thornton*, 218 Ga. App. 500, 462 S.E.2d 154, 156-57 (1995). That is, Plaintiffs must persuade the finder of fact that disclosure of the allegedly dangerous nature of the ABS systems would have affected the purchaser's decision whether to purchase the vehicle. While Plaintiffs assert that reliance may be presumed in the present action, the Court takes note of the Advisory Committee comments to Rule 23 recognizing that certification under Rule 23(b)(3) "may be unsuitable in fraud cases where there are variations in the kinds or degree of reliance by the persons to whom the alleged misrepresentations were addressed." Another district court recently rejected the plaintiffs' assertion in that case that reliance could be presumed in the adjudication of a common law fraud claim in a proposed nationwide class action. *In re Ford Motor Company Vehicle Paint Litigation*, 182 F.R.D. 214, 220-21 (E.D. La.1998). In *Ford Vehicle Paint Litigation*, the court undertook an extensive state law analysis of the treatment of this issue and determined "that the vast majority of states have never adopted a rule allowing reliance to be presumed in common law fraud cases, and some states have expressly rejected such a proposition." See *id.* at 221 (and cases cited therein). *Ford Ignition*

9

*Switch* also recognized the difficulties involved in adjudicating highly individualized issues in a class action. The Court in *Ford Ignition Switch* explained that issues such as those presented in this case, including, privity, reliance and affirmative defenses (e.g. contributory negligence, statute of limitations), may present insuperable obstacles to class certification. 174 F.R.D. at 346-47.

The preceding discussion encompasses just a few of the issues in these cases that, at trial, would require the court to analyze facts particular to individual plaintiffs. The number and significance of issues that affect different plaintiffs differently persuade the Court that class-wide factual issues do not predominate.

B. Common Legal Issues Do Not Predominate

a. Choice of Law Considerations

At the outset the Court must determine which law to apply to this action. When a federal court exercises diversity jurisdiction, it must determine which state's law to apply by reference to the forum state's law governing choice of law. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the typical diversity case the court would look to New Jersey's choice-of-law analysis and determine which state's law governs some or all issues, from among two or three candidates.

Likewise, in nationwide class actions, choice of law constraints are constitutionally mandated. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The parties before this Court have a due process right to have their claims governed by the state law applicable to their dispute. In the context of class certification, the Supreme Court has cautioned that the court "may not take a transaction with little or no relationship to the forum and apply the law of the forum in order to satisfy the procedural requirement that there be a common question of law.'" *Id.* at 821, 105 S.Ct. 2965. The Third Circuit has similarly mandated that "the dictates of state law may not be buried under the vast expanse of a federal class action." *In re School Asbestos Litigation*, 789 F.2d 996, 1007 (3d Cir.1986). More recently, the Third Circuit mandated "applying an individualized choice of law analysis to each plaintiff's claims." *Georgine*, 83 F.3d at 627. The application of New Jersey's choice-of-law rules to the present action, clearly leads to the necessity of applying the law of 50 states if a nationwide class is certified.

10

New Jersey choice of law principles require an interest analysis, in which the forum court compares the interests of the states whose laws are potentially involved in the underlying action and determines which state has the greatest interest in having its law applied. See *Gantes v. Kason Corp.*, 145 N.J. 478, 679 A.2d 106 (1996). Chrysler argues that a choice of law analysis leads to the conclusion that the laws of each Plaintiff's home state must be applied because those states have interests that outweigh the interests of New Jersey. The Court agrees.

Each Plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws. These interests arise by virtue of each state being the place where Plaintiffs reside, or the place where Plaintiffs bought and used their allegedly defective vehicles or the place where Plaintiffs' alleged damages occurred.

\* \* \*

### b. Variations in State Law

Plaintiffs have asserted five causes of action arising under state law. Chrysler argues that the difference in applicable state laws preclude a finding that common issues of law predominate, since the Court will be faced with the prospect of applying the laws of all 50 states, as required by *Erie R.R. v. Tomkins*, 304 U.S. 64, 78-80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

\* \* \*

In a motion for class certification, plaintiffs bear the burden of providing an "extensive analysis" of state law variations to determine whether there are "insuperable obstacles" to class certification. *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (citing *In re School Asbestos Litig.*, 789 F.2d at 1010). "If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996) (reversing certification of nationwide class in products liability case). "Prior to certification, the district court must determine whether variations in state law defeat predominance." *Castano*, 84 F.3d at 750.

