MAZIE SLATER KATZ & FREEMAN, LLC
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DAWN BEYE, KATHLEEN BRADLEY And CHRISTINE BYRAM, individually and on behalf of all others similarly situated, | : : : : | CIVIL ACTION NO.: 06-5337(FSH) |
| Plaintiffs, | : : | |
| vs. | : : | |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, INC., et al. | : : : | |
| Defendants. | : : | |
| RONALD DRAZIN, et al., | : : | CIVIL ACTION NO.: 06-6219(FSH) |
| Plaintiffs, | : : | |
| vs. | : : : | **CERTIFICATION OF DAVID A. MAZIE IN SUPPORT OF BEYE PLAINTIFFS' APPLICATION TO ALLOCATE COUNSEL FEE AWARD AND FOR REIMBURSEMENT OF EXPENSES TO MAZIE SLATER KATZ & FREEMAN** |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, INC., et al., | : : : : : | |
| Defendants. | : : : | |

DAVID A. MAZIE, hereby certifies as follows:

1.     I am a partner with the law firm of Mazie Slater Katz & Freeman, LLC ("Mazie Slater"), attorneys for Dawn Beye and Christine Byram (the "Beye Plaintiffs"). I make this certification in support of Mazie Slater's application to allocate the counsel fee

award in this matter, and for reimbursement of litigation expenses to Mazie Slater.[1]  I make this certification on personal knowledge.

2.      As the Court is aware, these two companion class actions, the Beye Action and the Drazin Action, involve claims against Horizon Blue Cross Blue Shield of New Jersey, Inc. ("Horizon") and Magellan Health Services, Inc.[2] for defendants' violations of New Jersey's Mental Health Parity Law, N.J.S.A. 26:2J-4.20 (the "Parity Law").  The Parity Law requires New Jersey health insurers to provide benefits for biologically based mental illnesses ("BBMI's") on the same level with any other sickness or illness. Although defendants have these legally mandated Parity Law obligations, they systematically and continuously breached those obligations to Horizon's insureds by refusing to provide parity benefits for the treatment of eating disorders.

3.      Pursuant to Court Order, the Beye Action was effectively consolidated with the Drazin Action for all pre-trial proceedings.  In fact, no discovery could take place -- or be scheduled -- without Mazie Slater and Nagel Rice first conferring on the scheduling. (See Orders dated February 15, 2008 and June 19, 2008, attached hereto as Exhibits "A" and "B").  Following the completion of all fact discovery and after the Beye Plaintiffs served all of their liability and damage expert reports, Nagel Rice engaged in surreptitious negotiations with the defendants, resulting in a proposed settlement on behalf of the class.

4.      The Court subsequently granted preliminary approval to the proposed settlement and provisionally certified the settlement class with Nagel Rice designated as

---

[1]      This application presumes that the Court has granted final approval of the settlement of these consolidated class actions.

[2]      The Beye Plaintiffs sued defendants Magellan Health Services, Inc., Green Spring Health Services, Inc., Magellan Behavioral Health, Inc., and Magellan Behavioral Health of New Jersey, LLC, (collectively "Magellan") as the exclusive administrator of managed mental health care benefits for Horizon to the Managed Care Service Agreement ("MCS Agreement") between the defendants.

provisional settlement class counsel. The Court also directed Mazie Slater to file its brief and other submissions by April 7, 2009 in support of its application for an allocation of the counsel fee award, as well as for reimbursement of out-of-pocket litigation expenses. The Court further ordered that the fee allocation dispute between Mazie Slater and Nagel Rice would be addressed at the time of the final approving hearing, currently scheduled for April 21, 2009.

**A.     Mazie Slater Led the Prosecution of these Consolidated Class Actions from their Inception Through the Completion of Discovery and Until the Drazin Parties Announced their Settlement**

5.     Mazie Slater took the lead in prosecuting these cases from the time that it filed the first eating disorder class action lawsuit against Horizon on behalf of the Beye Plaintiffs on November 8, 2006, and throughout the entirety of the case.[3]

6.     Mazie Slater's involvement over the past two years has been pervasive. All fact discovery on these cases was completed as of July 18, 2008.

7.     Mazie Slater's request for at least 50% of the net counsel fee award is warranted given the substantial work we performed on this matter through the time of settlement. The following summary highlights the significant benefits Mazie Slater contributed to the case that led to its settlement:

- Mazie Slater was the first to develop the theories against the Magellan entities and to add them as defendants on October 30, 2007. Five weeks later, on December 10, 2007, Nagel Rice followed Mazie Slater's lead when it added the Magellan defendants to its case.

