September 17, 2007

Steven C. Krane, Chairman
Standing Committee on Ethics and Professional Responsibility
c/o George Kuhlman
Ethics Counsel and Associate Director
Center for Professional Responsibility
American Bar Association
321 North Clark Street
Chicago, Illinois 60610

To the Committee:

A troubling practice, whereby attorneys in contingency fee representations are negotiating their fees directly with settling defendants, is occurring with increasing frequency and on an increasing scale.[1] The potential ethical improprieties of this practice -- one that has now become commonplace in mass tort contingency fee representations[2] -- are clear and considerable, as are the

---

[1] While the 1998 Master Settlement Agreement (MSA) entered into between the tobacco companies and the states remains the best known example of counsel for claimants separately negotiating with the settling defendants or respondents for the amount and the manner of payment of claimant counsels' legal fees, this practice has been documented in the following newspaper and magazine articles. *See,* Alex Berenson, *Class-Action Lawyer's Fee Under Scrutiny*, N.Y. TIMES, March 12, 2003 (reporting on a $20 million fee paid by defendant to prominent class-action lawyer for brokering a settlement between his clients and the defendant); Margie Hyslop, *Md. Looks to Up Tobacco* Ante, WASHINGTON TIMES, Nov. 25, 1998 (reporting on lawyer Peter Angelos' intention to secure part of his 25% fee in negotiating Maryland's stake in the MSA directly from the tobacco companies); Adam Liptak, *Big Litigation Firm Found To Have Acted Unethically*, N.Y. TIMES, July 4, 2003 (reporting on a $36 million jury award against a prominent law firm for unethical conduct in a class action lawsuit.); Mike McKee, *Enriching the Record: FeeAward Leaves Justices Hungry for Answers*, *available at* http://www.law.com/jsp/article.jsp?id=1052440784047 (last visited Oct 2, 2003)(reporting on $16 million in legal fees that are to be divided among 50 class action law firms nationwide upon settlement of a suit against nutritional and vitamin supplement companies).

[2] *See generally,* John C. Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV.1343, 1355-67 (1995).

consequences of its continuation.  As a result, we believe that the Standing Committee's attention to this matter is warranted.

We write this letter in two capacities.  First, we write as members of the Bar and legal academics concerned with maintaining the integrity of the fiduciary relationship between attorneys and clients that is essential for an effective and meaningful adversarial legal system in this country.  We strongly believe, and ethics norms and rules mandate, that it is the obligation of every attorney, wherever and to the extent possible, to avoid conflicts of interest that undermine the fiduciary relationship between attorneys and clients and undermine the public's confidence in and respect for our profession.  Secondly, we write as and on behalf of taxpayers and citizens from whom substantial funds have been taken, well in excess of $15 billion in the tobacco cases alone, through a process that both in appearance and substance exemplifies the dangers inherent when claimants' counsel negotiate their fee payments with their adversaries' principals.  We submit that the Model Rules call for a *per se* ban on the practice; in the alternative, we believe that the Rules require steps that will curtail the practice's most ethically problematic dangers.

Regarding the practice, we present the following propositions for the Committee's consideration:

*Proposition 1*

In the absence of statutory authority, attorneys who seek recovery on behalf of clients or classes and negotiate for the direct payment of their fees by defendant adverse parties and/or their counsel do so in what, at a minimum, is a presumptive but rebuttable violation of their fiduciary duty to their clients; more preferably, such practice should be deemed *per se* unethical.

*Proposition 2*

In the absence of a *per se* ban against such agreements, attorneys should submit a reviewable, written submission to their clients demonstrating that no practicable alternative form of fee payment was available and that, in practice and in fact, counsel had been faithful to their clients' interests at the expense of their own.

*Proposition 3*

Any provision in such agreements that in any way limits, insulates or precludes judicial or ethics-based review of the propriety of the fees should be *per se* unethical.

## Proposition 4

More specifically:  It is *per se* unethical for plaintiffs' attorneys to agree to any provision in such agreements that in any way compromises the right of the clients or classes to recover fees deemed excessive or unethical by such review.

## Proposition 5

More specifically:  Any provision in such agreements that in any way makes the validity or enforceability of the agreements contingent on the payment of the fees negotiated between defendants and plaintiffs' attorneys should be *per se* unethical.

## Proposition 6

More specifically:  All such agreements should be expressed in terms of a single settlement sum payable to the plaintiffs from which the plaintiffs' attorney fees are to be deducted, and any representation that expresses or implies that payment by defendants of the plaintiffs' attorneys fees does not limit the recoveries of the plaintiffs should be unethical.

### RULES INVOLVED

- The Model Rules of Professional Conduct (Model Rules) are the governing set of ethical standards.[3]

    o  Model Rule 1.5(a) bars "unreasonable" fees.

    o  Model Rule 1.7 provides that:

    "(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if…

---

[3] The Model Rules are the governing standards of the ABA and have been adopted by more than 40 states. Model Rules are available at http://www.abanet.org (last visited May 11, 2007).  *See* Nathan M. Crystal, PROFESSIONAL RESPONSIBILITY: PROBLEMS OF PRACTICE AND THE PROFESSION, 10-13 (2d ed. 2000) (hereafter Crystal).

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; *and*

(4) each affected client gives informed consent, confirmed in writing."

o   Model Rule 1.8 provides in relevant parts:

"(f) A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client gives informed consent;

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by Rule 1.6 . . . ."

## DISCUSSION

Consider an example that goes to the heart of the issue.  An attorney comes to her client and indicates that she has received a settlement offer in the amount of $100,000.  Having hoped for a higher recovery, the client expresses his

- 4 -

disappointment, especially considering that his net recovery after the contingency fee will be two-thirds of that amount.  The attorney tells the client that he should not be concerned with the fee because she and the defendant's insurance company have privately negotiated an agreement establishing the size and mode of payment of her fee, so that the client will not have to pay any fee at all.  "It's all been taken care of by me and the defendant," the attorney tells her client.  "There's nothing for you to worry about."  Clearly, the client in such a scenario does have something to worry about, and will and should be less confident in his attorney's loyalty to him.

Such cases are occurring with increasing frequency and upon a dramatically increasing scale, with the legal stakes often totaling millions and even billions of dollars.[4]  The problem is amplified in the class action context where the class is even more dependent on the judgment of the attorney when it comes to accepting the terms of a settlement.  "Within the context of negotiating for a common fund settlement on behalf of a class, class counsel would have a direct conflict with the class in negotiating for or accepting the defendant's offer for a specific fee award to be paid by the settling defendant, simultaneously with negotiating for a sum for a common recovery for the class.  Class counsel would be placed in the position of wearing two hats with contrary interests . . . ."[5]  Failure to police the ethical violations inherent in these arrangements undermines public confidence in the Bar as well as the ability of attorneys to offer their undivided loyalties to their clients.  As a result, the appearance of impropriety is now commonplace, and in many cases clients may not be represented adequately by counsel.  Attorneys, particularly those in class actions, clearly appear to have come more and more -- and to be seen by the public as coming more and more -- to represent their own interests rather than the interests of their clients.[6]

Although we significantly focus in this submission on the problems raised in the tobacco MSA settlements, we do so only because they constitute paradigm examples of the problems of ethics observance and monitoring that we believe increasingly endemic.[7]  The negotiations that led to the tobacco case MSA

---

[4] *See, supra* note 1.

[5] Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS, § 15.31 (3d ed. 1992). We note that the conflicts of interest occur whether the client is a class or an individual.

[6] *See, e.g.,* text and notes at footnotes at pp. 10, 23-28.