11

*Chin v. Chrysler Corp.*, 182 F.R.D. at 454-58.  See also, e.g., *Cole v. GMC*, 484 F.3d 717, 728

(5th Cir. 2007); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2001); *Cox House*

*Moving, Inc. v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 81132 (D.S.C. 2006); *Sanneman v.*

*Chrysler Corp.*, 191 F.R.D. 441, 449 (E.D. Pa. 2000); *In re Chrysler Corp. Paint Litig.*, 2000

U.S. Dist. LEXIS 2332 (E.D. Pa. 2000); *Carpenter v. BMW of N. Am., Inc.*, 1999 U.S. Dist.

LEXIS 9272 (E.D. Pa. 1999).

      Under *Chin*, and similar recent cases, the prospect of obtaining class certification for

purposes of litigation on anything approaching the scale of the Settlement Agreement is virtually

zero.  In contrast, the Settlement Agreement provides for uniform application of New Jersey law

and provides generalized and appropriately tailored relief which obviates what would otherwise

mandate individualized considerations of design, manufacturing, causation, contributory

negligence, product misuse, outside influence, reliance and other issues.  Predominance,

manageability and superiority issues under Rule 23(b)(3) would place insuperable barriers to

certification in a litigation context.  Thus, the Settlement provides comprehensive nationwide

relief well beyond the possibility of manageable adjudication.

      Plaintiffs also note, in passing, that victory at trial (assuming success at the certification

stage) would pose challenges. (Br. in Support at 29) Defendants view this as an understatement,

for various reasons, chief among them the fact that, as to the vast majority of the settlement class,

relief of any sort is beyond any result which might possibly have been obtained in litigation, as

such persons have had no water ingress experience and have no claim under any theory:

> Purchasers of an allegedly defective product have no legally
> recognizable claim where the alleged defect has not manifested

12

> itself in the product they own [citations]. . . . Thus, a [vehicle] that
> performs satisfactorily and never exhibits the alleged . . . defect is
> fit for the purposes intended and does not give rise to a breach of
> warranty claim or any other.

*Hubbard v. General Motors Corp.*, No. 95 Civ. 4362, 1996 U.S. Dist LEXIS 6974 at *9

(S.D.N.Y., 1996). Accord, e.g. *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999);

*Lee v. General Motors Corp.*, 950 F. Supp. 170, 171-74 (S.D. Miss. 1996); *Yost v. General*

*Motors Corp.*, 651 F. Supp. 656, 657-58 (D.N.J.1986)(complaint alleging design defect "likely to

cause" damage failed to state a claim); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp.

595, 603 (S.D.N.Y. 1982)(holding no cause of action for defect which never manifests itself);

*Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y.1997)("It is well established that

purchasers of an allegedly defective product have no legally recognizable claim where the alleged

defect has not manifested itself in the product they own."); see also *Martin v. Ford Motor Co.*,

914 F. Supp. 1449, 1453 (S.D. Tex.1996); *American Suzuki Motor Corp. v. Superior Court,* 37

Cal. App. 4th 1291, 1298-99, 44 Cal. Rptr. 2d 531 (1995) (reversing certification, and rejecting

argument that the potential for failure sufficed to state a claim: "To hold otherwise would, in

effect contemplate indemnity for a potential injury that never, in fact, materialized"); *Carlson v.*

*General Motors Corp.*, 883 F.2d 287, 297-98 (4th Cir. 1989), *cert. denied*, 495 U.S. 904 (1990)

(rejecting argument that an alleged latent defect in an automobile gave rise to "loss of resale

value claims" under the UCC, and refusing to certify a class of owners of the allegedly defective

automobile); *Barbarin v. General Motors Corp.*, 1993 WL 765821 at *2 (D.D.C. 1993)(refusing

to certify class of all owners of automobiles with allegedly defective brake system because it

13

would include persons who never experienced any problem with their brakes). The settlement here which offers otherwise unavailable relief and without delay, is thus by any measure fair, reasonable and adequate measured against the probable litigation outcome.