---

[3] Nagel Rice filed their complaint over one month later on December 26, 2006.

3

- Mazie Slater was the first to secure discovery from Magellan through service of an extensive subpoena duces tecum. Nagel Rice subsequently served a nearly identical subpoena. The only changes were the names of the plaintiffs. In all other aspects, the Drazin subpoena was identical to the Beye subpoena.

- Mazie Slater secured more than 100,000 pages of documents and multiple complex large claims data sets covering every aspect of the case. The claims data sets were produced **solely** in response to our firm's uniquely crafted comprehensive data demand that was based on our extensive knowledge of Horizon's claims processing systems obtained through years of litigation with Horizon in other class actions. Nagel Rice **never** prepared their own claims data demands, merely joining Mazie Slater's demands. These data sets were absolutely essential to calculate and prove damages, and to establish that this action should be maintained as a class action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d).

- Mazie Slater was the **only** law firm to procure and serve damage expert reports based on the claims data. The expert reports of Professor Thomas McGuire, Ph.D. of Harvard University and Professor Anthony LoSasso, Ph.D. of the University of Chicago are attached hereto as Exhibits "C", "D", "E" and "F". Because the deadline for the plaintiffs to serve such expert reports expired prior to the announcement of the proposed settlement, Mazie Slater's experts would have been the only damages experts to testify on plaintiffs' behalf at trial.

- On the key issue in this case -- whether eating disorders are BBMI's -- Mazie Slater retained four of the world's most renowned eating disorder experts,

4

Professor Michael Strober, Ph.D. of UCLA, Dr. Wade Berrettini, M.D., Ph.D. of the University of Pennsylvania, Professor Kelly Klump, Ph.D. of Michigan State University and Professor Walter Kaye, M.D of the University of Pittsburgh. Given the various facets to establishing whether eating disorders are BBMI's within the meaning of the Parity Law, Mazie Slater selected the leading experts from four (4) different scientific and medical disciplines: genetics, heritability, neuroimaging, and the etiology and treatment of eating disorders. Moreover, Professor Klump was the lead author of the **only** peer-reviewed article to address whether eating disorders are BBMI's. This is significant as this was the **exact issue** to be decided in this case. Copies of these expert reports are attached hereto as Exhibits "G", "H", "I" and "J".

- Mazie Slater arranged for and took the deposition of Harry Brandt, M.D. This was a significant deposition as Dr. Brandt is the only eating disorder expert who defendants ever consulted with as to whether eating disorders are BBMI's. It was only through Mazie Slater's efforts that plaintiffs were able to establish that Dr. Brandt has always held the opinion that eating disorders are BBMI's -- an opinion which the defendants ignored in formulating their policy that eating disorders are non-BBMI's. I traveled to Baltimore, Maryland to take the deposition.

- Mazie Slater took the lead in compelling the defendants to identify all information that they relied upon in determining that eating disorders are non-BBMI's. These materials were crucial in establishing that the defendants acted

5

arbitrarily and without any scientific basis when they determined that eating disorders are non-BBMI's.

- Mazie Slater took the lead on most of the other critical merits depositions. In addition to Dr. Brandt, the other important depositions we took the lead on were of Stanley Harris, M.D. (the Horizon representative who was responsible for formulating all of Horizon's policies on eating disorders); Dr. Elizabeth Rody (the Magellan representative who was responsible for developing Magellan's eating disorder policy recommendations to Horizon; this deposition took place in San Francisco, and no representative of Nagel Rice was physically present at the deposition); and Dr. Anna Baez, the head of Horizon's Member Appeal Committee. In all, Mazie Slater attended the depositions of approximately 25 witnesses over a period of approximately 30 days.

- Mazie Slater attended depositions in different parts of the country. I personally traveled to depositions in San Francisco, California; Wilmington, Delaware and Baltimore, Maryland. Significantly, **no partner** from Nagel Rice ever attended **any depositions** in this case.

- Mazie Slater is the only law firm to oppose defendants' motions to dismiss on the grounds that this Court lacks Federal CAFA jurisdiction and supplemental jurisdiction under 28 U.S.C. §1367. In contrast, Nagel Rice did not oppose these motions and, in fact, consented to "remand" to state court.