[7] *E.g. Ortiz v. Fibreboard Corp.,* 119 S. Ct. 2295 (1999). (Inviting Congress to deal with asbestos case settlements, in part because "the interests of the parties ostensibly represented in the negotiations" may be hindered by "the potential for gigantic fees." *Id.* at 2317). *See also* Lester Brickman, *Ethical Issues in Asbestos Litigation,* 33 HOFSTRA L. REV. 833, 840-843 (2005) (hereafter, *Ethical Issues*).

settlement go to the heart of the issues we raise in this submission.  In the MSA settlement, the tobacco industry and the plaintiffs' attorneys fixed the latter's fees and thereby gave rise to what at a minimum were appearances that led sophisticated observers to claim, on clearly colorable bases, that collusion and unethical practices permeated the MSA agreement and its settlement process. Note, for example, the comments of Joseph Califano, a distinguished attorney and former Secretary of Health and Human Services, in an article entitled *Tobacco: The Moral Issues:*

> The most sordid piece of money-changing in the temple of the American bar is the side deal – kept secret for months – that plaintiffs' lawyers crafted with the tobacco companies they sued.  Normally, defendants in a class action suit raise hell about the fees that plaintiffs' lawyers try to charge them.  But not Big Tobacco.  To get their sweetheart deal, the companies signed on the dotted line promising plaintiffs' lawyers not to "take any position adverse to the size of the fee award requested."  Big Tobacco even promised not to "express an opinion if asked" about the fees.  This side deal helps explain why lawyers, hired to represent states, sold out their colleagues at the plaintiffs' bar by agreeing to the prohibition against future class actions.[8]

In a profession where appearances are matters of fundamental concern to the Bar's ethics rules and norms,[9] the above comment makes clear why fee arrangements similar to those entered into in the tobacco MSA merit the consideration of, and action by, the Committee.

*****

A fundamental premise of the American legal system is that lawyers must be undividedly loyal to their clients' interests, even above their own.[10]  That is,

---

[8] Joseph A. Califano, *Tobacco: The Moral Issues*, THE NATIONAL CATHOLIC WEEKLY, Aug. 15, 1998, *available at* http://www.americamagazine.org/articles/tobaccoCalifano.cfm (last visited May 20, 2007).

[9] *E.g.*, Canon 9, MODEL RULES OF PROFESSIONAL RESPONSIBILITY.  *See also* EC 9-6.

[10] Newberg & Conte, *supra* note 5, §15.03 ("[A]ttorneys . . . seeking to represent the class assume fiduciary responsibilities to the class . . .") (quoting MANUAL FOR COMPLEX LITIGATION, §30 (2d ed. 1985)). Crystal, *supra* note 3, at 2-4. In the class action context, this means that the attorney is a fiduciary of the entire class.

attorneys are fiduciaries of their clients.  This is an uncontested state of affairs,[11] one that generally exists "as a matter of law," and was recently reiterated by the ABA in its Formal Opinion 06-438 regarding Model Rule of Professional Conduct 1.8(g).[12]  It is the duty of attorneys under fiduciary principles, the law of agency, and the rules of ethics to achieve the best possible results for their clients.  Through this mechanism, the basic structure of lawsuits in an adversarial system is established and maintained—a plaintiff has a dispute with another party, hires an attorney for representation, and brings a claim against that party.  For the justice system to resolve the dispute properly the attorneys for each party cannot act on their own behalves nor on behalf of adversarial interests; instead, attorneys must act only on behalf of their clients, and are charged with doing their utmost to resolve the dispute in their clients' favor.  Anything that interferes with the relationship between attorneys and their clients thus strips it of the public trust that the Bar must enjoy and, in fact, damages the ability of the system to resolve disputes properly and hinders its capacity to achieve the best possible resolutions of clients' cases.

Recognizing the importance of this trust relationship,[13] this Committee and other ethics resolution and enforcement bodies have generally recognized that if lawyers are compensated by parties other than their clients, they are, at a minimum, placed at grave risk of becoming fiduciaries of their clients *in name only*.  As such, the American Bar Association has taken numerous steps to prevent such interference with the fiduciary relationship, including drafting the Model Rules.  For example, Model Rule 1.8(f) contains specific guidelines providing the narrow circumstances under which payments by third parties are allowed.  Even with this specific rule, however, both this Committee and State bar associations have seen fit to expand those requirements in various cases – most specifically

---

[11] *See, e.g.*, *Garnick & Scudder, P.C. v. Dolinsky*, 701 N.E.2d 357, 358 (Mass. App. Ct. 1998).

[12] American Bar Association (ABA), Formal Opinion 06-438, *Lawyer Proposing to Make or Accept an Aggregate Settlement or Aggregated Agreement*, Feb. 10, 2006. (hereinafter ABA 2006 Op.).

[13] It is axiomatic in American jurisprudence that a lawyer's relationship to a client is one of trust: "There are few of the business relations of life involving a higher trust and confidence than that of attorney and client . . . ." *Stockton v. Ford*, 52 U.S. (11 How.) 232, at 247(1850); "The relationship of client and attorney is one of trust, binding an attorney to the utmost good faith in dealing with his client. In the discharge of that trust, an attorney must act with complete fairness, honor, honesty, loyalty, and fidelity in all his dealings with his client.  An attorney is held to strict accountability for the performance and observance of those professional duties and for breach or violation thereof, the client may hold the attorney liable or accountable." *Beal v. Mars Larsen Ranch Corp., Inc.*, 586 P.2d 1378, at 1383-84 (Idaho Sup. Ct. 1978); "The term 'fiduciary' itself was adopted to apply to situations falling short of 'trusts,' but in which one person was nonetheless obliged to act *like* a trustee." Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 DUKE L. J. 879, at 880 (1988) (emphasis original).

where insurance companies pay for their insureds' representation.[14]  The legal profession has been very careful about not allowing insurer payments to interfere with attorneys' representation of insureds.

An even more troubling situation has largely escaped significant ethics scrutiny and review, ***one in which third-party payers are the defendants --****i.e.*, adverse parties whose interests are diametrically opposed to those of the plaintiffs and who therefore have the most incentive to interfere with the fiduciary relationship between claimants and their counsel.

Some may suggest that the February 10, 2006, ABA Formal Opinion 06-438, addressed this issue; this is clearly not the case.  In its February 2006 opinion, this Committee addressed various issues pertaining to counselors' fiduciary duties to their clients in light of mass tort contingency fee agreements, specifically pertaining to Rule 1.8(g) of the Annotated Model Rules of Professional Conduct 146 (5th ed. 2002).  Rule 1.8(g) states as follows:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless each client gives informed consent, in a writing signed by the client.  The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.[15]

In its opinion, the Committee addressed and concluded that under Model Rule 1.8(g), an attorney must obtain informed consent and approval from multiple parties in order to render an aggregate settlement agreement to be valid.  The focus of the Committee's opinion was on ensuring that an attorney's clients have the

---

[14]  *See, e.g.*, ABA Comm. on Ethics and Professional Responsibility, Formal Op. 01-421 (2001) (discussing a lawyer's ethical obligations when working under guidelines imposed by an insurance company); Utah State Bar Ethics Advisory Op. Comm., Op. 02-03 (2002) (citing opinions); Ky. Bar Ass'n, Ethics Op. E-416 (2000) (attorney may not agree to abide by insurer-prescribed guidelines in representing the insured, unless certain requirements are met; certain guidelines are unacceptable in any case); Phila. Bar Ass'n Professional Guidance Comm., Ethics Op. 92-4 (1992) (attorney is not barred from representing patient in workers' compensation claim where doctor pays for the attorney and the recovery will go to the doctor, but the attorney must follow several rules and disclosure provisions).

[15] Rule 1.8(g), Model Rules of Professional Conduct.

final say in determining whether to accept a settlement agreement.[16]  The opinion further emphasized the need for candor between attorneys and their clients in order to prevent any favoritism of some clients over others.[17]  In addition, the Committee briefly noted that in the event someone other than the attorney's client was paying his legal fees, the attorney should comply with Model Rule 1.6(f).[18]  Clearly, the opinion did not purport to analyze the issue we raise in this submission:  Whether the negotiation process for the payment of attorneys' fees between a defense attorney and plaintiffs' counsel, which occurs independently of the settlement agreement itself and between individuals whose interests are diametrically opposed, is an ethical practice – and, even if this is not so on *per se* grounds, whether it is unethical to:

- in any way limit, inhibit or preclude judicial or ethics-based reviews of the propriety of the attorney fees set out in the agreement;

- in any way make the validity or enforcement of the agreement itself contingent on the payment of its attorney fee provisions;

- in any way limit, inhibit or preclude the ability of clients or classes to receive any fees deemed unethical or excessive pursuant to such reviews; or

- in any way seek to deny or obscure the fact that the payment of attorney fees necessarily reduces the recoveries of their clients.