From time to time in their submission, Plaintiffs reference "defects" which they allege in the class vehicles in terms which may invite a finding or imply acquiescence by the Defendants in these references. Defendants note that under the terms of settlement all claims are being dismissed with prejudice and that there has been no admission of liability, no less adjudication, that any of the class vehicles are defective in any way. The Settlement Agreement specifically states that there is no admission of liability:

> Defendants deny the material factual allegations and legal claims asserted by the Representative plaintiffs in the litigation, including, but not limited to, any and all charges of wrongdoing or liability arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the litigation, and further assert and maintain that numerous legal deficiencies and affirmative defenses bar the claims asserted in the litigation on behalf of the Representative plaintiffs and members of the putative class asserted in the Complaint, including but not limited to, Settlement Class Members.

Settlement Agreement, ¶2, Slater Cert. Exh. "5."

This point was reiterated in the Parties Joint Preliminary Approval Brief, which states:

> "[P]laintiffs have alleged that the vehicles' sunroof drains systems and, in some instances, the plenum drain systems can clog, allowing water to infiltrate and damage vehicle interiors. Plaintiffs have further alleged that maintenance recommendations for these vehicles did not adequately address the need to clean these drain systems to prevent accumulation of debris that can lead to clogs. Defendants have denied-and continue to deny-these allegations."

* * *

14

> "[t]he parties recognized the significant uncertainties and risks
> faced by the proposed plaintiff class and the defendants, and the
> benefits of reaching a comprehensive nationwide settlement."

Joint Application for Preliminary Approval p. 1-2, Slater Cert., Exh. "6."

Further, the Transcript of Proceedings before the Honorable Patty Shwartz, on February

17, 2010, states:

> "This Order, the Agreement, or the documents in support of the
> application for approval is not evidence of admission of liability by
> any defendant and may not be used in evidence in this proceeding
> except to consummate or enforce the Agreement or terms of this
> Order."

Transcript of Proceedings Feb. 17, 2010, Slater Cert., p. 20, Exh. "7."

Also, it bears mentioning that while Defendants agree that the Settlement provides more

than sufficient value and benefits to the Settlement Class to warrant approval, they do not accept

the double-counting of costs and benefits which permit Plaintiffs' expert Eads to attribute an

artificially inflated dollar value to the settlement for purposes largely geared toward plaintiffs'

fee petition.[3]  Apart from such issues, defendants join in support of the Settlement as fair and

adequate.

---

3 This issue will be addressed in defendants' separate brief on attorney fees.

15

### III. THE PARTIES' DISPUTE OVER FEES HAS NO IMPACT ON THE FAIRNESS OF THE SETTLEMENT, OTHER THAN CONFIRMING THAT THERE HAS BEEN NO IMPROPER TRADING OF CLASS RELIEF FOR ATTORNEY FEES

Plaintiffs correctly point out that objections to the fee petition in this case, which imply that there has been an improper "deal" or agreement on this subject resulting in a predetermined "unfair" outcome, are based on a completely erroneous view of the facts. There is no agreement on attorney fees between plaintiffs' counsel and defendants. As Plaintiffs note, and Defendants affirm, the subject of attorney fees was never discussed between the parties until after the execution of the current Amended and Superseding Agreement of Settlement. To be sure, Defendants in large measure agree with objectors critical of Plaintiffs' fee application on its own, either as announced in the Notice ($30 million) or as filed with the Court ($22.5 million). However, we are in complete agreement with Plaintiffs that nothing about the parties' dealings on this subject can be a basis of objection or criticism with respect to the Settlement itself. Defendants will detail the appropriate standards under New Jersey law. At $3.5 million or less based on an unenhanced lodestar, our view of a reasonable fee is worlds apart from the bonanza envisaged by Plaintiff's counsel, as we will argue in opposition to Plaintiffs' counsel's fee petition. Defendants view the lodestar fee approach as mandatory under the applicable fee shifting provision in the New Jersey Consumer Fraud Act, which is the only fee generating component of the New Jersey law made applicable to the "entire" Settlement Agreement.

16

(Joint Application for Preliminary Approval Brief, p. 14, Slater Cert., Exh. "6")  Insofar as this

concept or its details differ from those espoused by any objector, Defendants are in disagreement

with such objector.

The fairness of the Settlement is not adversely impacted by the number of objectors

protesting the exorbitant fees demanded by Class Counsel in the Class Notice (approximately

50% of objectors).  Defendants share such concerns and will show separately in the fee dispute,

why such fees are unmerited here.  Further, given the number of addressees of the Class Notice,

the number of objectors to the settlement itself, on substantive grounds, is extremely small.