- Mazie Slater was the only law firm to proceed with a B2 non-ERISA claim for future damages and injunctive relief, and Dawn Beye was the only plaintiff with such standing. Nagel Rice had no such plaintiff, and it conceded that it

6

was not asserting any such claims. This is significant as most of the value of the proposed settlement (in light of the new federal law affording parity to ERISA plans) is for **future** insurance coverage for non-ERISA insureds. One of the Beye Plaintiffs' damages experts, Professor McGuire of Harvard, valued these amounts. (See Exhibit "D").

- Mazie Slater was instrumental in raising dozens of disputes over defendants' failure to provide discovery as well as to resist defendants' efforts to obtain discovery which was not permitted under the Federal Rules. These were very involved discovery disputes, each of which took substantial time to prepare for submission to the Court. As a result of Mazie Slater's efforts, the Court entered numerous discovery orders in plaintiffs' favor.

- Mazie Slater led the successful effort to prevent Horizon from taking independent medical examinations ("IME's") of the minor ERISA beneficiaries. Some of the representative plaintiffs were so fearful of IME's that they would have dropped out of the lawsuit if compelled to submit.

- Mazie Slater led the successful effort to prevent the defendants from deposing the minor beneficiaries. It obtained certifications from four (4) different providers who stated that it would be devastating to the minor beneficiaries if they were deposed. Copies of the respective certifications are attached hereto as Exhibit "K". By contrast, Nagel Rice only filed a 3 page letter, unsupported by any certifications, which duplicates all of the arguments raised by Mazie Slater.

- Mazie Slater led the successful effort to prevent the defendants from obtaining the minor beneficiaries' private diaries and other writings. We obtained certifications from various providers who stated that it would be devastating to the minor beneficiaries if they were compelled to provide these materials. (Copies of the respective certifications are attached hereto as Exhibit "K"). By contrast, Nagel Rice **_did not submit any_** such certifications on behalf of their clients to resist the defendants' efforts.

8.     Through depositions, our law firm was able to establish that between 1999 (the time the Mental Health Parity Act was passed) and 2006 (when the Beye lawsuit was filed), Horizon and Magellan only consulted with one expert in eating disorders regarding whether or not eating disorders are BBMI.   (See Deposition of Lawrence Nardozzi ("Nardozzi Dep.") at 61:8-12 attached hereto as Exhibit "L").   However, that one expert, Dr. Harry Brandt (a non-party witness Mazie Slater alone located and subpoenaed), expressly testified that his opinion since the mid-1980s has been that eating disorders are BBMI. This was brought out through our questioning of the witness:

> Q.     Did you have -- prior to your interactions with Dr. Nardozzi in or about the summer of 2006, did you hold opinions as to whether or not eating disorders were biologically based mental illnesses?
>
> A.     Yes.
>
> Q.     And that's what you testified to earlier?
>
> A.     Correct?
>
> Q.     And it was your -- it was your opinion as of that time eating disorders were in fact biologically based mental illnesses?
>
> A.     Yes.

8

MR. FLYNN: Objection as to form.

Q.   Is that correct?

A.   Yes, that's been my longstanding opinion since the mid-1980's.

Q.   And have you shared that opinion with others since the '80's?

A.   Oh, yes. Every time I lecture about eating disorders.

Q.   And do you currently hold that opinion?

A.   Yes, I do.

Q.   And do you continue to share that opinion with others?

A.   There's a segment in my survey lecture on eating disorders that I give at medical schools, that I give for various groups about eating disorders, and there's a whole section delineating my view on the biological underpinnings of eating disorders.

(See Deposition of Harry Brandt ("Brandt Dep.") at 69:10-70:17 attached as Exhibit "M" hereto).

9.       Mazie Slaer was also able to uncover through our questioning that the defendants failed to find any medical or scientific literature that supports their position. Dr. Nardozzi, Magellan's Chief Medical Officer, conceded this:

Q.   Have you ever found a medical study that has expressly stated that there is not a genetic component to eating disorders?

A.   Not that I recollect.

Q.   What is the reason that Magellan has specifically determined that eating disorders are not biologically-based?

9

MR. FLYNN:  Objection as to the form.

A.   My involvement in this with regards to the issue, again, has been on the construction of the position paper whose conclusion is that the etiology is multifactorial.

Q.   Okay.  Is there any other reason why Magellan has determined that eating disorders are not biologically-based?

A.   Not to my knowledge.

(See Nardozzi Dep. at 122:25-123:15 attached as Exhibit "L" hereto).