Through silence on the above issues, where plaintiffs' counsel neither seeks nor is concerned about receiving compensation for her fees from her clients but rather relies for such fees on the very parties she has brought suit against in the ostensible interest of her clients, a dangerous practice is being permitted to thrive.

Such, as noted, was the case in the tobacco MSA settlement, where plaintiffs' counsel negotiated directly with the defendant tortfeasors over the

---

[16] ABA 2006 Op., *supra* note 12.

[17] *Id.*

[18] *Id.* at n.13.

amount and manner in which the fees of the former were to be paid.  Further, a particularly dangerous legal fiction was created by the settlement when the defendants' total payments were allowed to be artificially bifurcated into allegedly separate payments made to the plaintiffs and to their counsel – as if the size and character of the agreement's fee payments to the plaintiffs' attorneys did not negatively affect what their clients ultimately received.  When they are directly responsible for paying them, clients are aware of their attorneys' fees and know that such fee payments reduce their net recoveries.  On the other hand, the fiction openly and, for the most part, successfully propagated in the MSA settlement and comparable cases -- that the defendants were paying the plaintiffs' attorneys fees and that such fees were of no concern to the plaintiffs -- is one that the Bar must zealously undermine.

We cite, as an example of the above, the extraordinary statement made by then-Attorney General of New York State Eliot Spitzer in defending the MSA settlement:   "[O]ne of the underlying misconceptions about the tobacco settlement is that the attorneys' fees are coming out of the public's pocket.  That is not the case . . . ."[19]  As further discussed herein, the Spitzer statement, which served to politically shield State Attorneys General from accountability for the MSA settlement fees, is inaccurate as a matter of economics, ethics and reality.

The above claim of the then-New York Attorney General has been powerfully rebutted in a number of quarters, but none more so than by the testimony of former Congressman, now SEC Chairman Christopher Cox, given before the House Subcommittee on Courts and Intellectual Property:

> It is specious to argue that these $45-55 billion in [attorneys'] fees are not being diverted out of the funds available for public health and taxpayers.  The tobacco industry is willing to pay a certain sum to get rid of these cases.  That sum is the total cost of the payment to the plaintiffs and their lawyers.  It is a *matter of indifference* to the industry how the sum is divided – 75% for the plaintiffs and 25% for their lawyers, or vice versa.  That means that every penny paid to the plaintiff's lawyers – whether it is technically 'in the settlement or not' – is money that the industry could have paid to the states or the private plaintiffs.

---

[19] Ctr. for Legal Policy at the Manhattan Inst., Manhattan Inst. Conference Series vol. 1, *Regulation by Litigation: The New Wave of Government-Sponsored Litigation*, at 23 (1999) (Statement of the Honorable Eliot Spitzer).

Excessive attorneys' fees in this case will not be a victimless crime.[20] (emphasis added)

Ultimately it is of no consequence to defendants how claimants and their counsel divide up the total settlement dollars that the former must pay. But when the defendant has an opportunity to minimize his total losses by allocating a greater sum to fees in exchange for the plaintiff's attorney recommending that his client accept a lesser settlement, the defendant has no incentive not to take that course. Precisely for this reason, we submit, guidance from the Committee is very much in order.

In mass tort cases, in particular, it is in the defendant's interest for the allocation to swing more favorably toward the plaintiffs' lawyers, who exercise great control over the outcome of the case, including the effective power to offer and accept settlements. For example, it is routinely acknowledged that class action clients often have little ability to control their counsel, especially given the large number of clients – often geographically diverse – and the typical complexity of such litigation. A similar situation arises in cases involving government claimants where private, outside counsel have been retained – a setting in which government counsel and other government officials have a clear political self-interest in masking from constituents and the public the amounts paid to the outside counsel.[21]

One court aptly described the situation as follows: "The class members are not at the table; class counsel and counsel for the defendants are. Unlike in the non-class action context, most of class counsel's clients cannot be consulted individually about the terms of the settlement, nor is the resulting decree submitted to the class members for approval (although there is an opportunity to object)."[22] If the way to ensure the lowest total payout is to increase the lawyers' fees and reduce the clients' recoveries, defendants will not hesitate to do so. While settlement itself may be more likely where the defendants are ethically free to negotiate for the payment of and pay the fees of the plaintiffs' attorneys, permitting this to occur will make attorney-client fiduciary standards and optimal net recoveries by clients more difficult to achieve.

---

[20] Testimony of Honorable Chris Cox, Subcommittee on Courts and Intellectual Property, Dec. 12, 1997, *available at* http://www.afn.org/~afn54735/tob971210a.html, (last visited May 17, 2007).

[21] *See*, pp. 9-10, *supra.*

[22] *Staton v. Boeing Co.*, 313 F.3d 447, 469 (9th Cir. 2002) (*opinion withdrawn and superceded on denial of rehearing for other reasons, Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003)); *see, e.g.,* Liptak, *supra* note 1.

*In light of the above, we take the adamant view that the practice of direct negotiation between plaintiffs counsel and defendants over the former's fees, where not sanctioned and governed by legislation, should at a minimum be treated as presumptively impermissible. As a further minimum, therefore, we believe that such practice should be deemed allowable only after the attorneys meet a clear burden of demonstrating, in a written submission to their clients or, in class action litigation, to the court, that there was no practicable alternative form of payment available to them and that, in practice and in fact, they had been faithful to their clients' interests at the expense of their own.*

**\*\*\*\*\***

In taking the above position, we first note the law of agency. Since the relationship between a lawyer and a client is a classic illustration of agency – a lawyer acts on behalf of the client, representing the client, with consequences that bind the client,"[23] – lawyers are subject to the legal consequences that proceed from such a relationship.[24] As Duke University Law Professor Deborah A. DeMott explains, "the defining elements of the [agency] relationship are mutual manifestation of consent, the agent's undertaking to act on behalf of the principal, and the principal's right to control the agent. The relationship between a lawyer and a client is generally assumed by courts and commentators to be an agency relationship and therefore a relationship in which these defining elements are present."[25]

Applying the above elements to settlements where the merits and fees are negotiated simultaneously, it is evident that in such cases the attorney has turned the agency relationship on its head. Because "many clients lack the expertise to supervise the lawyer's actions" and generally do not understand their import, even more stringent adherence to fiduciary and agency principles is necessary,[26]

---

[23] Deborah A. DeMott, *The Lawyer as Agent*, *The Lawyer as Agent*, 67 FORDHAM L. REV. 301 (1998). *See* RESTATEMENT (SECOND) OF AGENCY § 1 (1958) ("[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

[24] *See generally*, Deborah A. DeMott, *The Lawyer as Agent*, 67 FORDHAM L. REV. 301, at 301-03 (1998).

[25] *Id.* at 302-03 (internal citations omitted).

[26] *See generally, id.* at 303. ("An important starting point is the realization that the law of agency contains its own definition of control. The concept of control as defined by agency is not the same as a generalized capacity to monitor or the actual exercise of influence. In agency, 'control' means prescribing on an ongoing basis what the

particularly those requiring the agent to receive the client's consent regarding matters related to settlement.[27]

Accompanying the lawyer's role as a fiduciary is the duty of loyalty to her client, which encompasses "more specific constraints on self-dealing, representation of adverse interests, competition, and the use of information acquired in connection with the agency."[28]  When an attorney acts in a manner that breaches the duty of loyalty such as "nondisclosure of an adverse interest, or other material facts or matters," the attorney has committed fraud[29] with remedies available to the client of fee forfeiture or disgorgement[30] that oftentimes do not require proof of injury or causation.[31]  At its core, the duty of loyalty requires an attorney to put his client's interests above all others, including his own.

Consistent with upholding the duty of loyalty, the Supreme Court held in *Evans v. Jeff D.*,[32] a major decision regarding statutory fee-shifting, that an attorney may waive a fee to which he is entitled under a statutory fee-shifting statute if doing so results in a settlement that advances the best interests of his client.[33]  The majority summed up the ethical issue in the opinion's footnote 14: "Generally speaking, a lawyer is under an ethical obligation to exercise independent professional judgment on behalf of his client; he must not allow his own interests,

---

agent shall or shall not do. Much in the common law of agency turns on the distinction between a right of control and the actual exercise of control."  *Id.*)

[27] Crystal, *supra* note 3, at 251(citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 38 and cmt. *d.*) (Model Rule 1.2(a) provides "[a] lawyer shall abide by a client's decision whether to settle a matter.")