**IV.    THE EXTRAORDINARILY SMALL NUMBER OF EXCLUSION REQUESTS IS,
LIKE THE MINUTE NUMBER OF OBJECTIONS, ITSELF PROBATIVE OF
THE FAIRNESS OF THE SETTLEMENT AS IT APPLIES TO THE CLASS AS A
WHOLE.  A PARTICULAR INDIVIDUAL'S OBJECTION THAT THE
SETTLEMENT COULD BE BETTER AS TO HIM, IS NOT A VALID BASIS TO
DISAPPROVE A SETTLEMENT.**

The "existence of objections does not mean that the settlement is unfair . . . [and] it is

clear under the applicable law that even majority opposition to a settlement cannot serve as an

automatic bar to a settlement" if a district judge believes the settlement to be fair.  *Bailey v. AK*

*Steel Corp.*, 2008 U.S. Dist. LEXIS 16704,*12 (S.D. Ohio 2008) (*quoting In re Telectronics*

*Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1018 (S.D. Ohio 2001)).  Once preliminary approval has

been granted, a settlement is presumptively reasonable and an objector must overcome a heavy

burden to obtain disapproval of a proposed settlement.  *See, e.g., Williams v. Vukovich*, 720 F.2d

909, 921 (6th Cir. 1982). When a significant majority of class members have not objected to or

excluded themselves from a class action settlement, courts have interpreted that response as

evidence that the settlement warrants final approval. Thus, for example, in *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d Cir. 1990), the Third Circuit found that objections by 29 members out of a settlement class of 281 – over 10% of the total – did not affect the Court's finding that "the response of the class members both in numbers and in rationale, strongly favors settlement." *Id.* at pp. 118-19.

Aside from their almost infinitesimal number compared to the size of the class, most of the non-fee or anti-class action objections are nothing more than complaints that the settlement is insufficient as to a particular individual. It is well established that "complaining that the settlement should be 'better' . . . is *not* a valid objection." *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *5 (N.D. Cal. 2007) (emphasis added) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)).

Stated another way, the test of a settlement's fairness is not whether it makes each and every class member happy, or whether it puts money into the pocket of each class member. *See, e.g.*, *Rebney v. Wells Fargo Bank*, 220 Cal. App. 3d 1117, 1125, 1139-40 (1990) (approving class action settlement under which some class members received no individualized benefit because, amongst other reasons, "[d]efense judgments were hardly beyond the realm of possibility").

This is because "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Thus, the fairness of the settlement must be measured against class members' realistic potential recovery, discounted to account for the nature of settlement as a compromise

18

and the fact that the proposed settlement provides immediate benefits to the class at large—

without the risk, expense, and delay of continued litigation. *See, e.g., Officers for Justice*, 688

F.2d at 625; *In re Wireless Tel. Fed. Cost Recovery Fees Litig., supra.* "[U]nless the settlement

is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive

litigation with uncertain results." *Rodriguez v. West Publishing Corp., supra.*

In any event, the opt-out right, mandated by considerations of Constitutional due process,

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811 (1985), is the ultimate vehicle by which any

putative class member who truly feels short-changed by the settlement is protected. This option

provides the complete answer to anyone who feels he or she has been done out of something by

the settlement. This is particularly the case where the overwhelming majority of the Settlement

Class has neither objected nor opted out.

V.   **THE COURT SHOULD DISREGARD THE ONE-SIDED AND LARGELY INACCURATE ALLEGATIONS IN SLATER CERTIFICATION NO. 1, WHICH ARE NOT GERMANE TO ANY ISSUE DETERMINATIVE OF THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT.**

The Defendants have no choice but to address one unusual and highly troubling aspect of

Plaintiffs' submission in support of fairness, *i.e.*, the Certification of Adam M. Slater in Support

of Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses dated

June 9, 2010 ("Slater Cert. I"). The overwhelming bulk of this massive opus (Slater Cert. 1 ¶¶ 17-

76) is devoted to a prolonged one-sided, self-serving, and fundamentally misleading rehash of

every discovery or other issue in the case, all portrayed, exclusively from one side's point of

view, as a heroic effort by the plaintiffs to overcome improper conduct by the defense. Yet, no

such charges or insinuations will be found anywhere in the brief. Remarkably, the only propositions in the brief for which this epic is cited are the entirely uncontroversial and innocuous statements that there has been "extensive discovery" (Br. in Support at 10, 14) and that over 50 depositions were taken. (Id. at 11) Neither of these real propositions is in dispute. Indeed, this Court's informal opinion of February 17, 2010 has already referenced the extended proceedings, both in and out of Court, which preceded the settlement in this case. This submission is therefore unnecessary and irrelevant to any point determinative of the fairness of the settlement, or even for that matter the fees to be awarded.