10.     It was Mazie Slater that established that Dr. Nardozzi was formulating defendants' position on this subject, even though he is not an expert in eating disorders. For example, he admitted that eating disorders never made up more than 1% of his own personal medical practice. (Nardozzi Dep. at 155:5-7). In fact, Dr. Nardozzi admitted that there is medical literature concluding that there may be a genetic component to eating disorders. (Nardozzi Dep. at 88:5-8). He also admitted that he had never performed any research on eating disorders, and only listed three sources in the footnotes to the position paper that he drafted. (Nardozzi Dep. 156:13-25; 158:3-16).  However, none of the three items that he cited in his position paper address whether eating disorders are BBMI.  This was brought out through our questioning of the witness.

11.     Similarly, it was Mazie Slater that took the lead in deposing Stanley Harris, M.D., the primary person at Horizon who made the decision on the ultimate BBMI/non-BBMI policy.  Dr. Harris admitted during my questioning that he is not an expert in eating disorders.  (See Deposition of Stanley Harris, M.D. ("Harris Dep.") at 28:4-9 attached as Exhibit "N" hereto).  Like Magellan, Dr. Harris admitted to me that Horizon performed

absolutely no review of any medical or scientific literature to determine its policy on eating

disorders, nor consulted with any experts:

> Q.    Okay. Fair to say that from 1998 through 2006,
>        Horizon did not on its own review any medical or
>        scientific literature to determine whether or not eating
>        disorders are biologically-based mental illnesses?
>
> A.    Not that I recall.
>
>
>        (Harris Dep. 48:14-19).
>
>                                    *        *        *
>
> Q.    And you're not aware of anyone at Horizon who
>        sought any outside expertise from any scientist or
>        physician or any other expert between the time 1998
>        until the time of the newspaper article in 2006 to
>        evaluate Horizon's policy in determining whether or
>        not eating disorders are biologically-based?
>
>        MR. JAY: Objection to form. It is compound. You
>        could go ahead.
>
> A.    Not that I'm aware of.

(Harris Dep. 58:19-59:3).

In short, Mazie Slater was able to establish that Horizon and Magellan prepared a self-

serving policy without the support of <u>any</u> expert or the support of <u>any</u> scientific or medical

research.

12.    In addition, it is beyond dispute that it was Mazie Slater that solely

established the scope and value of the Class's damages claims. As noted above, only our

law firm served damages expert reports and, thus, only our law firm had damages experts

who would have testified at trial.   The nationally recognized health economists we

retained, Professors McGuire and LoSasso -- and the professional computer programmer

we retained to assist them -- each prepared two reports: the first to establish CAFA's monetary jurisdictional threshold and the second to calculate aggregate Class damages for purposes of trial. (Exhibits "C", "D", "E" and "F").

13.     In their CAFA reports, Professors McGuire and LoSasso conservatively estimated the amount in controversy to be $75.27 million. In doing so, our experts utilized the very same data that defendants relied on, even though, as our experts pointed out, this data understated the actual past damages. For example, in comparing the electronic data produced by defendants with paper records involving specific claims the data ostensibly were supposed to capture, Professor LoSasso observed that there were "inconsistencies in the data suggest[ing] the potential for undercounting of the actual extent of claim values associated with exhaustion of benefits in treating eating disorders." (Exhibit "E" at 4). Furthermore, in estimating the lower bound compensatory and injunctive relief damages component under CAFA to be $19.3 million, Professor McGuire succinctly noted in his report: "[e]conomic damages to class members are the difference between what insurance benefits members would have received had eating disorders been covered at parity with BBMIs and what was actually paid when eating disorders were covered as non-BBMI." (Exhibit "C" at 5). Citing to the economic literature, Professor McGuire continued:

> It is well-established in the literature on economics and mental health that utilization of inpatient and office-based mental health care goes up when coverage improves. Indeed, the "demand response" to coverage and mental health care is generally regarded to exceed the demand response for other forms of health care. A full estimate of damages must take account of the utilization and insurance benefits that would be paid in response to expanded coverage. Claims denied for exhaustion miss damages of this form. (Id. at 6 (footnotes omitted)).

14.     In their Class damages reports, our experts again began their assessment by analyzing the incomplete and flawed claims data produced by defendants.  They then calculated class damages utilizing a novel methodology developed for this litigation that employed both economic and statistical principles and benchmarks.  In doing so, Professor McGuire concluded:

> First, data on claims denied for exhaustion can be used to assess _some_ of the damages to _some_ of the class members damaged.  Damages estimated based on claims denied for exhaustion thus constitute a _lower bound_ of actual damages in this case.  For the period November 1, 2000 through 2007, damages from claims denied for exhaustion amount to $1.18 milllion.