[28] DeMott, *supra* note 24, at 307.

[29] 7A C.J.S. ATTORNEY & CLIENT § 251 (1980).

[30] *Hendry v. Pelland*, 73 F.3d 397, 399 (D.C. Cir. 1996).

[31] *Id.* at 402. ("[C]lients suing their attorney for breach of the fiduciary duty of loyalty and seeking disgorgement of legal fees as their sole remedy need prove only that their attorney breached that duty, not that the breach caused them injury."); *Arce v. Burrow*, 997 S.W. 2d 229 (TX 1999), *rev'g in part and aff'd in part, Arce v. Burrow*, S.W.2d 239 (Tex.App.-Houston 1997) (The Supreme Court of Texas held that former clients could pursue a cause of action for fee forfeiture for breach of fiduciary duty even in the absence of actual harm to the clients); *In re Estate of Corriea*, 719 A.2d 1234, at 1241 (D.C. 1998) (holding that the plaintiff's inability to quantify the damages suffered did "not disqualify the profits ordered disgorged as 'just compensation for the wrong'") (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 399 (1940)); *Eriks v. Denver*, 824 P.2d 1207, 1213 (Wash. 1992) (en banc) (rejecting the argument that a finding of damages and causation is required to order fee forfeiture); *Rice v. Perl*, 320 N.W.2d 407, 411 (Minn. 1982)(holding that the client need not prove actual harm to obtain fee forfeiture).

[32] 475 U.S. 717 (1986).

[33] *Id.* at 729-38.

financial or otherwise, to influence his professional advice."[34]  This position tracks Rule 1.2(a) of the Model Rules of Professional Conduct:

> [A] a lawyer is required to evaluate a settlement offer on the basis of his client's interest, without considering his own interest in obtaining a fee; upon recommending settlement, he must abide by the client's decision whether or not to accept the offer.[35]

The Court went on to state that "[p]lainly [the lawyer] had no *ethical* obligation to seek a statutory fee award. Her ethical duty was to serve her clients loyally and competently.  Since the proposal to settle the merits was more favorable than the probable outcome of the trial, [her] decision to recommend acceptance was consistent with the highest standards of our profession . . . [A]pproval of the settlement involved no breach of ethics . . . ."[36]

Some may argue that *Evans* illustrates precisely why fee payments by defendants are in fact beneficial: that they encourage settlement.  The difficulty with this view is that it ignores the fact that, while settlements generally may be more likely, settlements that are favorable to claimants may be distinctly *less likely* because of the economic realities of the litigation and settlement process.  As noted, the primary interest of defendants is minimizing the total payment they must make.  In the context of this submission, the point cannot be stressed enough that the *Evans* case involved a statutorily defined process while the questions posed by this submission involve private party conduct bereft of authoritative authorization and, as noted, largely not subject to ethics review.

Where the defendants and the plaintiffs' counsel are negotiating not only the recovery but, as if unrelated, the fees to be paid to plaintiffs' counsel, the interests of the plaintiffs and their attorneys sharply diverge and are subject to strikingly perverse incentives to diverge.  Courts and commentators have noted these perverse incentives, as does the Manual for Complex Litigation, which has been found to "condemn . . . fees that are paid separate and apart from the settlement funds paid to the class . . . ."[37]  This concern arises because, "[when the defendant

---

[34] *Id.* at 728, n. 14.

[35] MODEL RULES OF PROFESSIONAL CONDUCT, Rule 1.2.

[36] *Evans*, 475 U.S. at 728 (emphasis added).

[37] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.* 55 F.3d 768, at 802 (3rd Cir. 1995).

pays the attorneys' fees from its own funds,] the defendant's adversarial role with regard to the attorneys' fees is . . . diminished . . . ."[38]   Courts have further noted that the "plaintiffs' attorneys and defendants will team up to further parochial interests at the expense of the class"[39]  and have noted that the dynamic between plaintiffs' lawyers and the defense "creates incentives for collusion – the temptation for the lawyers to agree to a less than optimal settlement 'in exchange for red-carpet treatment on fees.'"[40]   Attorneys, even those with the best of intentions, will feel this pressure when negotiating their fees with the opposing parties.

> As aptly stated by one court:

> > The incentives for the negotiators to pursue their own self-interest and those of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals.[41]

> And as further elaborated by a Third Circuit Panel on Court Awarded Attorney Fees:

> > Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations."[42]

> In sum:  any time a plaintiff's attorney negotiates fees directly with the defendant, these conflicts of interest and the ethical concerns that accompany them

---

[38] *Strong v. BellSouth Telecom., Inc.*, 137 F.3d 844, at 850 (5th Cir. 1998).

[39] *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, at 524 (1st Cir. 1991).

[40] *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, at 52-53(2nd Cir. 2000) (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991) (quoting John C. Coffee, Jr., *The Unfaithful Champion:  The Plaintiff as Monitor in Shareholder Litigation*, 48 Law & Contemp. Probs. 5, 26-33 (1985)); *See also*, *Staton*, 313 F.3d 447, 469 (9th Cir. 2002) ("We have characterized these inherent dangers of class settlements as encompassing the possibility that 'the agreement . . . is the product of fraud or overreaching by, or collusion between, the negotiating parties . . . .'") (citing *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, at 625 (9th Cir. 1982)).

[41] *Staton*, 313 F.3d at 469.

[42] REPORT OF THE THIRD CIRCUIT TASK FORCE, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985).

will inevitably be present and, we submit, should be openly dealt with by all who bear responsibility for the maintenance and preservation of Bar ethics.

**\*\*\*\*\***

An acutely disturbing add-on set of practices has emerged of late in class and mass tort litigation in the form of provisions that insulate directly negotiated fees from judicial or ethics-based review.  These practices go to the heart of our submission to the Committee and what we ask of it; we call on the Committee to declare them *per se* unethical.

Aware of the potential for challenge to the fee awards, plaintiffs' counsel and defendants often draft settlement agreements that include provisions inhibiting or precluding review of the attorney fee arrangements.  In some cases, the agreements specify that the entire settlement must be negated if the fees are reduced or in any way successfully challenged.  Such agreements dramatically increase the likelihood of collusion, and do so in inverse proportion to the capacity of plaintiffs to avail themselves of the intended protections of Rule 1.5.  In this context, concerns over such treatment of fees are aggravated because the agreements eliminate a primary means and critical incentive for challenging fee requests.  In *Lobatz v. U.S. West Cellular of California, Inc.*,[43] "where the defendant had agreed that it would not contest a fee request of $1 million that was apart from the settlement fund, [and the court] noted that '[s]uch an agreement has the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class."[44]

In fact, "[t]he effect of such an arrangement is to neutralize the court's power and responsibility to pass upon the reasonableness of the amounts to be paid to plaintiff's counsel . . . ."[45]  Unfortunately, courts are under significant pressure to accept settlements despite questions regarding fee provisions.[46]  As one court put it,

---

[43] 222 F.3d. 1142 (9th Cir. 2000).

[44] *Staton*, 313 F.3d 447, at 474 (citing *Lobatz*, 222 F.3d at 1148).

[45] *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d 1106, at 1130-31 (7th Cir. 1979) (citing the MANUAL FOR COMPLEX LITIGATION, §1.46).

[46] *See, e.g., Staton*, 313 F.3d at 481 ("The parties' all-or-nothing approach imposes pressure to approve otherwise acceptable and desirable settlements in spite of built-in attorneys' fees provisions."); *In re Gen. Motors Engine Interchange Litig.*, 594 F.2d at 1131 ("This court has previously declined to upset a settlement agreement merely because some problems regarding fees and expenses remain unresolved.").

"[j]udicial review . . . takes place in the shadow of the reality that rejection of a settlement creates not only delay but also a state of uncertainty on all sides, with whatever gains were potentially achieved for the putative class put at risk."[47]

Even where reviewing courts are willing to subject fees to scrutiny, such settlement agreements often structure powerful disincentives to contest fees because the plaintiffs would stand to lose more than they would gain were they to accept determinations that the fees were unethical.  Even further disincentives are created when, as is at times the case, they put plaintiffs at risk of paying significant refunds of case proceeds that have already been paid and spent.