Nonetheless, to be sure that there is no misunderstanding, or that silence be deemed to be consent or acquiescence, Defendants must note their comprehensive disagreement with the thrust of Mr. Slater's narrative of this litigation and his biased summary of the various disputes and issues that arose in the course of discovery, the vast majority of which was accomplished without any intervention by the Court. We do not feel it necessary to waste the Court's time revisiting each and every issue canvassed one-sidedly by Mr. Slater, as they have long since been resolved and ultimately led to a mutually agreeable and fair Settlement Agreement. The Joint Letters, which were appended as exhibits to Mr. Slater's brief (See Exhs to Slater Certification 72-85) speak for themselves and, despite his selective quotation of one side's position only, reflect the positions of both parties at the time of the dispute, requiring no after-the-fact "spin." In fact, particularly compared with the extraordinary volume and ultimately international scope of discovery, the subject matter truly in dispute was minimal.

20

In fact, though one might not guess it from reading the Slater certification, not one written or published discovery ruling issued by the District Judge in the case, and no sanctions of any sort were imposed at any time. Plaintiffs' attempt to analogize this case to *McCoy v. Health Net*, 569 F.Supp.2d 448 (D.N.J. 2008), a protracted donnybrook with which the Court is all too familiar, is wildly off the mark. As Judge Hochberg observed in approving the settlement in *McCoy*:

> The seven years of litigation in these cases defy simple summary. As the Court noted in 2006,
>
> > The *Wachtel* and *McCoy* cases are two of the oldest on this Court's docket. The litigation has been fierce and without respite, through several changes of defense counsel. . . . In sum, it gives new meaning to the term "scorched earth" litigation tactics.
>
> *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006). The *Wachtel* docket sheet is now 115 pages long, with 141 motions, 283 briefs, 316 other applications, 44 hearings, 11 conferences, and 5 appeals to the Third Circuit.

*McCoy v. Health Net, Inc.*, 569 F. Supp. 2d at 451. Nothing remotely comparable has occurred in this case.

As is evident, the discovery burdens in this case were borne primarily by the defense. In rough numbers, plaintiffs produced at best several hundred pages of documents; defendants, well over 200,000, coming from four different corporate entities on two continents. The staggering disproportion between the volume of documents and witnesses produced by the two sides would of course lead one to the unsurprising conclusion that the side burdened with the production would seek some limit to it by the legitimate means available.

21

Mr. Slater intimates that each joint letter was prompted by and the result of his efforts to overcome defendants' alleged "stonewalling"; this is not the case. For instance, the certification states that a December 13, 2007 hearing was held to address "the slow progress of defendants' production of discovery." In fact, plaintiffs had only served their discovery requests on November 14, 2007, and therefore no discovery responses were even due as of the hearing date. In reality, the hearing was held in order to set a reasonable schedule to produce the anticipated tens of thousands of pages of documents, which were far too voluminous for defendants to process and produce within 30 days. Prior to that time, one of the major impediments to defendants' production was the lack of a confidentiality order, a matter concerning which the Court was kept apprised, and on which Defendants ultimately prevailed, over Plaintiffs' strenuous objections. See, Discovery Confidentiality Order on Informal Application, Dkt. No.32, February 28, 2008.

As a supposed example of "stonewalling" tactics by the defense, the Slater certification quotes a lengthy statement by defense counsel arguing against the expansion of the vehicle class well beyond what was originally pleaded in the complaints. In fact, the argument was directed to the inclusion of two new named plaintiffs in *Dewey* matter as to whom there was no allegation that either had suffered damages as a direct result of the alleged defects and that they likely lacked standing to sue. (Slater Cert. 1 at ¶ 28) The certification also conveniently fails to note that, as a result of those objections, counsel for the *Dewey* plaintiffs, given the opportunity to do so accompanied by an admonishment by the Court, voluntarily withdrew both individuals from

22

the case within days (*See* Stipulation and Order Dismissing the Claims of Additional Named

Plaintiffs Stiene and Nadeau, Dkt. No. 67, entered 5/13/08).