> Second, the paid claims data file from Horizon can be used to assess a more comprehensive measure of damages for inpatient and outpatient users in nonparity plans.  For 2008, I assess these damages to be $2.4 million.  Over the years 2008 through 2023, damages total $82.9 million dollars. (Exhibit "D" at 4-5).

15.     Horizon and Magellan were served with our damages reports before any settlement was announced and the figures and analysis arrived at by our experts was certainly a substantial impetus to pushing defendants to settle the case.

**B.     In Representing the Class, Mazie Slater Devoted Over 3,200 Hours of Professional Time by 10 Different Attorneys, Including Two Senior Partners, and Incurred Almost $250,000 in Unreimbursed Litigation Expenses**

16.     Over the past two years, Mazie Slater devoted extensive resources to this class action.  From inception of the litigation until the proposed settlement was submitted to the Court, ten different lawyers worked on this case, billing 3,230 hours.  Significantly, 502 hours were billed by David A. Mazie, a senior partner in the law firm; 734 hours were billed by Eric D. Katz, a senior partner in the firm; and 1,434 hours were billed by Beth

Baldinger, senior counsel who has been practicing for over twenty (20) years. This equates to $1,322,628 in billable time (utilizing our current billing rates) or $1,260,451 in billable time (should the Court employ our historical rates in effect as of the date the services were rendered). A true and correct copy of Mazie Slater's billing records through November 21, 2008, including Fee Summary Using Current Billing Rates is attached hereto as Exhibit "O". In addition to the substantial hours, Mazie Slater has reasonably incurred $249,671 in out-of-pocket disbursements in litigating this matter. A true and correct copy of a breakdown of these reasonable and necessary out-of-pocket disbursements for, inter alia, expert fees, Westlaw research, deposition transcript costs, court fees, travel expenses, and medical record acquisition, is attached hereto as Exhibit "P". Our vigorous litigation of these cases required a substantial outlay of manpower and expenses which not only allowed us to aggressively litigate this matter, but which also diverted valuable resources from other matters handled by our office.

17. Our law firm is one of the leading plaintiffs' law firms in the state and our fee applications have been regularly approved by the Superior Court, Law Division. In addition, on our contingency matters we regularly obtain several multiples of our hourly rates. Consequently, our hourly rates are reasonable.

**C. The Drazin Parties Engaged in Secretive "Reverse Auction" Settlement Negotiations Without Mazie Slater's Knowledge or Involvement**

18. As we have previously advised the Court, at no time was our law firm ever apprised of settlement negotiations between the parties, let alone invited to participate. That Nagel Rice and defendants would conduct secretive, clandestine settlement negotiations while putting up a phony front of continuing to aggressively litigate the case along with our firm is curious at best. Most significantly, these negotiations constituted

14

the quintessential "reverse auction" scenario where the defendants chose to negotiate with only one plaintiffs' law firm because they thought they could strike a better deal. There can be no real dispute, however, that a significant factor driving the settlement was the aggressive manner in which Mazie Slater led the litigation of this case.

19.    The class action case law is long settled that Courts loathe "reverse auction" negotiations, and it is respectfully requested that this Court not compensate Nagel Rice a greater allocation simply because it was the signatory to the settlement and thus designated settlement class counsel at the preliminary approval stage, <u>after all the discovery work was already completed</u>.

**D.   Settlement Benefits Added to the Drazin Agreeement Following Mazie Slater's Objections to the De Vito/Aetna Settlement**

20.    It is significant to note that although Mr. Nagel and Horizon engaged in surreptitious negotiations and never once requested Mazie Slater's involvement or input, the parties nonetheless adopted and incorporated into the Drazin settlement agreement key recommendations we alone raised when our clients objected to the then proposed <u>De Vito/Aetna</u> settlement during the June 2008 preliminary approval stage.

21.    First, Mazie Slater argued that the Aetna settlement failed to account for the fact that "most families never submit claims after pre-authorization for in-patient treatment is denied because they know these claims will never get paid." (June 2, 2008 letter from Mazie Slater to Judge Hochberg ("Aetna Objection") at 4, attached hereto as Exhibit "Q"). During oral argument at the preliminary approval hearing, my partner Eric Katz expanded on this issue, stating that Class Members who did not previously submit claims for reimbursement because it would have been futile to do so should now be afforded the opportunity, as part of any settlement, to submit a proof of claim form in order to be

reimbursed from the settlement fund. (6/24/08 Court Transcript at 51:8-53:14, attached hereto as Exhibit "R").