As noted, the paradigmatic example of such an arrangement is the 1998 Master Settlement Agreement reached between the tobacco companies and the states.  When a New York judge questioned the amount and reasonableness of the fees paid to New York attorneys under the MSA,[48] its Attorney General argued against New York's receipt of what would have been the significant portion of the $625 million, $13,000 per hour fee award that the Court had made clear it would award to the State.  Nonetheless, New York's Attorney General noted that payment of any portion of the MSA fee award to the State would threaten the overall New York MSA settlement itself and thereby jeopardize the even larger payments that the State badly needed.[49]

Recognizing the risk of loss that his own state faced if the fees were successfully challenged, West Virginia Attorney General Darrell McGraw similarly defended his decision not to ask a court to review the attorneys' fees, declaring, "Why in the world would we try to unsettle the settlement and have to give back the money?"[50]

---

[47] *Staton*, 313 F.3d at 461.

[48] *State of N.Y. v. Philip Morris, Inc.*, N.Y.L.J., October 28, 2002, p. 26, col.4, *modified in part, rev'd in part* at 308 A.D. 2nd 57, 763 N.Y.S. 2nd 32, (1st Dept. 2003).  *See,* Jonathan D. Glater, *Judge Questions Legal Fees in New York Tobacco Case*, N.Y. TIMES, Mar. 27, 2003.

[49] *Id.*

[50] Sam Tranum, *McGraw Decided Against Review of Pay*, CHARLESTON DAILY MAIL, Oct. 21, 2001. However, for a successful attempt by a state to challenge the reasonableness of contingency fees under the MSA, *see* Alex Beam, *Renegade Lawyer Challenges Fees*, ATLANTIC MONTHLY, June 1, 2004 (describing how the state of Massachusetts which had received the largest attorneys' fees of all states covered by the tobacco MSA, convinced a jury to decrease the 25% contingency fee the lawyers had negotiated with the tobacco companies to 10.5% with the aid and testimony of a dissatisfied lawyer from one of the firms contracted to represent the state in the tobacco litigation).

One may for purposes of this letter fully assume that both Attorneys General acted in the best interests of their states in light of the terms of the MSA and the circumstances before them; under the MSA, a successful challenge to the fees that resulted in a major award of excess fees to their States could have resulted in lesser, not greater recoveries for their States, and would have required the refund of billions of dollars of already expended case proceeds.  That this might have been so, however, only demonstrates the profoundly troubling effect of such agreements on the prospects for review of attorney fees and the incentives for collusion that direct negotiation of those fees creates.  As a result, in the MSA case, plaintiffs' outside counsel and the tobacco companies have largely been able to evade meaningful judicial review of attorney fees despite the fact that the MSA explicitly subjected payment of the fees "to the Code of Professional  Responsibility of the American Bar Association."[51]  Incorporating the Code into the fee agreement did little more than maintain the façade of ethical propriety, because, as noted, other provisions of the MSA insulated the fees from effective reviews that might have been brought under the Code.[52]

Statutory fee-shifting regimes offer an example of how the legal system has more effectively acted to protect the attorney-client fiduciary relationship from interference, even in cases where the opponents pay the attorneys' fees.  Two mechanisms exist to this end: (1) rules requiring or proscribing certain attorney conduct; and (2) clear ownership of fee award by clients and not their attorneys.

In statutory fee-shifting cases, plaintiffs' lawyers are generally allowed to bargain with the defendants over the fee award.[53]  Prior to the Supreme Court's decision in *Evans v. Jeff D.*, some State bars had determined that such negotiations were unethical.[54]  While, since *Evans*, State bar ethics opinions generally have

---

[51]  Master Settlement Agreement, Exhibit O: Model State Fee Payment Agreement, Section 2: Agreement to Pay Fees, 1998.

[52]  Nor do F.R.C.P Rule 23(e) or comparable State provisions deal with the issue posed by this petition. Under Rule 23(e), courts are limited to either approving or disapproving settlement agreements as a whole, thus returning the dilemma to the square one position confronted by the New York and West Virginia Attorneys General: Either challenge the fees and cause the parties to return to the table with no settlement at all, or forfeit the challenge to the fee agreement notwithstanding its seemingly unethical character.  Richard. A. Givens, RULE & MANUAL OF FEDERAL PRACTICE, vol. 1, ch. 3, Sec. 3.145 (3d Ed. 1987); J. W. Moore, MOORE'S FEDERAL PRACTICE, Vol. 5, §23.160 (3rd Ed., 2004).

[53]  *Evans*, 475 U.S. 717 (1986).  The Supreme Court expressly stated that it did not base its decision on attorneys' ethical duties but on the language of the federal fee-shifting statute in question.  *Id.* at 727-28.

[54]  *See, e.g.*, Maine Grievance Comm'n of the Overseers of the Bar, Op. 17 (1981) (such negotiations are unethical if they occur prior to or simultaneous with the settlement of the underlying action.).  Other states held that such negotiations were permissible, but only if the attorney was careful to ensure that a lawyer disclose all potential

allowed plaintiffs' lawyers to negotiate with defendants over fee awards in statutory fee-shifting cases, they have always also strictly cautioned attorneys to be aware of and to disclose the conflicts of interest between them and their clients.[55] Many opinions make clear that clients always have the right to make final decisions regarding settlement, and that the attorneys may not prohibit the clients from accepting settlements that waive attorneys' fees.[56]  Some have even required that attorneys in fee-shifting cases must inform their clients that "[they] may be able effectively to win [their] lawsuit[s] by waiving their attorney's fees."[57]  Thus, even where statutes make defendants liable for the plaintiffs' attorneys' fees, courts and the Bar have been careful to protect clients from the clear conflicts of interest with their counsel.

✳✳✳✳✳

**_Even more important than the procedural protections of client interests in fee-shifting cases is the need to make unambiguously clear that, in all such cases, fee awards belong to clients and not their attorneys._**

In statutory fee-shifting cases, attorneys' fee awards essentially are a form of special damages.[58]  The Manual for Complex Litigation states that the sum of the attorneys' fees and the settlement fund "ordinarily should be treated as a settlement fund for the benefit of the class."[59]  Critically, the courts have regularly confirmed that fee awards, including fees awarded pursuant to both federal and state statutes

---

conflicts of interest at the outset of the case, and continue such disclosures as the case progressed.  State Bar of Mich., Formal Ethics Op. C-235 (1985).  Likewise, the Board of Professional Responsibility of the Supreme Court of Tennessee went a step further by requiring plaintiffs' counsel to advise the client that independent legal advice may be obtained regarding the negotiations.  Formal Ethics Op. 85-F-96(a) (1986).

[55] *See, e.g.,* Utah State Bar Ethics Advisory Op. Comm., Op. 98-05 (1998) (noting that attorneys can generally deal with the conflicts inherent in such negotiations through appropriate arrangements with their clients).

[56] *See, e.g.,* Utah State Bar Ethics Advisory Op. Comm., Op. 98-05 (1998) (attorneys cannot contract away the clients' right to determine whether a settlement offer that waives such fees will be accepted); D.C. Bar Legal Ethics Comm., Op. 289 (1999) (citing opinions); *but see* The State Bar of Cal. Standing Comm. on Professional Responsibility and Conduct, Formal Op. 1994-136 (1994) (stating that the right to recover fees awarded pursuant to 42 U.S.C. § 1988 may be contractually assigned from the client to the attorney, and such contracts may bar the client from waiving such fees, but the contract terms must be fair and reasonable to the client and the attorney must meet certain disclosure requirements).

[57] The State Bar of Cal. Standing Comm. on Professional Responsibility and Conduct, Formal Op. 1989-114 (1989).

[58] Geoffrey C. Hazard, Jr. & W. William Hodes, THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT, § 1.5:104 (2d ed. 1998 Supplement).