A further distortion of the record is the characterization of the Court's June 9, 2008 Order

as an "overwhelming" victory for the plaintiffs, based on, *inter alia,* the Court's directive that

"the party who seeks to use the [foreign-language] document shall provide an English translation

of same." (Slater Certification, Exh. 99) In fact, Defendants never claimed the right to submit

documents to the Court without translating them. The gist of the Court's ruling in fact vindicated

Defendants' position that no translations need be prepared merely for purposes of production and

rejected plaintiffs' request for an order compelling the defendant companies to produce English

translations of every single foreign-language document produced in response to discovery.

With regard to plaintiffs' compliance with discovery orders, we note that despite the very

basic document requests that were served on them, complete and timely responses were often not

provided. Plaintiffs frequently provided "supplemental" documents on the day or the eve of the

particular deposition. When one considers the relatively limited nature of the documents

requested, virtually all of which pertained to the plaintiffs' maintenance and repair of the class

vehicles, and should have been disclosed completely in plaintiffs' initial disclosures, it is at the

least ironic that Plaintiffs' counsel accuses the defense of misconduct in this respect.

The Court issued an Order on Informal Motion and Sixth Amended Scheduling order,

dated January 30, 2009 (amended February 9, 2009), in which the Court, as noted by Mr. Slater,

denied plaintiffs' motion to have Mr. Gsovski's *pro hac vice* admission revoked, a move which

the Court clearly viewed as excessive, to say the least. See Slater Certification ¶ 48 and Exhibit

117 and 118. The Court also granted defendants' requests regarding their outstanding discovery requests directed at plaintiffs, (see Joint Letter January 29, 2009, Slater Cert. No. I, Exh. 80), including ordering the production of plaintiffs' vehicles for inspection at nearby dealerships and the production of Mr. Competello, a competent witness who suddenly became a "consultant" to plaintiffs to throw up a "work product" shield. In addition, the Court ordered that going forward, plaintiffs were required to coordinate all discovery requests served on defendants, thus putting an end to a game of hide and seek concerning the named plaintiffs and their vehicles.

The asymmetry in the discovery process has no better illustration than plaintiffs' studied refusal, delay and diversion in simply producing their clients' vehicles – the subject matter of the lawsuit – for inspection, a process to which Defendants have an absolute right under the Federal Rules. Transposed to the other side of the litigation, this would be virtually tantamount to the Defense having refused any cardinal discovery whatsoever. In fact, the entire subject matter of the entire Slater certification and all discovery disputes in this case affected only a minute fraction of the hundreds of thousands of pages produced by the defense.

Finally, Plaintiffs' chastisement of the Defendants and in particular Mr. Matte, for forthrightly correcting a clerical error and promptly producing personal files whose existence he truthfully acknowledged but which he did not understand was subject to a production request addressed to his employer, is not a legitimate cause for complaint. In short, plaintiffs' attempted tale of woe proves at best an exaggerated and misleadingly incomplete view of normal discovery issues, the majority of which were resolved without any intervention by the Court.

24

Were we to go on in this vein and place context into each matter addressed in the Slater Certification, this submission would be as lengthy as his. As tempting as this may be, neither his epic one-sided survey, nor our feasible response item by item, would be useful for the Court. First, it is not germane on the issue of fairness of the settlement. Second, the Court is well aware of the proceedings, and knows how hard counsel worked even on weekends and holidays. Third, the Slater one–sided version is not even relevant on the issue of attorneys fees because his time is amply reflected in the lodestar calculation and no more.

As stated, there is no dispute that the litigation in this case was an arm's length and adversarial process, in which each side zealously defended what it viewed as its prerogatives. This is naturally so, in a case in which Plaintiffs assiduously resisted even the limited discovery sought from them. That, however, is all. Plaintiffs' apparent attempt to spin these entirely normal events into some form of "scorched earth" or discovery abuse, cf. *McCoy, supra,* at this hour, and in this context, should simply be disregarded.

## **CONCLUSION**

For the reasons stated above, and notwithstanding the areas of disagreement noted, Defendants join plaintiffs in urging that the Settlement in this case receive the Court's final approval.

Respectfully submitted,

CHASE KURSHAN HERZFELD & RUBIN, LLC
Attorneys for Defendants

By:    /s/  Jeffrey L Chase
       Jeffrey L. Chase (JLC 4476)

June 28, 2010

HERZFELD & RUBIN, P.C.

By:    /s/  Daniel V. Gsovski
       Daniel V. Gsovski (DG 4413)

/