22.     Mr. Nagel and Horizon heeded this recommendation and, consequently, incorporated in the proposed Drazin settlement agreement provisions that broaden the definition of the Class to include any member who "had such claims during the Class Period but did not have them submitted, and where if such claims would have been submitted, benefits would have been denied or limited" because of non-BBMI limitations. (Proposed Drazin agreement at page 2, Definition of "Class"). Furthermore, these Class Members will now have the chance to submit a claim form seeking reimbursement as part of the "Supplemental Unsubmitted Claims Fund." (Id. at ¶¶1.3 and 2.3).

23.     Second, Mazie Slater argued that the Aetna settlement failed to contain an independent "enforcement mechanism" that would "protect class members should a dispute arise as to the amount of reimbursement determined by Aetna." We were troubled about the impropriety, perceived or real, when the "defendant itself . . . decide[s] how much it should pay and if it did so correctly." We were also apprehensive because Class Members would only be able to challenge the carrier's payment decisions after the fact, through binding arbitration, where the insureds would have to retain counsel at their own expense. (Aetna Objection at 7, attached hereto as Exhibit "Q").

24.     In response, the Drazin parties have listened to our concerns and included provisions that now require the joint selection of an independent "Settlement Administrator" responsible to "oversee" the disbursement of settlement funds to Class Members from an "Escrow Account." (Proposed Drazin agreement at Article 1). In addition, Class Members will now be afforded the opportunity to submit claim forms to the

16

Settlement Administrator, during the settlement process, seeking additional compensation from a "Supplemental Submitted Claims Fund." (Id. at ¶2.2).

25.    At the preliminary approval hearing for the Drazin settlement, defense counsel commented on these "important" improvements and the "key areas" that make the settlement of these consolidated eating disorder coverage actions "more comprehensive" than the De Vito settlement:

> [THE COURT]  With that we can begin.  I'm going to ask not Mr. Nagel or any of the plaintiffs counsel, I'm going to ask Mr. Sellinger to state what settlement the defendants are seeking preliminary approval of.
>
> MR. SELLINGER:  Your Honor, the --
>
> THE COURT:  And to state briefly its terms and how, if at all, it differs from the settlement I gave preliminary approval to in DeVito versus Aetna.
>
> MR. SELLINGER:  Your Honor, Horizon and Magellan reached a settlement with the Drazin plaintiffs covering the entire class, the class covers Horizon insureds who were denied coverage on the basis of a non-BBMI, as well as medical necessity.  The settlement provides for a fund to cover the denials or disallows for the non-BBMI claims.
>
> It also provides, and that's similar to the Aetna settlement.  It also provides, unlike the Aetna settlement, for two additional funds.
>
> One is a -- a supplemental fund to the extent that the dollars that are put into a fund to pay those who were denied BBMI benefits, to the extent that they claim that they have benefits denied in excess of those provided for in the settlement agreement, there is a supplemental fund to cover them, and there's a separate supplemental fund for unsubmitted claims also, unlike the Aetna agreement, whereby class members who did not submit claims because, for example, they believed they had already exceeded their limits, that they would be allowed to submit a claim with respect to that fund as well.

      \*      \*      \*

THE COURT: All right.

Does Magellan -- is it the same -- does Magellan wish to separately add anything that's in the settlement that it believes it is asking the court for preliminary approval on?

MS. SOOY: No, Your Honor. We agree with everything Mr. Sellinger has just laid out for you.

The only thing I would add, one other difference that I think is important, is that our settlement provides for an outside third-party settlement administrator to receive the claim forms, to process them and to make the payments to the class members, and in the Aetna situation, I think most of that was handled by the plaintiffs lawyers. So that's another important difference that was think provides some additional benefit protection to the class members. (See January 7, 2009 Transcript of Proceedings, at 5-6, attached as Exhibit "S" hereto).

26.    In short, although Mr. Nagel and Horizon intentionally cut Mazie Slater of the settlement process, they nevertheless fully considered our legitimate criticisms of the earlier Aetna settlement and have adopted our proposals designed to enhance the benefits offered to Class Members.