[59] MANUAL FOR COMPLEX LITIGATION, § 30.42 (3d ed. 1995).

other than 42 U.S.C. § 1988, are property of the client and not the attorney.[60]  The Ninth Circuit has held that class members have standing to challenge class counsel's fee, even when they had been paid separately by the defendants, because if "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class.  If that were the case, any excessive award could be considered property of the class plaintiffs, and any injury they suffered could be redressed at least partially by allocating to them a portion of that award."[61]  Notable here is the explicit reference to the fiduciary duty that must form the basis of attorney-client relations.

In contrast to the open contractual arrangement of fee-shifting statutes, when attorneys negotiate their fees with the defendants in non-statutory fee-shifting cases, clients often are not presented with choices regarding the fee amount and the means of payment for their own attorneys.  In fact, there are many situations in which one is hard-pressed to find a purpose of such negotiations other than preventing clients from deciding how and what to pay their attorneys – *i.e.*, from deciding what their net recovery should be.  There is a fundamental difference between negotiating fee awards under statutory provisions and negotiating fees through private agreements separate and apart from negotiations for common funds or other recoveries.  In the former case, part of the plaintiffs' total recovery consists of a fee award that is separately negotiated between the plaintiffs' attorneys and the defendants.  Whether that award will go to attorneys or their clients, however, is a matter of negotiation between the two and no one else.  On the other hand, the cases that are the subject of this submission, where attorneys effectively establish their fees with parties whose interests join with them in maximizing those fees, effectively remove from their clients the capacity to negotiate fees and thereby establish net recoveries.

---

[60] *See, e.g., Venegas v. Mitchell*, 495 U.S. 82, at 87 (1990) ("Section 1988 makes the prevailing *party* eligible for a discretionary award of attorney's fees . . . [I]t is the party, rather than the lawyer, who is so eligible . . . .") (citations omitted); *Evans*, 475 U.S. at note 19 (extensive case citations); *Carlton v. Owens*, 443 So.2d 1227, at 1232 (Ala. 1983) ("An award of attorney's fees belongs to the client and not the attorney."); *Alfred J.L. v. Leo J.R.*, 1986 WL 9919, at *4 (Del. Super. Ct. 1986) ("[The] attorneys' fee provision exists for the benefit of parties and not the attorneys . . . .  Several jurisdictions have noted that the real party in interest with regard to fees is the client and not the attorney."); *Carmichael v. Iowa State Highway Comm'n*, 219 N.W.2d 658, at 664 (Iowa 1974) (citing 7 C.J.S. *Attorney and Client* § 163) ("The allowance of attorney fees in a judgment gives the attorneys no interest and ownership in the judgment to the extent of the amount of the fee allowed, but the judgment in its entirety is the property of the client . . . The award for fees is for the client, not the attorney . . . ."); *In the Matter of Estate of Robinson*, 690 P.2d 1383, at 1388 (Kan. 1984) ("[T]he award of attorney fees [is] made not to the attorneys but to the litigant who was personally liable to the attorneys."); *In re McRoberts' Estate*, 43 A.2d 910, at 911 (Pa. Super. 1945) (attorneys' fees awarded pursuant to section 35(a) of the Orphans' Court Partition Act "belong, and are awarded, to the petitioner, not counsel . . . .").

[61] *Lobatz*, 222 F.3d at 1147.

This is precisely what happened in the case of the tobacco MSA settlements, and is occurring with increasing frequency in class action and mass tort cases. Not only did the New York Attorney General come out against judicial review of the fee arrangement for fear of losing State funds, but he stated affirmatively that, "one of the underlying misconceptions about the tobacco settlement is that the attorneys' fees are coming out of the public's pocket. That is not the case . . . The tobacco companies are paying the attorneys' fees and, therefore, these fees are not state property."[62]  In terms of the MSA as written and intended, these comments are factually accurate. But this is precisely the problem. The State was cut out of the process of determining the fees to be paid to its own attorneys, a fact that rendered it more likely, not less, that the money paid to plaintiffs' private attorneys effectively came directly out of the public's pocket. Unless plaintiffs own the entirety of a separately negotiated settlement fund, there is no protection against the direct conflict of interest between the client and her attorney on the issue of fees. And unless there are clear ethical norms protecting clients (and, in cases involving government claimants, also protecting the public) from the fraudulent misrepresentation that fees paid to counsel do not detract from fees paid to claimants, such misrepresentations are certain to continue.

✶✶✶✶✶

The concerns raised by this submission are made particularly acute by the multibillion dollar character of many of the cases which caused the submission to be made.

In *Matter of Rhone-Poulenc Inc.*,[63] Judge Posner well described the significance of this phenomenon in deciding a class action certification appeal where the potential liability of the defendants exceeded the net worth of each. In such cases, Judge Posner wrote, where "[o]ne jury ... [can] hold the fate of an industry in the palm of its hand … and hurl [it] into bankruptcy … the industry is likely to settle – whether or not it really is liable."[64]  The *Rhone-Poulenc* court understood that the "small probability of an immense judgment in a class action"[65] will generally make litigating it on the merits an imprudent course of action for defendants.[66]

---

[63] 51 F. 3d 1293 (7th Cir. 1995).

[64] *Id.* at 1300.

[65] *Id.* at 1299, *citing* Henry J. Friendly, FEDERAL JURISDICTION: A GENERAL VIEW at 120 (1973)

Where private party negotiations become the means of resolving the fees payable in major cases where both strong pressures and incentives exist for defendants to offer windfall fee payments to opposing counsel, the need is acute for ethics rules and procedures permitting effective review and monitoring of those fees.

**\*\*\*\*\***

The Trial Court ruling opposed by the New York Attorney General because it sought to give the State of New York a significant share of a $625 million MSA fee award was reversed by the Appellate Division.  This was done on a number of procedural grounds, including the fact that the New York MSA agreement had previously been affirmed in a prior judicial proceeding.  For purposes of this submission, however, the critical element of the Appellate Division opinion in *State of N.Y. v. Philip Morris*[67] was its reversal of the Trial Court's determination that his action was justified on grounds of his "inherent authority over attorneys."[68]  In terms significant for the Committee, the Appellate Division decision reads as follows:

> There is a difference between the power of courts in general and an individual judge's power to conduct the legal fee inquiry at issue here.  Thus, courts have inherent authority to promulgate rules of general applicability regarding lawyers' fees (*Matter of First Natl. Bank of East Islip v Brower,*  42 NY2d 471; *Gair v Peck*, 6 NY2d 97, *cert denied* 361 US 374), to respond to a complaint from bar associations that "ambulance chasing" was spreading to a demoralizing extent (*People ex rel. Karlin v Culkin,* 248 NY 465), and to set legal fees in connection with the settlement of an estate (*matter of Stortecky v Mazzone*, 85 NY2d 518; *Matter of Lafferty*, 297 AD2d 469).  However, neither Justice Ramos nor independent counsel has cited any authority for the proposition that a court has inherent authority to haul

---

[66] The court did not explicitly note other considerations that strengthen its finding.  Such considerations include the fact that the mere bringing of such actions is likely to depress stock values and to diminish corporate and industry goodwill with both the public and public officials, thereby further and greatly exacerbating the pressure on defendants to settle cases without regard to their merits.

[67] 308 A.D.2d 57 (N.Y.A.D. 1 Dept. 2003).

[68] *Id.* at 67.

before it lawyers who last appeared before a different judge of coordinate jurisdiction some two-and-a –half years earlier, to start a *sua sponte* inquiry into the appropriate amount of attorneys' fees when no fee application was pending before it, or to review an arbitral award when no party has moved to modify or vacate such award.

The cases relied upon by Judge Ramos merely hold that a court has "control over attorneys *appearing before it*" *(Chang v Chang,* 190 AD2d 311, 319 … and that a judge "may regulate *the conduct of attorneys in his courtroom*" *(Matter of dePerno v Garramone,* 120 Misc 2d 881, 882…   [Emphasis added].

What the Appellate Division made clear in *Philip Morris,* and rightly so, was that clearly articulated rules of ethics rather than case-by-case trial court adjudications are the best means of protecting client rights and avoiding conflicts of interest and excess fee payments in cases such as the one before it – yet another reason why we have petitioned the Committee to issue a formal ruling herein.