**E.    Mazie Slater and Its Lawyers are Experienced Class Counsel**

27.    Mazie Slater and/or its lawyers have been appointed Class Counsel in various matters and, most importantly, in three significant health care class actions, including two against defendant Horizon: Sutter, M.D. v. Horizon, (Docket No. ESX-L-3685-02) (60,000 physician class); Kirsch, D.D.S. v. Horizon, (Docket No. ESX-L-4216-05) (8,000 dental provider class); and Sutter, M.D. v. Oxford Health Plans (American Arbitration Association Case No. 18 193 20593 02) (20,000 physician class). The Sutter/Oxford matter is one of the first of its kind in United States history to be certified as

18

a class action in arbitration. Mazie Slater and/or its lawyers have also litigated other types of class actions: Kampf v. Comcast, Superior Court of New Jersey, Essex County, Docket No.: ESX-L-9194-97 (class action involving a class of approximately 60,000 Comcast subscribers who challenged a change in the cable services. The class was certified and the court approved the settlement of this matter); Bartz Michalski Trust, et al. v. Mark D. Fishman, et al., United States District Court, Northern District of Alabama, Civil Action No.: cv9802407 (where we were co-lead counsel in class action involving allegations of fraud, negligence and securities violations in a private offering of stock); and In Re International Nesmont Securities Litigation Lorraine Derensis, et al. v. Coopers & Lybrand Chartered Accountants, et al., Docket No. 94:4202 (WGB) (where we represented an intervenor in a securities class action in connection with the settlement and related issues).

28.     As with these consolidated eating disorder health care class actions, the three Sutter/Horizon and Kirsch/Horizon provider health care class actions identified above concern similar automated claims processing improprieties that occurred on the same claims processing platforms and systems.  Specifically, all of these cases involve the rejection of professional services submitted for reimbursement through the use of policies and software designed to limit benefits.

29.     In all of the health care class actions in which Mazie Slater and/or its lawyers have been Class Counsel, we have expended many thousands of hours of attorney time and litigated several issues of first impression.  The discovery in these cases has involved state-of-the-art electronic claims data discovery and the review of millions of pages of documents.  We applied all of these very same resources and expertise to the litigation of these consolidated eating disorder cases.

19

The following is a summary of the experience of our attorneys who had extensive involvement in every aspect of this consolidated eating disorder litigation.

### David A. Mazie

30.     I have been a Certified Civil Trial Attorney since 1996, a distinction held by less than 2% of New Jersey attorneys, and have tried dozens of jury and bench trials. I am experienced in complex litigation and have numerous jury verdicts and settlements exceeding $1 million, including the landmark $135 million liquor liability verdict against Aramark, which is the largest personal injury verdict in New Jersey history. The Appellate Division subsequently reversed the jury's verdict and the case was thereafter settled for $26 million. I have tried numerous cases to conclusion, and I have not lost a trial in over ten years. In addition to the Verni v. Aramark case, my recent accomplishments include a $15.75 million audit malpractice settlement, a $12.5 million wrongful death jury verdict, a $7.25 million actuarial malpractice settlement, and a multi-million dollar Lasik malpractice case which is believed to be the largest Lasik malpractice recovery in New Jersey history. I also litigated and settled the Earl Faison police brutality case, which was described by the Star Ledger as the most infamous police brutality case in New Jersey history.

31.     In addition to the representation of private clients, over the past twenty years I have represented the New Jersey Commissioner of Banking and Insurance as liquidator of several failed insurance companies, handling numerous multi-million dollar commercial litigations on the Commissioner's behalf. I have also acted as special counsel to the federal government (the RTC and FDIC) in several multi-million dollar professional liability lawsuits arising out of a number of failed banks and savings and loans.

32.     I have numerous reported decisions, many of which have changed the law:

Ravin, Sarasohn v. Lowenstein Sandler, 365 N.J. Super. 241 (App. Div. 2003); Taglieri v. Moss, 367 N.J. Super. 184 (App. Div. 2004); Reynolds v. Guard Dogs Unlimited, Inc. 325 N.J. Super. 298 (App. Div. 1999); Nubenco Enterprises, Inc. v. Inversiones Barberena, S.A., 963 F.Supp. 353 (D.N.J. 1997); Integrity Insurance Co. v. Teitelbaum, 245 N.J.Super. 133 (Law Div. 1990); In Re: Integrity Insurance Company, 193 N.J. 86 (2007); Resolution Trust Corp. v. Edie, 1994 WL 744672 (D.N.J. Oct. 4, 1994); Resolution Trust Corp. v. Castellett, 1994 WL 411809 (D.N.J. Aug. 2, 1994); Resolution Trust Corp. v. Castellett, 1993 WL 719763 (D.N.J., May 25, 1993); Ladner v. Mercedes-Benz of North America, Inc. 266 N.J. Super. 481 (App. Div. 1993); Home State Insurance Co. v. Continental Insurance Co., 313 N.J. Super. 584 (App. Div. 1998); Home State Insurance Co. v. Continental Insurance Co., 158 N.J. 104 (1999); In re Phenylpropanolamine (PPA), 2003 WL 22417238 (N.J. Super., July. 21, 2003); Fillebrown v. Steelcase, Inc., 63 Fed Appx. 54, 2003 WL 1191162 (3d Cir. 2003); Verni v. Harry M. Stevens, et al, 387 N.J. Super. 160 (App. Div. 2006); Liss v. Federal Insurance Co., 2006 WL 2844468 (App. Div. 2006); Clark v. University Hospital/UMDNJ 390 N.J. Super 108 (App. Div. 2006); New Jersey Eye Center v. Princeton Ins. Co., 394 N.J. Super. 557 (App. Div. 2007); Verni v. Lanzaro, 404 N.J. Super. 16 (App. Div. 2008).