**CONCLUSION**

In examining the tobacco MSA settlement cases that we believe demonstrates the need for a Committee ruling,[69] we believe it clear that in many of the State proceedings the fees paid to plaintiffs' counsel were excessive if not literally shocking and in violation of the fiduciary standard of reasonableness set forth in Rules 1.5 and 1.8 of the Model Rules – both in terms of appearances and realities.  Thus, the inhibitions and effective barriers against ethics reviews contained in the MSA agreement – their provisions inhibiting judicial review of the fees and their companion provisions calling for unethically excess fees be remitted to the defendant tobacco companies – make the need for ethics rules and monitoring and, in our view, for Committee action, manifest and compelling.

In making the above assertion, we begin by citing a mere sample of comments made by persons generally known to seek limits on the reach and

---

[69] The fact that the MSA agreement was entered into a number of years ago will not render any Committee opinion moot with regard to its terms; fee payments under the agreement continue on an annual basis into the foreseeable future.

character of present-day tort and class action law.[70]  We further cite the earlier noted comments of former HHS Secretary Joseph Califano[71] or those of such anti-smoking advocates as former FDA Commissioner David Kessler, who deemed the fees "outrageous."[72]   By further example, we cite economists such as Paul Klemperer and Jeremy Bulow, the latter later appointed as Director of the Bureau of Economics of the Federal Trade Commission, who wrote of the "very dangerous" and "terrible examples" set by the tobacco settlements and their capacity to "open up unprecedented opportunities for collusion throughout the economy."[73]  For purposes of this submission, however, the above comments and many like them need only be seen as evidence of the appearance problems associated with the fee payments in the tobacco MSA settlements.  While ethics law is of course deeply attentive to such considerations,[74] we here cite far more compelling findings regarding the tobacco MSA settlement fees – those made by attorneys who participated in the tobacco litigation and by leaders of the trial bar itself:

- Michael Ceresi, a pioneer in the tobacco litigation who represented the State of Minnesota in its tobacco lawsuit, deemed the Texas, Florida, and Mississippi lawyers' fee awards "far in excess of these lawyers' contribution to any of the state results."[75]

- John Coale, a major trial bar leader, denounced the tobacco fee awards as "beyond human comprehension" and flatly stated that "the work does not justify them."[76]

---

[70] *E.g.,* Michael Barone, *Trying the Lawyers,* U.S. NEWS AND WORLD REPORT, June 28, 1999, p. 34; Jon Kyl*, The Trial Lawyer's Dirty Secret,* available at http://kyl.senate.gov/record_print.cfm ?id=205496 (last visited May 20, 2007); Robert A. Levy, *The Great Tobacco Robbery: Lawyers Grab Billions,* Mar. 6, 1999, available at http://www.cato.org/dailys/03-06-99.html (last visited May 21, 2007). James Freeman, *Ever Heard of a Rapacious Lawyer,* USA TODAY, 9/22/99, at  http://www.usatoday.com/news/comment/columnists/freeman/ ncjf40.htm; Stuart Taylor Jr., *How a Few Rich Lawyers Tax the Rest of Us,* NATIONAL JOURNAL, June 26, 1999, p. 1866.

[71] *See,* Califano, *supra* note 8.

[72] *See,* Jon Kyl, *The Trial Lawyer's Dirty Secret,* available at http://kyl.senate.gov/record_print.cfm ?id=205496 (last visited May 20, 2007).

[73] Jeremy Bulow and Paul Klemperer, *The Tobacco Deal,* BROOKINGS PAPERS ON ECONOMIC ACTIVITY, Nov., 1998.

[74]  *E.g.* Canon 9, MODEL RULES OF PROFESSIONAL RESPONSIBILITY, *and see,* EC 9-6.

[75] *See* Kyl, *supra* note 72.

[76]  *Cited in*, Robert A. Levy, *Hired Guns Corral Contingent Fee Bonanza,* LEGAL TIMES, Feb. 1, 1999.

- An ultimate expression of the above came from Richard D. Hailey, President of the American Trial Lawyers Association. Hailey's finding was as follows:

> Common sense suggests that a one billion dollar fee is excessive and unreasonable and certainly should invite the scrutiny [of the courts. ATLA] generally refrains from expressing an institutional opinion regarding a particular fee in a particular case, but we have a strong negative reaction to reports that at least one attorney on behalf of the plaintiffs in the Florida case is seeking a fee in excess of one billion dollars.[77]

The record in the tobacco MSA case settlements is rife with such seemingly manifest abuses as multibillion dollar fees,[78] $3,000 per hour fees to read newspapers and associated lavish expenses,[79] $350 million in fees to attorneys with no class action experience who made limited contributions to the case outcome,[80] a rejected fee offer of $500 million to an attorney who represented the State under law that "changed centuries of precedent to ensure a win in th[e] case,"[81] an alleged "bargain fee" of $50 million that included a $310 per hour charge for reading the

---

[77] Letter from Richard D. Hailey, President, Association of Trial Lawyers of America to Rep. Richard Coble, quoted in Fla. Lawyers Attacked by Peers; Trial Association Says Fees Excessive; Smoke Under Fire, RICHMOND TIMES DISPATCH, Dec. 10, 1997, at A7. *See also generally,* Lester Brickman, *The Tobacco Litigation and Attorneys' Fees,* 67 FORDHAM L. REV. 2827 (1999).

[78] *See* Statement of Sen. John Cornyn, CONGRESSIONAL RECORD, April 10, 2003, p. S. 5246.

> As for the five law firms that actually did represent Texas in the tobacco litigation, they filed relatively late lawsuits that were based on other lawyers' work – and were awarded $3.3 *billion* in attorneys' fees. This award amounts to compensation that, even had these attorneys worked all day every day during the entire period of the litigation, is well in excess of $100,000 an hour. [Emphasis in original].

[79] *See Tax Those Lawyer Fees,* MADISON CAPITAL TIMES, July 14, 1999 (editorial); Mike Ivey, *Tobacco Suit Lawyers Traveled in Style: Hotels, Limos, Flights Add Thousands to Bill,* July 13, 1999, MADISON CAPITAL TIMES, July 13, 1999; Phil Brinkman, *Law Firms Put Hours at 24,733: At $75 Million, It's $3,032 an Hour,* WISCONSIN STATE JOURNAL, July 13, 1999.

[80] Tim O'Brien, *A $350M Boardwalk Bonanza,* NEW JERSEY LAW JOURNAL, Sept. 27, 1999.

[81] Daniel LeDuc, *Angelos, Md. Feud Over Tobacco Fee,* WASHINGTON POST, Oct. 15, 1999.

*Wall Street Journal* and a $290 per hour fee for identifying and ordering books,[82] fees in the $50,000 per hour range for a late filed case,[83] and a large number of comparably problematic payments. [84]

> *In the face of the above, and going to the heart of this submission, is the fact that these and comparable fee payments were not subject to serious if any ethics review under prevailing ethics standards. This unacceptable reality results from the fact of negotiations conducted between the defendants and the plaintiffs' attorneys over the latter's fees and, even more significantly, from the built-in barriers to fee reviews created by the negotiating parties.*

A 2003 asbestos case described by the *New York Times* further illustrates the nature and degree of the problem, and sets out the ultimate issue posed by this submission:  Whether fiduciary or ordinary business standards are to govern the attorney-client relationship.  In the case, an attorney for a class was paid $20 million by the parent company of the defendant for crafting a settlement with his client class and additional classes represented by other attorneys. [85]  Commenting on this arrangement, one legal ethics expert stated, "[T]hey're taking money from the other side to get a deal through that the other side wants too?  What does one need to say?"[86]  The attorney in the case defended his actions, stating, "I did a business transaction," while counsel for the parent company paying him stated, "Why shouldn't he get paid for brokering a deal?"[87]

The defenses posed in the above case were echoed during the

---

[82] Glen Justice, *In Tobacco Suit, Grumblings Over Lawyer Fees,* PHILADELPHIA INQUIRER, Oct. 4, 1999.

[83] Ted Wendling, *Bonanza for 3 Lawyers: Ohio Trio Could Split Up to $1Billion in Tobacco-Case Fees,* CLEVELAND PLAIN DEALER, Feb. 29, 2000, *Lucky Strike: Ohio's Lawyers Came Late to the Trough, But They'll Get Their Fill – And Then Some,* CLEVELAND PLAIN DEALER, Mar. 1, 2000.