33.    I have been named to the Best Lawyers in America numerous times, and I personally received the most votes of any New Jersey trial attorney in the 2005, 2006 and 2007 Super Lawyers rankings. I have also been named multiple times to the Lawdragon 500 top plaintiff's attorneys in the country. In 2005, the New Jersey Law Journal named me "Lawyer of the Year" for my various achievements as a trial attorney.

### Eric D. Katz

34.     Mr. Katz, also a Certified Civil Trial Attorney, concentrates his practice in managed care, class action, ERISA and provider law.  He has been voted a New Jersey Super Lawyer annually since 2007 in the area of class action law and has been designated a Lawdragon, as one of the top 3000 plaintiff's attorneys in the United States.  In 2004, Mr. Katz was appointed litigation Class Counsel by the Superior Court in Sutter/Horizon, and in 2005 he was appointed litigation Class Counsel by the Superior Court in the Kirsch/Horizon matter.  In 2007, Mr. Katz was appointed settlement Class Counsel by the Superior Court in the Sutter/Horizon matter.  In all three instances, Horizon never once disputed that Mr. Katz had the qualifications and experience to represent the Classes.  In addition, in 2005 Mr. Katz was appointed Class Counsel by the American Arbitration Association in the Sutter/Oxford class arbitration (one of the first certified class-wide arbitrations in the country following the United States Supreme Court's decision in the landmark arbitration case of Green Tree Financial).

35.     Mr. Katz has provided counsel to a number of specialty medical organizations, including the American Academy of Pediatrics and the American Medical Association.  In 2002, he was appointed to the New Jersey Joint Negotiation Unit for Physicians for Responsible Negotiation.  This appointment was made at the request of the Medical Society of New Jersey.  The purpose of the Unit was to recommend protocols to be utilized by New Jersey physicians when engaging in collective bargaining negotiations with the managed care industry under the auspices of the State Attorney General pursuant to the New Jersey Joint Negotiations Law enacted in January 2002.

22

36.     In addition to his complex litigation and class action experience, Mr. Katz is

a recognized published authority in this state on the subjects of product liability and toxic

tort law, having co-written with Hon. William A. Dreier, P.J.A.D. (Ret.) and Hon. John E.

Keefe, P.J.A.D. (Ret.), the most-widely cited treatise on these areas of the law entitled

New Jersey Products Liability and Toxic Tort Law (published annually by Gann Law

Books). Since its initial printing, the treatise was adopted by the Administrative Office of

the Courts as a bench book on product liability and, for a number of years, was distributed

to the entire state judiciary on an annual basis. The Appellate Division and New Jersey

Supreme Court cite to the book regularly. To date, the treatise has been cited on twenty

(20) or more occasions in published opinions.

### Beth G. Baldinger

37.     Ms. Baldinger is an experienced trial attorney for over 20 years and has had

extensive experience in complex civil litigation. Ms. Baldinger has settlements and

verdicts in many cases in excess of $1 million, including the infamous Adam Katz case

against the New Jersey Sports and Exposition Authority for Mr. Katz's wrongful death and

a $10 million verdict for negligent security. Ms. Baldinger has the following published

opinions to her credit: Brennan v. Orban, 145 N.J. 282 (1996) and Aldrich v. Schwartz,

258 N.J. Super. 300 (App. Div. 1992).

38.     In sum, our law firm and its attorneys have demonstrated that we

represented the class vigorously and competently. We dedicated substantial manpower and

financial means toward the interests of the class and applied all of our skills and resources

to bring this litigation to a successful resolution. We therefore respectfully request that

Mazie Slater be allocated at least 50% of the counsel fee award and full reimbursement of

our our-of-pocket litigation expenses should the Court grant final approval to this settlement.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
DAVID A. MAZIE

Dated: April 7, 2009