[84] That the tobacco cases call for special ethical attentiveness is heightened by the fact that they were litigated by private counsel representing State governments on a contingency fee basis.  *See, County of Santa Clara v. Atlantic Richfield Co.,* Case No. 1-00-CV-788657 (Cal. Superior Ct., Santa Clara County 2007), *citing People ex rel Clancy v. Superior Court,* 39 Cal. 3rd 740 (Cal. Supreme Ct. 1985) (contingency fee arrangement "is antithetical to the standard of neutrality that an attorney representing the government must meet." *Id.* at 750.); *Cf., Berger v. U.S.* 295 U.S. 78, at 88 (1935) (criminal prosecutor's obligation "is not [to] win a case, but that justice shall be done."); *Tumey v. Ohio,* 273 U.S. 510 (1927).

[85] The case is *In re Combustion Engineering Inc.,* 295 B.R. 459 (Bankr. D. Del. 2003), and the details of the arrangement are set out in *Ethical Issues, supra* note 7 at 886-889.

[86] Berenson, *supra* note 1 (quoting Susan P. Koniak, Boston University law professor and legal ethics expert).

[87] *Id.*

tobacco legislation debate by then-Senate Minority Leader Tom
Daschle.  Opposing a Senate amendment that would have awarded
legal fees in the tobacco cases on a risk-based sliding scale capped at
$4,000 per hour, Senator Daschle argued that "a lawyer is a legal
businessperson."[88]

It is of course true that lawyers are engaged in commercial activities, but as
one State Supreme Court noted,

> We realize that business contracts may be enforced between
> those in equal bargaining capacities, even though they turn
> out to be unfair, inequitable or harsh.  However, *a fee
> agreement between lawyer and client is not an ordinary
> business contract.*  The profession has both an obligation of
> public service and duties to clients which transcend ordinary
> business relationships and prohibit the lawyer from taking
> advantage of the client.[89]

---

[88] *Quoted in* Lester Brickman, *Will Legal Ethics Go Up in Smoke?*  WALL STREET JOURNAL, June 16, 1988.

[89] *In re Swartz*, 686 P.2d 1236, at 1243 (Ariz. 1984) (internal citations omitted) (emphasis added). *See also*, Brickman, *supra* note 88:

> What kind of business is it from which the public is excluded?  Actually, the law
> isn't a business – it's a profession.  As such it is governed by professional rules
> of ethics.  The governing ethics rule once stated that lawyers' fees could not be
> "clearly excessive."  This wasn't restrictive enough, so the profession
> promulgated a stricter rule:  Fees have to be *reasonable*.  If the standard of
> reasonableness has any meaning, it is surely violated by fees of tens of
> thousands of dollars an hour.

> If Mr. Daschle prevails, he and his colleagues will have stripped the requirement
> of reasonable fees from lawyers' codes of ethics.  Maybe they're on to
> something.  Eliminating legal ethics may have some appeal.  Lawyers' rules of
> ethics are pretty messy – all this stuff about conflicts of interest and
> confidentiality.  Why not just get rid of them altogether?  Well, lawyers
> wouldn't like that, because it would undermine the principal basis for their right
> of self-governance....

> The public has a compelling interest in preserving legal ethics, including that
> rule that fees must be reasonable.  The higher the fees tort lawyers get, the
> greater the share they take of injured clients' recoveries.  Moreover, the higher
> the fees, the more tort litigation and the more costs that are imposed on society.
> The civil justice system, which generates the fees that Mr. Daschle does not
> want curbed, exists to serve citizens. Lawyers are not businesspeople; they are
> professionals entrusted with the people's business.

The same point was well made by another court dealing with the issue:

> An attorney is only entitled to fees which are fair and just and which adequately compensate him for his services. This is true *no matter what fee is specified in the contract,* because an attorney, as a fiduciary, cannot bind his client to pay a greater compensation for his services than the attorney would have the right to demand if no contract had been made. Therefore, as a matter of public policy, *reasonableness is an implied term* in every contract for attorney's fees.[90]

Accordingly, we ask the Committee to address the troubling and growing practice of plaintiffs' attorneys negotiating their fees directly with defendants in the absence of statutory authorization.

As noted above, we believe that a *per se* ban should apply against such practices against such practices in the absence of express statutory authorization. In the absence of such a ban, however, and as we have noted, we believe that affirmative mechanisms must be put in place that allow clients or classes to fairly gauge the ethical propriety of their attorneys' fees, to be able to challenge those fees before a suitable forum, and to receive any fees found to be excessive.

In conjunction with the above concerns, we ask that the Committee issue a Formal Opinion setting forth its views on these important matters.[91]  As noted, the Committee's Formal Opinion 06-438 limited its analysis to emphasizing the importance of full disclosure of the terms of aggregate settlement agreements by attorneys with their individual clients.  While the Committee directed attorneys to Rule 1.8(f) in the event they were to be compensated by a third party, the issue here raised – whether attorney fee negotiations should be permitted defendants and plaintiffs' counsel whose necessarily opposing interests create clear conflicts in ethics issues, and whether agreements that limit or effectively preclude ethics reviews and determinations of the fiduciary propriety of the fees— remains open for exploration and comment by the Committee.

---

[90] *Missouri ex rel. Chase Resorts, Inc. v. Campbell,* 913 S.W. 2d 832, at 835 (Mo. App. 1996) (internal citations omitted) (emphasis added).

[91] We note that the Committee has the authority to issue opinions that may contradict state court holdings, as has been done in disclosure and screening cases.

\*\*\*\*\*

We thus reiterate our request to the Committee for a Formal Opinion covering cases where defendants and plaintiffs' counsel engage in direct negotiations to establish the fees of the latter, that:

1.  In the absence of statutory authorization, establishes a *per se* ban against such conduct.

2.  In the alternative, establishes a requirement that attorneys provide a written submission to their clients, or in class actions to the courts, demonstrating that no practicable alternative form of fee payment was available and that, in practice and in fact, the attorneys had been faithful to their clients' interests at the expense of their own.

3.  In all circumstances, establishes a *per se* ban on any agreement that in any way limits, inhibits or precludes judicial or ethics-based reviews of the propriety of the fees.

4.  In all circumstances, establishes a *per se* ban on any agreement that in any way makes its validity or enforceability contingent on the payment of its fee provisions.

5.  In all circumstances, establishes a *per se* ban on any agreement that in any way inhibits or precludes the right of clients to recover any fees deemed excessive or unethical by such reviews.

6.  In all circumstances, establishes a requirement that all settlement agreements should be expressed in the form of a single sum payable to the plaintiffs, from which plaintiffs' attorney fees are to be deducted.

Given the significant number of cases, many of which involve numerous clients and in which millions and billions of dollars are at stake, the fundamental relationship between attorneys and their clients is undergoing a major shift.  We

thus believe it vital, now more than ever, for the Committee to provide clear guidance on the issues raised herein.  We submit that such guidance is necessary to ensure that client rather than attorney interests remain at the heart of all representations, that fiduciary standards apply to such representations, and that the process of enforcing legal ethics and fiduciary standards will become serious and operational.


Respectfully submitted,



| | |
|---|---|
| Richard Abel | UCLA Law School |
| David Barnhizer | Cleveland-Marshall College of Law |
| Lester Brickman | Cardozo School of Law |
| Robert Cochran | Pepperdine University School of Law |
| Roger Cramton | Cornell University Law School |
| Leonard Gross | Southern Illinois University School of Law |
| Allison Hayward | George Mason University School of Law |
| Michael Horowitz | Hudson Institute |
| Michael Krauss | George Mason University School of Law |
| Lisa G. Lerman | The Catholic University of America |
| Judith Maute | University of Oklahoma Law Center |
| Tom Morgan | George Washington University Law School |
| Jeffrey O'Connell | University of Virginia School of Law |
| Deborah Rhode | Stanford Law School |
| Howard Rosenberg | University of Denver Sturm College of Law |
| Ronald Rotunda | George Mason University School of Law |
| George Schatzki | Arizona State University College of Law |
| Peter H. Schuck | Yale Law School |
| William Simon | Columbia University School of Law |
| Bradley Wendel | Cornell University Law School |