**FOR PUBLICATION[1]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN M. DEWEY, et al.,      : | |
|      : | |
|     Plaintiffs,   : | |
|      : | |
|   v.      : | Civil Action No. 07-2249(FSH) |
|      : | |
| VOLKSWAGEN OF AMERICA, et al.,  : | |
|     Defendants.   : | |

| | |
|---|---|
| JACQUELINE DELGUERCIO, et al.,  : | |
|      : | |
|     Plaintiffs,   : | |
|      : | |
|   v.      : | Civil Action No. 07-2361(FSH) |
|      : | |
| VOLKSWAGEN OF AMERICA, et al.,  : | |
|     Defendants.   : | |

## OPINION

**SHWARTZ, United States Magistrate Judge**

## I. INTRODUCTION

This matter is before the Court by way of Plaintiffs' motions for: (1) certification of the settlement class; (2) final approval of the class settlement embodied in the agreement dated February 11, 2010; (3) an award of attorneys' fees; and (4) reimbursement of expenses and costs.

---

[1] The Court has published this Opinion due to the size of the class and number of objections.

For the reasons set forth in this opinion, the motions are granted.

## II. BACKGROUND AND RELEVANT FACTS

The plaintiffs initiated two class actions against Defendants Volkswagen of America, Inc., Volkswagen AG, Volkswagen BG, and Volkswagen Group of America ("VWGoA") (collectively "VW") and Audi AG and Audi of America, LLC (collectively "Audi")[2] for alleged defects in certain cars.  On May 11, 2007, Plaintiffs John M. Dewey, Patrick DeMartino, and Patricia Romeo (the "Dewey plaintiffs") filed a class action Complaint alleging that certain VW and Audi vehicles have defectively designed pollen filter gasket areas and sunroof drains. (Dewey v. Volkswagen of Am., Inc., Civ. No. 07-2249, Docket Entry No. 1 ¶ 1 (D.N.J. filed May 11, 2007).)[3]  One week later, Plaintiff Jacqueline Delguercio ("Delguercio") initiated a substantially similar class action.  (Delguercio v. Volkswagen of Am., Inc., Civ. No. 07-2361, Docket Entry No. 1 ¶ 1 (D.N.J. filed May 18, 2007).)[4]  On June 22, 2007, the Court consolidated the cases for pre-trial purposes.  (Dewey, Docket Entry No. 8; Delguercio, Docket Entry No. 6.)

According to their Fourth Amended Complaints,[5] the plaintiffs allege that design defects

---

[2] The claims against Volkswagen de Mexico were dismissed without opposition on November 19, 2008. (Dewey v. Volkswagen of Am., Inc., Civ. No. 07-2249, Docket Entry No. 116.)

[3] Hereinafter, all record cites to Dewey v. Volkswagen of Am., Inc. will be formatted as follows: (Dewey, Docket Entry No. ___.).

[4] Hereinafter, all record cites to Delguercio v. Volkswagen of Am., Inc. will be formatted as follows: (Delguercio, Docket Entry No. ___.).

[5] The Dewey plaintiffs filed Amended Complaints on September 28, 2007, April 15, 2008, June 17, 2008, and July 30, 2008.  (Dewey, Docket Entry Nos. 18, 57, 83, 86.)  The Delguercio plaintiffs filed Amended Complaints on September 28, 2007, April 9, 2008, June 17, 2008, and July 30, 2008.  (Delguercio, Docket Entry Nos. 11, 38, 60, 63; Dewey, Docket Entry Nos. 58, 87.)

in the sunroof drain, the pollen filter, the plenum drains, and other parts of VW and Audi vehicles caused water to pool and spill over, rather than drain, damaging the interior cabin, transmission, and/or electrical systems of the car.  (Dewey, Docket Entry Nos. 86 ¶ 3 and 87 ¶ 8; Delguercio, Docket Entry No. 63 ¶ 8.)  Based on these allegations, the Dewey plaintiffs assert claims based on the New Jersey Consumer Fraud Act (CFA), the Uniform Commercial Code (UCC), common law fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, and unjust enrichment.  (Dewey, Docket Entry No. 86 ¶¶ 70–121.)  Based upon the same allegations, the Delguercio plaintiffs allege that the defendants breached express and implied warranties, improperly repaired the vehicles, breached the covenant of good faith and fair dealing, made negligent misrepresentations, violated the CFA, were unjustly enriched, and engaged in fraud.  (Dewey, Docket Entry No. 87 ¶¶ 46–97; Delguercio, Docket Entry No. 63 ¶¶ 46–97.)

The defendants filed motions to dismiss and quash service upon the foreign defendants, (Dewey, Docket Entry Nos. 13, 24, 29, 41, 84;  Delguercio, Docket Entry Nos. 16, 18), and the plaintiffs sought the issuance of letters rogatory and withdrew the same.  (Dewey, Docket Entry Nos. 104, 108, 109, 110;  Delguercio, Docket Entry No. 79.)  The motions were denied with respect to all defendants except for Volkswagen de Mexico.  (Dewey, Docket Entry No. 55.)

The parties also engaged in discovery and raised numerous discovery and case management disputes.  (Dewey, Docket Entry Nos. 43, 46, 49, 53, 60, 61, 72, 73, 78, 79, 80, 82, 91, 96, 98, 99, 101, 102, 111, 115, 118, 119, 120, 124, 133, 134, 137, 140, 143, 146, 147, 149, 152; Delguercio, Docket Entry Nos. 26, 29, 30, 32, 33, 41, 42, 47, 52, 53, 56, 58, 59, 61, 67, 68, 70, 71, 73, 75, 79, 81, 83, 84, 85, 88, 91, 97, 98, 100, 101, 102, 105, 106, 107, 108, 110.)

Discovery included the production of thousands of documents, some of which were in foreign languages, more than fifty depositions throughout the United States, and consultation with numerous automotive experts.  (Dewey, Docket Entry No. 163 Attach. 13 ¶ 3; DelGuercio, Docket Entry No. 121 Attach. 13 ¶ 3; Dewey, Docket Entry No. 163 Attach. 2 ¶¶ 16–18; DelGuercio, Docket Entry No. 121 Attach. 2 ¶¶ 16–18; Dewey, Docket Entry No. 196 Attach. 1 ¶ 7.)

    After more than two years of discovery, the parties notified the Court that they were engaged in serious settlement discussions, but time was needed to obtain confirmatory discovery. As a result, in September 2009, the Court suspended the pretrial deadlines and set deadlines for the parties to file a joint motion for preliminary approval of a settlement class and class settlement, and for the appointment of class counsel.  (Dewey, Docket Entry Nos. 154, 155, 157, 160, 162; Delguercio, Docket Entry Nos. 113, 114, 116, 118, 120.)  At the time, class and merits fact discovery were scheduled to close on September 30, 2009, expert discovery was scheduled to be completed by January 27, 2010, and the Final Pretrial Conference was to occur on February 25, 2010.  (Dewey, Docket Entry No. 149; Delguercio, Docket Entry No. 110.)

    On November 10, 2009, the United States District Judge approved the parties' request to consent to Magistrate Judge jurisdiction "to conduct all settlement proceedings and enter final judgment," pursuant to 28 U.S.C. § 636(c).[6]  (Dewey, Docket Entry Nos. 158, 159; Delguercio,

_____

    [6] Under 28 U.S.C. § 636(c), a magistrate judge may conduct "any or all proceedings in a . . . civil matter and order the entry of judgment in the case" upon consent of the parties.  If consent of one of the parties is not given, a magistrate judge may still hear certain pretrial matters. 28 U.S.C. § 636(b)(1)(A).  Here, all parties consented to have the magistrate judge "conduct all settlement proceedings and order the entry of final judgment" pursuant to § 636(c). (Dewey, Docket Entry No. 159.)
    In class action lawsuits, unnamed class members generally "are not 'parties' before the

Docket Entry No. 124.)

On January 29, 2010, the parties filed a joint motion for preliminary approval of a class

---

court in the sense of being able to direct the litigation," because in representational litigation procedural safeguards are in place to ensure that the representative adequately represents the interests of the class. Williams v. Gen. Elec. Capital Auto Lease, 159 F.3d 266, 269 (7th Cir. 1998); Fed. R. Civ. P. 23(a)(3)–(4). As such, the unnamed class members are "bound by the plaintiffs' decision to consent to the magistrate judge's § 636(c) jurisdiction." Stackhouse v. McKnight, 168 Fed. Appx. 464, 466 n.1 (2d Cir. 2006); Kingsborough v. Sprint Commc'ns. Co., 673 F. Supp. 2d 24, 30 (D. Mass. 2009) (holding that unnamed class members are bound by the named class members' consent and are not "parties" for the purposes of § 636(c) despite their status as parties for the purpose of bringing an appeal); see Williams, 159 F.3d at 269. While the Supreme Court established that unnamed class members are "parties" for the purpose of appealing a ruling on their objection to a class action settlement and, thus, need not first intervene, the Court made clear that "considering non-named class members parties for the purpose of bringing an appeal [does not] conflict with any other aspect of class action procedure." Devlin v. Scardelletti, 536 U.S. 1, 14 (2002). Thus, "the Court's decision in Devlin does not establish [that an unnamed class member is] a 'party' for purposes of § 636(c)." Kingsborough, 673 F. Supp. 2d at 30.

Relying on Stackhouse, 168 Fed. Appx. at 467, certain objectors raise the possibility that other objectors can "later vacate a magistrate judge's dispositive order by arguing that they are parties under § 636(c) and did not give consent to be heard by a magistrate judge." (Dewey, Docket Entry No. 232 at 5). Their reliance on Stackhouse is misplaced. First, Stackhouse addressed whether or not a motion to intervene is a dispositive motion that a magistrate judge in the Second Circuit can decide only with consent of the parties to the motion or whether it can only be addressed by way of a report and recommendation. There are no motions to intervene in the present case so this issue is not implicated. Second, even if there had been a motion to intervene filed, it is not viewed as a dispositive motion in this District. In re Gabapentin Patent Litig., 312 F. Supp. 2d 653, 661 (D.N.J. 2004) (stating that "a motion to intervene is typically treated as non-dispositive"); United States. v. W.R. Grace & Co.–Conn., 185 F.R.D. 184, 187 (D.N.J. 1999) (noting that it is "common practice in this district for a magistrate judge to hear and determine a motion to intervene" in accordance with L. Civ. R. 72.1(a)(2), regardless of whether the parties consent to magistrate jurisdiction). Third, objectors do not have a right to intervene in a class action because intervention as a matter of right is inconsistent with the goal of Rule 23. Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 551–52 (1974); In re Cmty. Bank of N. Va., 418 F.3d 277, 315 (3d Cir. 2005). Finally, because no Rule 24 intervention motion was filed, the Court need not address whether such a motion, if granted, gives rise to the presence of a new "party" whose consent would be needed.

For all of these reasons, the Court finds that the named parties' consent to magistrate judge jurisdiction permits it to decide all issues related to the motions for final approval of the class settlement and attorneys' fees, as well as objections to both.

settlement, preliminary approval of a settlement class, and appointment of class counsel.

(<u>Dewey</u>, Docket Entry No. 163; <u>Delguercio</u>, Docket Entry No. 121.)  A telephonic hearing on

this motion was held on the record on February 3, 2010.  The Court considered the written

submissions, oral arguments, and governing law and directed that, no later than February 5, 2010,

the parties submit revised proposed settlement documents that included certain provisions for

notice to the putative class and changes to the type of documentation needed to obtain

reimbursement.  (<u>Dewey</u>,  Docket Entry No. 168; <u>Delguercio</u>, Docket Entry No. 125.)  This

deadline was ultimately extended until February 11, 2010.  (<u>Dewey</u>, Docket Entry Nos. 171, 172;

<u>Delguercio</u>, Docket Entry Nos. 125, 126.)

      The Order granting preliminary approval of a settlement class, class settlement, and

appointment of class counsel was signed on February 17, 2010, and entered on February 23,

2010.  (<u>Dewey</u>, Docket No. 175; <u>Delguercio</u>, Docket No. 129.)   The Order was amended on

March 26, 2010, and again on April 14, 2010.  (<u>Dewey</u>, Docket No. 176, 178; <u>Delguercio</u>,

Docket No. 130.)  The Amended Preliminary Approval Order provides for preliminary

certification of classes described as:

    (a)    all Persons, other than officers, directors, or employees of the defendants, who
purchased or leased, new or used, the following settlement class vehicles:

- 2001–2007 Volkswagen New Beetle vehicles with Vehicle Identification Numbers (VINs) below 3VW---1C-7M514779, equipped with sunroof;

- 2001–2005 Jetta A4 Sedan with VINs with "9M" in position 7 and 8, and 2001–2005 Volkswagen Jetta Wagon A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;

- 2001–2006 Volkswagen Golf A4, Volkswagen GTI A4 vehicles with VINs with "1J" in position 7 and 8, equipped with sunroof;

- 2005–2007 Volkswagen Jetta A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 2006–2007 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1999–2005 Volkswagen Passat B5 vehicles;

- 1997–2006 Audi A4 vehicles, B5 and B6 Platforms in MY[7]2005, with VINs with "8E" in position 7 and 8 with also "J" or "L" or "V" or "P" or "X" in position 4, and in MY2005 and MY2006, with VINs with "8H" in position 7 and 8 (including Cabrio, S, and RS versions);

- 1998–2005 Audi A6 C5 vehicles with VINs with "4B" in position 7 and 8 (including Allroad, S, and RS versions);

and

(b)   all persons, other than officers, directors, or employees of the defendants, who currently own or lease the following settlement class vehicles:

- 1998–2000 and 2007–2009 Volkswagen New Beetle with VINs 3VW---1C-7M514779 or higher, equipped with sunroof;

- 1997–1999 Volkswagen Jetta A3 with VINs with "1H" in position 7 and 8, 1999–2000 Volkswagen Jetta A4 with VINs with "9M" in position 7 and 8, and 2008–2009 Volkswagen Jetta A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1997–1999 Volkswagen Golf/GTI A3 with VINs with "1H" in position 7 and 8, 1999–2000 Volkswagen Golf/GTI A4 with VINs with "1J" in position 7 and 8, and 2008–2009 Volkswagen Golf/GTI A5 vehicles with VINs with "1K" in position 7 and 8, equipped with sunroof;

- 1998 Volkswagen Passat B5 vehicles;

- 1997 Volkswagen Passat B4 and 2006–2009 Volkswagen Passat B6 vehicles equipped with sunroof;

- 2004–2009 Volkswagen Touareg vehicles;

- 2005–2008 Audi A4 B7 Platform vehicles equipped with sunroof, in MY2005, with VINs with "8E" in position 7 and 8 and also "A" or "D" or "K" or "G" or "U" in position 4 (including S and RS versions);

- 1997 Audi A6 C4 vehicles;

- 2005–2009 Audi A6 C6 vehicles equipped with sunroof with VINs with "4A" or "4F" in position 7 and 8 (including S and RS versions);

- 1997–2009 Audi A8 vehicles  (including S versions).

The proposed settlement provides for: (1) educational preventative maintenance

---

[7] The abbreviation "MY" means "model year."

information for all class members; (2) inspection, modification, and repair of plenum and sunroof drain systems for certain qualifying class members; (3) monetary reimbursement for repair and vehicle damage for certain qualifying class members to be paid out of an $8 million reimbursement fund; (4) donation of all unclaimed reimbursement funds to an educational, charitable, or research facility after five years; and (5) payments of $10,000 to each representative plaintiff to be paid separate from the reimbursement fund. (<u>Dewey</u>, Docket Entry No. 174 Attach. 1 at 15–24; <u>Delguercio</u>, Docket Entry No. 128 Attach. 1 at 15–24.) The defendants also agreed to pay class counsel's fees and expenses, but no agreement concerning the amounts or method to calculate the fees was reached. (<u>Id.</u> at 36 ¶¶ 15.2–15.3.)

The Amended Preliminary Approval Order also directed that notice of the proposed settlement be communicated in the following ways: (1) direct mail to all original and subsequent owners and lessees of settlement class vehicles for whom mailing address data is available; (2) establishment of a website with an electronic version of the mailed notice and claim form; and (3) publication in USA Today. (<u>Dewey</u>, Docket Entry No. 178; <u>Delguercio</u>, Docket Entry No. 130; <u>see</u> <u>Dewey</u>, Docket Entry No. 174 Attach. 1 at 25–27; <u>Delguercio</u>, Docket Entry No. 128 Attach. 1 at 25–27 and Docket Entry No. 130.) The summary notice was published in USA Today on May 7, 2010, and May 12, 2010, and notices, reimbursement forms (where applicable), and a revised maintenance schedule were mailed to 4,202,925 VW class members and 2,141,208 Audi class members. (<u>Dewey</u>, Docket Entry No. 216 ¶ 5; <u>Dewey</u>, Docket Entry No. 241 ¶ 3.) Most class members were given until June 15, 2010, to request exclusion from or file objections to the settlement. (<u>Dewey</u>, Docket Entry Nos. 176, 178; <u>Delguercio</u>, Docket Entry No. 130.) In June 2010, a second mailing was sent using updated addresses for owners and lessees of 579,088

-8-

class vehicles who did not receive the first mailed notice. (Dewey, Docket Entry No. 241 ¶ 3.) The opt-out/objection and claims deadlines for those who were sent this second mailing was extended until July 21, 2010, and August 30, 2010, respectively. (Id.)

The settlement administrator, Rust Consulting, established the court-ordered website which, as of July 22, 2010, had 19,891 unique visitors. (Id. ¶ 6.) As of July 22, 2010, Rust Consulting also received 1,961 emails and 14,918 claim forms. (Id. ¶¶ 6, 10.) Rust Consulting also established a toll-free number which, as of July 22, 2010, received 18,137 calls. (Id. ¶ 5.)

The Amended Preliminary Approval Order also appointed Mazie Slater Katz & Freeman and Schoengold & Sporn, P.C. (f/k/a Schoengold Sporn Laitman & Lometti, P.C.) as co-class counsel, and established deadlines for filing motions for final approval and for attorneys' fees and costs. (Dewey, Docket Entry No. 178 at 4–5; Delguercio, Docket Entry No. 130 at 4–5.) Subsequent Orders adjusted the deadlines to file motions for final approval of a settlement class and the class settlement, and for attorneys' fees and resolved disputes concerning confirmatory discovery. (Dewey, Docket Entry Nos. 181, 185, 191; Delguercio, Docket Entry Nos. 132, 134.)

Consistent with the Orders, on June 9, 2010, the plaintiffs filed their motion for attorneys' fees, seeking an award of $22.5 million. This number was based upon the plaintiffs' determination that the value of the settlement exceeded $142 million and their assertion that they were entitled to 15.83% of the settlement. (Dewey, Docket Entry Nos. 194–201.) On July 23, 2010, the parties notified the Court that the plaintiffs agreed to seek and the defendants agreed not to oppose having the settlement valued at $90 million. (Dewey, Docket Entry No. 238.) Despite the reduction in the value the plaintiffs assigned to the settlement, the plaintiffs repeated

their request for the $22.5 million fee award[8] and asserted that it was based on their view that they are entitled to a fee equal to 25% of their revised settlement valuation of $90 million. (Fairness Hearing.)

In support of their valuation figure, the plaintiffs have submitted the expert reports of economist Dr. George Eads and appraiser Mr. Richard Hixenbaugh and the defendants presented the expert reports of economist Dr. Janusz Ordover and automotive engineer Robert Lange. (Dewey, Docket Entry No. 219 at 35; .)

On June 17, 2010, the plaintiffs filed their motion for final approval of the settlement class and class settlement. (Dewey, Docket Entry No. 213.) On June 28, 2010, the defendants filed a brief joining in the request for final approval of the settlement but disputing the plaintiffs' characterization of the pretrial process, the value of the settlement, and the likelihood that the plaintiffs could succeed with class certification or prevail at trial. (Dewey, Docket Entry Nos. 215, 217.) In addition to the positions of the parties, the Court considered objectors from 203 putative class members[9] and was informed that 1,119 putative class members opted-out of the class and settlement. (See Dewey, Docket Entry No. 241 ¶ 8.)

On July 26, 2010, the Court conducted a Fairness Hearing.  During the hearing, the Court

---

[8] Counsel represent that the lawyers and paraprofessionals spent at least 12,195.5 hours on this case and that the lodestar amounts to $6,535,696.16 using what they assert are hourly rates used by other firms doing class action work. (Dewey, Docket Entry No. 195 Attach. 1 at 8–12; Dewey, Docket Entry No. 240 ¶ 5; Dewey, Docket Entry No. 242 Ex. 1.) In addition, the plaintiffs seek costs totaling $1,003,652.05. (Dewey, Docket Entry Nos. 194–201; Dewey, Docket Entry No. 240 at 4; Dewey, Docket Entry No. 242 Attach. 2.)

[9] Rust Consulting reported receiving only 152 unique objections, (Dewey, Docket Entry No. 241 ¶ 9), but the Court has received additional and/or different objections, bringing the total to 203.

-10-

heard oral arguments from the parties and objectors who sought to be heard and heard testimony from Dr. Eads.[10]

Based upon the record and the governing law, the Court makes the findings and conclusions set forth in this Opinion.

### III. DISCUSSION

**A.    Subject Matter Jurisdiction**

The Class Action Fairness Act of 2005 (CAFA) grants district courts original jurisdiction over any civil action involving a proposed class of at least 100 members "' in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant.'" DiCarlo v. St. Mary Hosp., 530 F.3d 255, 261 (3d Cir. 2008) (citing the district court's application of 28 U.S.C. § 1332(d)(2)); see also 28 U.S.C. § 1332(d)(5)(B).

These requirements are satisfied here.  First, the dispute involves more than one million

---

[10] At the Fairness Hearing, counsel for certain objectors sought to cross-examine Dr. Eads.  The Court denied the request because: (1) the objectors' counsel provided no notice of a desire to examine the witness; (2) the plaintiff and the Court both examined the witness; and (3) the objectors' counsel had the opportunity to challenge the expert's opinion both orally and in writing.  Moreover, the record shows that the objections were considered and some of the questions class counsel and the Court posed addressed concerns raised by various objectors.  Furthermore, the parties represented that the objectors had access to the expert's deposition transcript.  Thus, counsel for the objectors had sufficient information, without separate examination, to challenge the expert's opinion via oral argument.  Because the record was adequate for the objectors' counsel to make his arguments and the Court to make its finding, his separate examination was not necessary.  Cf In re Cmty. Bank of N. Va., 418 F.3d at 316 (finding that discovery by objectors is permissible only if the totality of the circumstances show that class counsel for the parties did not conduct adequate discovery or if the discovery was not available to the objectors).

class members.  (<u>Dewey</u>, Docket Entry No. 213 Attach. 3 at 6.)  Second, the amount in

controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs.  (<u>Dewey</u>,

Docket Entry Nos. 86 ¶ 14 and 87 ¶ 12; <u>Delguercio</u>, Docket Entry No. 63 ¶ 12.)  The monetary

component of the settlement alone is $8,000,000. (<u>Dewey</u>, Docket Entry No. 174 ¶ 5; <u>Delguercio</u>,

Docket Entry No. 128 ¶ 5.)  Third, at least one named plaintiff is a citizen of a state different

from the defendants.  The named plaintiffs are citizens of Maryland, New Jersey, New York, and

California.  (<u>Dewey</u>, Docket Entry No. 86 ¶¶ 17, 20, 23, 26, 29; Docket Entry No. 87 ¶¶ 14–17;

<u>Delguercio</u>, Docket Entry No. 63 ¶¶ 14–17.)  Defendants VWAG and Audi AG are German

companies, (<u>Dewey</u>, Docket Entry Nos. 90 ¶ 32 and 95 ¶ 35), while VWGoA is a New Jersey

corporation and Audi of America is an unincorporated division of it.  (<u>Dewey</u>, Docket Entry Nos.

89 ¶ 34 and 90 ¶¶ 34, 37 and 95 ¶ 37.)  VWBG is a defunct German Corporation and Audi of

America, LLC is a Delaware corporation.  (<u>Dewey</u>, Docket Entry No. 86 ¶¶ 33, 36; Fairness

Hearing; <u>Dewey</u>, Docket Entry Nos. 89 ¶ 33 and 94 ¶ 36.)  Given that there are plaintiffs from

New York, Maryland, and California and no defendant is a citizen of those states, CAFA's

minimal diversity requirement is met.  Therefore, this Court has subject matter jurisdiction over

this case.

**B.**    **Personal Jurisdiction**

Personal jurisdiction exists over the parties because the defendants regularly do business

in this District and the named plaintiffs have, by filing this action, voluntarily submitted to this

Court's jurisdiction.  As to out-of-state class members, sufficient notice of the settlement and an

opportunity to object have been provided, (<u>Dewey</u>, Docket Entry Nos. 175, 176, 178, 181, 216),

thereby satisfying due process and the requirements of Fed. R. Civ. P. 23(b)(3).  <u>Phillips</u>

Petroleum Co. v. Shutts, 472 U.S. 797, 812–13 (1985); In re Prudential Ins. Co. of Am. Sales

Practice Litig., 148 F.3d 283, 306 (3d Cir. 1998) ("In re Prudential"); Varacallo v. Mass. Mut.

Life Ins. Co., 226 F.R.D. 207, 224 (D.N.J. 2005).

## C.   **Class Certification**

For the Court to certify a class, the plaintiffs must satisfy all of the requirements of Rule

23(a), and one of the requirements of Rule 23(b).  Fed. R. Civ. P. 23(a)–(b).  Class certification

cannot be presumed and a class may be certified only after a rigorous analysis demonstrates that

all Rule 23 requirements are met.  See In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305,

307 (3d Cir. 2008).  Even where a plaintiff seeks certification of a settlement class,[11] as opposed

to formal class certification, courts "must consider the propriety of certification as if the case

were to go to trial."  In re Prudential, 962 F. Supp. at 508.  With these rules in mind, the Court

now addresses the class certification factors.

### I.   **Rule 23(a)**

Under Rule 23, a class action is appropriate when:

(1)   the class is so numerous that joinder of all members is impracticable;

(2)   there are questions of law or fact common to the class;

(3)   the claims or defenses of the representative parties are typical of the claims
or defenses of the class; and

(4)   the representative parties will fairly and adequately protect the interests of

---

[11] A settlement class is "a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement, thus allowing a defendant to explore settlement without conceding any of its arguments against certification."  In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 508 (D.N.J. 1997) ("In re Prudential") (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 786 (3d Cir. 1995) ("In re Gen. Motors")) (internal citations omitted).

the class.

Fed. R. Civ. P. 23(a).  These prerequisites are known as numerosity, commonality, typicality, and adequacy.  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).  They are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees . . ." Id. The Court will address each in turn.

**a.    The Class is So Numerous that Joinder of all Members is Impracticable**

The Court must first consider whether the class is so numerous that joinder of all members is impracticable.[12]  See Varacallo, 226 F.R.D. at 229 (noting that joinder of hundreds of individuals would be impracticable).  The numerosity "requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient." Szczubelek v. Cendant Mortgage Corp., 215 F.R.D. 107, 116 (D.N.J. 2003); see also McGee v. Cont'l Tire N. Am., Inc., Civ. No. 06-6234, 2009 WL 539893, at *10 (D.N.J. Mar. 4, 2009) (observing that it is impracticable to join 280,000 geographically dispersed class members). While no minimum number of plaintiffs is required, "generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001); see also In re Prudential, 148 F.3d at 309 (holding that a proposed class of 8 million past and present policyholders satisfies the numerosity requirement).  Moreover, a class must be large enough in number to ensure that, for efficiency purposes, the defendant is not subjected to multiple, similar lawsuits.

---

[12] Numerosity and commonality are both used to evaluate the sufficiency of the class itself.  See Hassine v. Jeffes, 846 F.2d 169, 176 n.4 (3d Cir. 1988).

-14-

Thus, to determine if numerosity is satisfied, a court should "consider the estimated number of parties in the proposed class, the expediency of joinder, and the practicality of multiple lawsuits." Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 543 (D.N.J. 1999) (citations omitted).

Here, the estimated number of class members exceeds 5.5 million. (Dewey, Docket Entry No. 213 Attach. 3 at 6.) The class definition includes owners or lessees of approximately 3 million 1997–2009 VW and Audi vehicles. (Id.) A lawsuit involving such a large number of individual potential plaintiffs would be inefficient, unwieldy, and difficult for both the Court and the parties to manage.[13] Moreover, absent a class approach, the defendants could be subjected to numerous similar lawsuits. Because the number of potential plaintiffs in this case makes joinder of all parties impractical, the Court finds that the numerosity requirement is satisfied.

**b.    There are Questions of Law or Fact Common to the Class**

Second, the Court must consider whether there are questions of law or fact shared among the named plaintiffs and all members of the class. For a class to satisfy the commonality requirement, "the named plaintiffs [must] share at least one question of fact or law with the grievances of the prospective class." In re Prudential, 148 F.3d at 310 (citing Baby Neal, 43 F.3d at 56). Though identical claims ease satisfaction of this requirement, "factual differences among the claims of the putative class members do not defeat certification." Id. at 311 (citations omitted). The key consideration is whether the class seeks a remedy to a grievance involving common questions of law and fact. Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985).

---

[13] After Amchem Prods. Inc. v. Windsor, 521 U.S. 591 (1997), "the manageability inquiry in settlement-only class actions may not be significant." In re Prudential, 148 F.3d at 321.

Thus, it is usually relatively simple to satisfy this requirement.  <u>In re Ikon Office Solutions, Inc.</u>, 191 F.R.D. 457, 463 (E.D. Pa. 2000) (hereinafter "<u>In re Ikon I</u>").

While the Court acknowledges that the case involves multiple manufacturers, multiple car models, and multiple model years, some common factual and legal questions arise from complaints about the plenum and sunroof drain systems that each class member's vehicle contained.  Factually, the systems serve the same purpose, namely to keep water from seeping into the vehicle, and the class representatives have all complained that the systems have failed to accomplish this purpose.  (<u>Dewey</u>, Docket Entry Nos. 86 ¶ 3 and 87 ¶ 8; <u>Delguercio</u>, Docket Entry No. 63 ¶ 8.)  Legally, the success of each claim hinges on similar facts and requires proof regarding the design of these systems and the maintenance instructions and whether they fulfilled their purposes.  The named plaintiffs and the potential class members are situated such that the defendants owed them the same duties and the alleged failure to fulfill these duties allegedly caused the same damage to all class members.  Accordingly, there are questions of law and fact common to the settlement class.

> ### c.      The Claims of the Representative Parties are Typical of the Claims of the Class

Third, the Court must determine whether the claims of the representative plaintiffs are typical of those of the class members.  Specifically, "[t]ypicality lies where there is a strong similarity of legal theories . . . or where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant."  <u>In re Prudential</u>, 962 F. Supp. at 518 (internal citations omitted).  This factor also considers "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with

those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57. Like the commonality requirement, however, all putative class members need not share identical claims. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531–32 (3d Cir. 2004) ("In re Warfarin"). Indeed, "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of varying . . . fact patterns." Stewart, 275 F.3d at 227 (citation omitted). Put differently, the typicality requirement is met, regardless of factual differences, as long as the same unlawful conduct was directed at or affected both the plaintiffs and the absent class members. In re Warfarin, 391 F.3d at 531–32; Cannon, 184 F.R.D. at 544 (claims are typical if they arise from the same course of conduct and are based on the same legal theory).

In the present case, the named plaintiffs and each potential class member is or was an owner or lessee of one or more of the vehicles that the defendants designed and/or manufactured. Additionally, the named plaintiffs and the potential class members each owned or leased cars with the plenum or sunroof drain systems that allegedly failed to prevent water infiltration, and each either suffered or risked suffering water damage as a result. Moreover, each was allegedly provided insufficient maintenance instructions to avoid damage. (Dewey, Docket Entry Nos. 86 at 2–9 and 87 at 8, 10; Delguercio, Docket Entry No. 63 at 8, 10.) Thus, each potential class member was subjected to the same conduct in which the defendants engaged and this conduct forms the basis of the named plaintiffs' claims. Accordingly, the named plaintiffs' claims are typical of the claims of the other class members. See Zinberg v. Washington Bancorp, Inc., 138 F.R.D. 397, 407 (D.N.J. 1990).

**d.    The Representative Parties Will Fairly and Adequately Protect the Interests of the Class**

Fourth, the Court must be satisfied that the representative parties will "fairly and adequately protect the interests of the class." In re Warfarin, 391 F.3d at 532. This inquiry "has two components designed to ensure that absentees' interests are fully pursued." Id. (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 630 (3d Cir. 1996)). First, the Court must assess whether the named plaintiffs' counsel will adequately represent the class. In re Warfarin, 391 F.3d at 532; In re Gen. Motors, 55 F.3d at 800. To this end, courts consider whether the plaintiffs' counsel is qualified, experienced, and able to conduct the litigation. In re Prudential, 148 F.3d at 312. Second, courts must evaluate "conflicts of interest between named parties and the class they seek to represent." In re Warfarin, 391 F.3d at 532. This requires the Court to determine whether or not there is "'antagonism between [the named plaintiffs'] objectives and the objectives of the [class]', [which constitutes] a 'legally cognizable conflict of interest' between the two groups." In re Ins. Brokerage Antitrust Litig., Civ. No. 04-5184, 2007 WL 542227, at *15 (D.N.J. Feb. 16, 2007) (quoting Jordan v. Commonwealth Fin. Sys., Inc., 237 F.R.D. 132, 139 (E.D. Pa. 2006)). A conflict will not be sufficient to defeat class certification "unless [that] conflict is apparent, imminent, and on an issue at the very heart of the suit." Id. (internal quotation marks omitted).

In the present case, the first prong of adequate representation is met. Class counsel Adam M. Slater and Samuel P. Sporn and their respective law firms are experienced in class action litigation and have prosecuted numerous class actions throughout the United States. (See Dewey, Docket Entry No. 195 Attach. 1 ¶ 4; Dewey, Docket Entry No. 196 Attach. 1 ¶¶ 1, 5.) Their

-18-

conduct in this case is consistent with their well-deserved reputations. They conducted extensive discovery, investigated public and private sources of information relating to the claims, examined the evidence produced during discovery, consulted with a variety of technical automotive experts, and researched the law of all fifty states. (<u>Dewey</u>, Docket Entry No. 194 at 26–28; <u>see</u> <u>Dewey</u>, Docket Entry No. 196 Attach. 1 at 4–7.) Moreover, the record reflects hard fought motion practice on both discovery and merits issues that has continued even through the Fairness Hearing. (<u>See, e.g.</u>, <u>Dewey</u>, Docket Entry Nos. 43, 46, 49, 51, 53, 70, 72, 73, 74, 75, 77, 78, 97, 99, 100, 102, 105, 111, 115, 117, 119, 124, 128, 129, 130, 131, 132, 138, 144, 145, 146, 147, 152, 153, 217, 219; <u>Delguercio</u>, Docket Entry Nos. 15, 26, 29, 30, 32, 47, 48, 53, 57, 58, 59, 69, 71, 72, 77, 103, 104, 111, 112, 114, 132.) In addition, they engaged in lengthy and complex settlement negotiations in an effort to resolve an alleged defect afflicting more than 3 million cars. (<u>Dewey</u>, Docket Entry No. 194 at 26; <u>see</u> <u>Dewey</u>, Docket Entry No. 196 Attach. 1 at 6–7; <u>see also</u> <u>Dewey</u>, Docket Entry No. 213 Attach. 3 at 6.) Together with the well-represented defendants, they devised a plan to address these alleged defects by offering class members, depending on their vehicle, repair of existing problems, reimbursement for past repairs, and information to prevent future damage. Accordingly, the Court finds that the attorneys are qualified, experienced, and able to conduct the litigation of this class action.

The second prong is also satisfied as there are no conflicts of interest between the named plaintiffs and the class members. The named plaintiffs are in the same position as the class members because each of them owned or leased the subject vehicles that contained the allegedly defective plenum or sunroof drain system, received allegedly inadequate maintenance recommendations and, as a result, suffered the same injury. Like the putative class members, the

named plaintiffs have an interest in obtaining redress for damage or avoiding future damage caused by the allegedly defective systems. Moreover, there is nothing before the Court to show that the proposed representatives have interests that differ from those of the class members at large. The fact that the relief class members receive may differ based upon the vehicle the member owned or leased does not reflect antagonism or differing interests. Rather, it reflects the compromise reached to address the frequency problems were reported for each model. Thus, the proposed class representatives are adequate.

Accordingly, the Court appoints Jacqueline DelGuercio, Lynda Gallo, Francis Nowicki, Kenneth Bayer, John M. Dewey, Patrick DeMartino, Patricia Romeo, Ronald B. Marans, and Edward O. Griffin as class representatives and Adam M. Slater and his firm Mazie Slater Katz & Freeman LLC and Samuel P. Sporn and his firm Schoengold & Sporn, P.C. as co-lead class counsel.

### ii.     Rule 23(b)

Having determined that the class satisfies Rule 23(a)'s requirements of numerosity, commonality, and typicality, and it has adequate representation, the Court now considers whether the proposed class falls within one of the categories set forth in Rule 23(b). The named plaintiffs seek class certification under Rule 23(b)(3) and, as such, must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see, e.g. Dal Ponte v. Am. Mortgage Express Corp., Civ. No. 04-2152, 2006 WL 2403982, at *4 (D.N.J. Aug. 17, 2006); Cannon, 184

F.R.D. at 545.  The Court will address the predominance and superiority requirements in turn.

      a.     **Predominance**

To determine whether common issues predominate over questions affecting only individual members, the Court must look at each claim upon which the plaintiffs seek recovery and identify the law that applies to the claim.  See In re Hydrogen Peroxide, 552 F.3d at 311 (noting that the predominance inquiry requires an examination of the elements of the plaintiffs' claims "through the prism of Rule 23").  Once the court identifies the applicable law, it must determine whether generalized evidence exists to prove the elements of the plaintiffs' claims on a simultaneous, class-wide basis, or whether proof will be overwhelmed by individual issues. Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 210 (E.D. Pa. 2000).  While the "presence of individual questions . . . does not mean that the common questions of law and fact do not predominate," In re Ins. Brokerage Antitrust Litig., 2007 WL 542227, at *15 (quoting Eisenberg, 766 F.2d at 786), the predominance requirement demands that the issues in the class action be applicable to the class as a whole, and support at least one cognizable common cause of action, and involve common proof.  See Sullivan v. DB Invs., Civ. No. 08-2784, 2010 WL 2736947, at *14 n.15 (3d Cir. July 13, 2010); Szczubelek, 215 F.R.D. at 120.

In their Fourth Amended Complaints, the named plaintiffs seek relief for violations of the CFA, breach of express and implied warranties, negligent misrepresentation, fraud, unjust enrichment, breach of the duty of good faith and fair dealing, and improper repair, based on defects in the sunroof drains or plenum drains in cars that the defendants designed and/or manufactured.  (Dewey, Docket Entry Nos. 86 ¶¶ 70–121 and 87 ¶¶ 46–97; Delguercio, Docket

Entry No. 63 ¶¶ 46–97.)  Putting aside differences that may exist among the state laws for some

of the state law claims asserted in plaintiffs' complaint, see, e.g. Sullivan, 2010 WL 2736947, at

*14 n.15, the plaintiffs state that their primary claim is breach of express warranty.  (Dewey,

Docket Entry No.194 Attach. 1 at 6 n.5, 8; Fairness Hearing.)  As the Hon. Harold A. Ackerman

observed, the state laws on express warranty are similar.  In re Ford Motor Co. E - 350 Van

Prods. Liab. Litig. (No. II), Civ. No. 03-4558, slip op. at 10 (D.N.J. Sept. 3, 2008).  Moreover,

liability for all of the claims will depend on evidence about the design of the plenum or sunroof

drains and whether or not they fulfilled their purpose.  In addition, proof of some of the claims

will depend upon the sufficiency of the maintenance instructions that the defendants distributed

to the class, the warranties that the defendants provided, and whether they fulfilled their

purposes.  See id.  Thus, similar evidence will be offered regardless of the individual class

member's vehicle model or year.  Moreover, all class members seek recovery based upon

common legal theories for similar damages that each class member sustained or could sustain

because the plenum or sunroof drain failed to keep water out or because the maintenance

requirements were not clearly conveyed.[14]  Accordingly, individual inquiries will not

predominate over the common questions of fact and law, at least as to the express warranty

claim, that are shared among members of the potential class.  Therefore, the predominance factor

is satisfied.

### b.    Superiority

Next, the Court considers whether or not a class action is a superior method of fairly and

---

[14] Unlike in Sullivan, there is no claim that the plaintiffs lack standing to pursue at least one of the alleged causes of action.

efficiently adjudicating the controversy.  Rule 23(b)(3) provides a non-exhaustive list of factors

to be considered when making this determination.  These factors include:

> (A)  the class members' interests in individually controlling the
>       prosecution or defense of separate actions;
>
> (B)  the extent and nature of any litigation concerning the
>       controversy already begun by or against class members;
>
> (C)  the desirability or undesirability of concentrating the
>       litigation of the claims in the particular forum; and
>
> (D)  the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  An analysis of each factor demonstrates that a class action is a superior

method of addressing this dispute.

    With regard to the first factor, it is not clear that the individual class members would have

an interest in controlling the prosecution of individual actions given the limited amount each

plaintiff could recover.  The maximum recovery of each individual is likely the actual value of

the repair and clean up for damage that actually occurred.  Given the cost to file an individual

suit ($350.00) and the expenses required to litigate the case, which would require retention of

design experts, it is not apparent that the money potentially recoverable by an individual class

member is large enough to make individual litigation a realistic possibility.  Florence v. Bd. of

Chosen Freeholders of Burlington, Civ. No. 05-3619, 2008 WL 800970, at *13–14 (D.N.J. Mar.

20, 2008); Jones v. Commerce Bancorp, Inc., Civ. No. 05-5600,  2007 WL 2085357, at *4

(D.N.J. July 16, 2007).  Moreover, denying certification would require each owner or lessee to

file suit individually at the expense of judicial economy.  In re Wellbutrin Sr Direct Purchaser

Antitrust Litig., Civ. No. 04-5525, 2008 WL 1946848, at *9 (E.D. Pa. May 2, 2008).

    The other factors also each weigh in favor of certification.  Regarding the second factor,

there is no evidence of any other litigation involving the claims asserted in the present case.  The

third factor also favors certification because efficiency makes it "'desirable to litigate similar,

related claims in one forum.'" <u>Florence</u>, 2008 WL 800970, at *14 (quoting <u>Cannon</u>, 184 F.R.D.

at 546); <u>In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.</u>, 174 F.R.D. 332, 351 (D.N.J.

1997). The fourth factor points to the superiority of a class approach because there is nothing

before the Court to suggest difficulty in managing this case as a settlement class action. In fact,

"litigating all claims together avoids the risk of inconsistent results for [the d]efendant and for all

direct purchasers." <u>In re Wellbutrin</u>, 2008 WL 1946848, at *10. In short, a class action here

promotes judicial efficiency, avoids inconsistency, and provides a single forum to resolve

numerous common claims.

For these reasons, the Court finds that the plaintiffs have satisfied Rule 23(a) and

23(b)(3). Thus, the Court certifies the class for settlement purposes. The Court next turns to the

question of whether the settlement agreement should be approved.

**D.**     **Fairness of the Class Action Settlement**

Rule 23(e) requires court approval of any class action settlement and sets forth procedures

to be followed for deciding whether approval should be granted.[15] Fed. R. Civ. P. 23(e);

--------

[15] Specifically, Rule 23(e) provides:

> The claims, issues, or defenses of a certified class may be settled . . . only
> with the court's approval. The following procedures apply to a proposed
> settlement . . .
>
> (1)    The court must direct notice in a reasonable manner to all class
>        members who would be bound by the proposal.
>
> (2)    If the proposal would bind class members, the court may approve it
>        only after a hearing and on finding that it is fair, reasonable, and
>        adequate.
>
> (3)    The parties seeking approval must file a statement identifying any
>        agreement made in connection with the proposal.
>
> (4)    If the class action was previously certified under Rule 23(b)(3), the
>        court may refuse to approve a settlement unless it affords a new
>        opportunity to request exclusion to individual class members who
>        had an earlier opportunity to request exclusion but did not do so.
>
> (5)    Any class member may object to the proposal if it requires court

Varacallo, 226 F.R.D. at 235. The procedures "strengthen the process of reviewing proposed class-action settlements" and "assure adequate representation of class members who have not participated in shaping the settlement." Fed. R. Civ. P. 23(e) advisory committee's note (2003 Amendments). Rule 23(e) requires the Court to follow these procedures and "make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard." Id.

The Court approaches the parties' request for approval of their settlement mindful of its obligation under Rule 23 and the fact that "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." In re Gen. Motors, 55 F.3d at 784. In Weiss v. Mercedes-Benz of N. Am., 899 F. Supp. 1297, 1300 (D.N.J. 1995), former Chief Judge John W. Bissell observed that this policy is further supported by the advantages to the parties of a settlement as they "have far greater control of their destiny than when a matter is submitted to a jury" and reflects the consideration that "the time and expense that precedes the taking of such a risk can be staggering." The Court of Appeals reiterated these benefits in Ehrheart v. Verizon Wireless, Civ. No. 08-4323, 2010 WL 2365867, at *3 (3d Cir. June 15, 2010), in which it stated that settlements conserve judicial resources and enable the parties to avoid the costs and risks of a complex trial.

Here, the settlement requires the defendants to provide certain benefits to owners or lessees of particular VW and Audi vehicles. The benefits available to the class members vary depending upon the frequency of drain problems for the make and model of their vehicle. Under its terms, all class members receive educational preventative maintenance materials, including

---

approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).

mailings that recommend inspections and cleaning of the sunroof and plenum drain systems. (Dewey, Docket Entry No. 173 Attach. 1 at 16; DelGuercio, Docket Entry No. 127 Attach. 1 at 16.)  Some class members who own particular vehicle models receive vehicle cleaning and inspection, while others may have valves in the sunroof drain removed, and still others may receive reimbursement from an $8 million fund for expenses incurred for repairs, carpet cleaning, or carpet replacement.  (Dewey, Docket Entry No. 173 Attach. 1 at 15–19; DelGuercio, Docket Entry No. 127 Attach. 1 at 15–19.)  Certain vehicles will receive repair or replacement of the transmission control module and/or its attached wiring harness.  (Dewey, Docket Entry No. 173 Attach. 1 at 17–18; DelGuercio, Docket Entry No. 127 Attach. 1 at 17–18.)

Notice of the proposed settlement was transmitted to the settlement class pursuant to the Amended Preliminary Approval Order, using the best practicable notice methods under the circumstances.  (Dewey, Docket Entry No. 178 at 5–6; DelGuercio, Docket Entry No. 130 at 5–6.)  Specifically, notice was: (1) mailed to more than 5 million owners and lessees, using vehicle registration records from all fifty states to identify those in possession of vehicles covered by the settlement; (2) published on two separate dates in USA Today; and (3) provided through a website established for the purpose of posting the notice, claims forms, settlement agreement, and other relevant documents.  (Dewey, Docket Entry No. 178 at 6 ¶ 8; DelGuercio, Docket Entry No. 130 at 6 ¶ 8; Dewey, Docket Entry No. 213 Attach. 4 ¶ 9; see also Dewey, Docket Entry No. 174 at 25–27; DelGuercio, Docket Entry No. 128 at 25–27.)  The effectiveness of the notice is demonstrated by the class members' responses.  For instance, Rust Consulting's website had 19,891 unique visitors as of July 22, 2010.  (Dewey, Docket Entry No. 241 ¶ 3.)  Rust Consulting also received 1,961 emails, 14,918 claim forms, and more than 18,137 telephone calls as of July 22, 2010.  (Dewey, Docket Entry No. 241 ¶¶ 5-6, 10.)

The Amended Preliminary Approval Order and the settlement agreement also provide that any person included within the class may choose to be excluded from the class by submitting

a written request for exclusion postmarked no later than June 15, 2010, (Dewey, Docket Entry No. 178 at 6–7 ¶¶ 9–10; DelGuercio, Docket Entry No. 130 at 6–7 ¶¶ 9–10; Dewey, Docket Entry No. 174 at 32; DelGuercio, Docket Entry No. 128 at 32), with the exception of a group of 579,088 putative class members to whom notice was re-sent, who had until July 21, 2010 to request exclusion. (Dewey, Docket Entry No. 241 ¶ 3.) Approximately 1,119 have exercised their right to opt-out, (Dewey, Docket Entry No. 241 ¶ 8), and over 200 have lodged written objections. Id. These responses indicate that the class received and understood the notice.

Moreover, the claims process is reasonable. As stated above, as of July 22, 2010, Rust Consulting has received 14,918 claims forms, (Dewey, Docket Entry No. 241 ¶ 10), and a substantial number of eligible class members have already received concrete benefits from the settlement. For instance, as of July 23, 2010, 78% of those eligible for the P9 and P9/66C8 Service Actions, which benefit MY2002 and certain MY2001-2005 VW Passat vehicles, and 79% of those eligible for the JU service action, which apply to certain MY2002 Audi A4, Audi A6, and Audi allroad vehicles, have taken advantage of those service action benefits. In addition, 97,711 vehicles have taken advantage of the 60A7/S9 service action, which applies to MY2001–2007 New Beetles, MY 2001–2006 A4 Golf/GTIs, and MY2001–2005 A4 Jettas. (Dewey, Docket Entry No. 240 at 5.) That so many class members have sought these inspections and repairs indicates the reasonableness of the claims process and the available relief. In addition, a claims form is available for those class members entitled to reimbursement for out-of-pocket expenses that does not require submission of receipts if they are not available, which thereby eases the burden on the claimants. (Dewey, Docket Entry No. 173 Attach. 4 ¶ 3.)

These events show that the putative class received valid, due, and sufficient notice of the settlement and these proceedings. Accordingly, the notice complies with due process requirements, and Rule 23(e) is thereby satisfied.

Furthermore, experienced counsel on both sides seek approval of the settlement. (See

Dewey, Docket Entry No. 213 Attach. 4 ¶ 2; Dewey, Docket Entry No. 213 Attach. 5 ¶ 3; see also Docket Entry No. 217 at 25 (reflecting the defendants' agreement that the settlement should be approved).) Experienced class counsel's approval is entitled to considerable weight and favors finding that the settlement is fair. See In re Cendant Corp. Litig., 264 F.3d 201, 233 n.18 (3d Cir. 2001) ("In re Cendant") (quoting In re Gen. Motors, 55 F.3d at 785); In re Warfarin, 391 F.3d at 535; Varacallo, 226 F.R.D. at 240. Even with counsel's concurrence, however, the Court must carefully examine the fairness and reasonableness of the settlement, as it serves as a fiduciary that "guard[s] the claims and rights of the absent class members." Ehrheart, 2010 WL 2365867, at *2.

In this Circuit, the factors set forth in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), are used to determine whether a class settlement is fair and reasonable. See In re Warfarin, 391 F.3d at 534–35. The Girsh factors are:

(1)   the complexity, expense and likely duration of the litigation;

(2)   the reaction of the class to the settlement;

(3)   the stage of the proceedings and the amount of discovery completed;

(4)   the risks of establishing liability;

(5)   the risks of establishing damages;

(6)   the risks of maintaining the class action through the trial;

(7)   the ability of the defendants to withstand a greater judgment;

(8)   the range of reasonableness of the settlement fund in light of the best possible recovery; and

(9)   the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157 (quotation marks and alterations omitted). In addition, in In re AT & T Corp., 455 F.3d 160, 165 (3d. Cir. 2006), the appellate court observed that:

district courts should also consider other potentially relevant and appropriate factors, including, among others: '[T]he maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the

-28-

development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved-or likely to be achieved-for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

In re AT & T Corp., 455 F.3d at 165 (quoting In re Prudential, 148 F.3d at 323) (internal quotation marks omitted). The Court has considered all of these factors to the extent they are applicable to decide whether to approve or reject the proposed class action settlement.

### I.      The Complexity, Expense, and Likely Duration of the Litigation

First, the Court must consider the complexity, expense, and likely duration of the litigation. The purpose of this factor is "'to capture the probable costs, in both time and money, of continued litigation.'" In re Ikon Office Solutions Secs. Litig., 209 F.R.D. 94, 104 (E.D. Pa. 2002) (hereinafter "In re Ikon II") (quoting In re Gen. Motors, 55 F.3d at 812). In short, "[b]y measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." In re Gen. Motors, 55 F.3d at 812.

Here, at the time the parties executed a settlement agreement, more than two and a half years had already passed since the lawsuit commenced and, without a settlement, the "adversarial path" would have stretched for years longer. The parties had yet to complete expert discovery, engage in dispositive motion practice, go to trial, or pursue any potential appeals. Accordingly, in the event this settlement is not approved, the parties will be forced to re-commence contentious litigation, which would undoubtably result in the expenditure of significant resources. Avoiding these potential protracted proceedings favors settlement. Id. at 812; In re Cendant Corp. Derivative Action Litig., 232 F. Supp. 2d 327, 333 (D.N.J. 2002) ("In re Cendant Derivative") (stating that disputed questions of liability and damages "'would involve fairly

-29-

complex and protracted litigation'") (quoting In re Cendant, 264 F.3d at 234). Therefore, this factor weighs in favor of approving the settlement.

### ii.       The Reaction of the Class to the Settlement

The second factor the Court must consider is the reaction of the settlement class to the settlement. Under this factor, courts "attempt[] to gauge whether members of the class support the settlement." In re Warfarin, 391 F.3d at 536 (internal quotations and citations omitted). Courts do this by looking at the "number and vociferousness of the objectors." In re Gen. Motors, 55 F.3d at 812. While courts "generally assume[] that 'silence constitutes tacit consent to the agreement,'" the "practical realities of class actions [have] led some courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." Id. (quoting Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993)) (recognizing that "[e]ven where there are no incentives or informational barriers to class opposition, the inference of approval drawn from silence may be unwarranted").

In the present case, with the potential class of over 5 million members,[16] less than 1% objected and only one state's attorney general raised a concern about one component of the settlement. (Dewey, Docket Entry No. 213 Attach. 4 ¶ 11; Dewey, Docket Entry No. 213 Attach. 5 ¶ 6.) The small number of objections to the settlement itself may be indicative of endorsement. See In re Prudential, 148 F.3d at 318; Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118–19 (3d Cir. 1990) (10% objection rate indicates class favors settlement); Bolger, 2 F.3d at 1313–14; Weiss, 899 F. Supp. at 1301 (a small percentage of objections allows an inference that a majority silently consents); Varacallo, 226 F.R.D. at 237–38. Moreover, as set forth herein,

---

[16] Dewey, Docket Entry No. 216 at 4 (6,344,133 total class members consisting of 4,343,668 current owners and the remainder former owners; no mention of current or past vehicle number); Dewey, Docket Entry No. 196 Attach. 1 ¶ 3 (6.4 million notices sent to owners of approximately 3 million vehicles); Dewey, Docket Entry No. 213 ¶ 9 (6,344,133 pieces of mail sent to approximately 5.5 million individuals).

none of the objections support a finding that the settlement is not fair or reasonable. <u>Bailey v.</u>

<u>AK Steel Corp.</u>, Civ. No. 06-468, 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008) (stating that

the "existence of objections does not mean that the settlement is unfair . . . [and] it is clear under

the applicable law that even a majority opposition to a settlement cannot serve as an automatic

bar to a settlement" that a court finds to be fair).

### a.      Objections to the Settlement

Under Rule 23(e)(5), "[a]ny class member may object to the proposal if it requires court

approval under this subdivision (e) . . . ." Fed. R. Civ. P. 23(e)(5).  As previously noted, notice

was sent to more than 5 million class members, and the Court received 203 objections to the

settlement.  More than 180 objections were submitted directly by putative class members.  In

addition, nine attorneys presented objections on behalf of approximately sixteen objectors.[17]

Plaintiffs note that several of these attorneys[18] have been described as "professional objectors"

and their positions have not always been well-received,[19] (Dewey, Docket Entry No. 213 at

---

[17] Objectors Sally J. van Haitsma, Tara Castaldo, and Michael A. Brusca (represented by Forrest S. Turkish); Objector David Sacks (represented by Douglas A. Cole); Objectors David Stevens and Orion Antique Importer, Inc. (represented by Thomas L. Cox, Jr.); Objectors Robert and Katherine Falkner (represented by Edward Cochran); Objector J.M. Cooper (represented by Chris M. Trepagnier); Objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan (represented by Theodore H. Frank (pro hac vice) and David M. Nieporent (local)); Objector Paul M. Kaufman (represented by Vincent S. Verdiramo (local) and Edward F. Siegel (pro hac vice)); and David T. Murray and James E. Pentz (represented by John J. Pentz).

[18] Edward Cochran (representing Objectors Robert and Katherine Falkner); Theodore H. Frank (pro hac vice) (representing Objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan); Edward F. Siegel (pro hac vice) (representing Objector Paul M. Kaufman); and John J. Pentz (representing David T. Murray and James E. Pentz).

[19] See Taubenfeld v. AON Corp., 415 F.3d 597, 599 (7th Cir. 2005) (faulting Pentz for failing to articulate his client's argument and putting forth "conclusory assertions" in his client's written objection); In re Wal-Mart Wage and Hour Employment Practices Litig., Civ. No. 06-225, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) (finding that Pentz, Siegel, and Cochran have a "documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated

-31-

35–37.) While "federal courts are increasingly weary of professional objectors," O'Keefe v. Mercedes-Benz U.S., LLC, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) (citation omitted), the Court has considered all objections, including those not timely filed, and finds none warrant rejection of the settlement.[20]

### 1.    The Suit is Meritless

---

by the settling class or counsel for the settling class"); Lonardo v. Travelers Indem. Co., Civ. No. 06-962, 2010 WL 1416698, at *15 (N.D. Ohio Mar. 31, 2010) (calling Frank's brief "long on ideology and short on law" when he failed to cite a single case); In re Initial Public Offering Sec. Litig., 671 F. Supp. 2d 467, 497 n.219 (S.D.N.Y. 2009) (noting that Pentz has been criticized by other courts for submitting "canned objections"); In re UnitedHealth Group Inc. PSLRA Litig., 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009) (holding that Siegel and other professional objectors "conferred no benefit whatsoever on the class or on the Court" and calling their pleadings "disingenuous," "outlandish," "laughable," and an attempt to "hijack as many dollars as they can wrest from a negotiated settlement"); Perez v. Asurion Corp., Civ. No. 06-20734, 2007 WL 2591180, at *8 (S.D. Fla. Aug. 8, 2007) (stating that the court "did not find any of the papers filed by [Siegel] to be particularly helpful"); In re AOL Time Warner ERISA Litig., Civ. No. 02-8853, 2007 WL 4225486, at *3 (S.D.N.Y. Nov. 28, 2007) (calling Pentz and Tsai's arguments "counterproductive" and "irrelevant or simply incorrect"); In re Royal Ahold N.V. Sec. & ERISA Litig., 461 F. Supp. 2d 383, 386 (D. Md. 2006) (noting that Pentz is a professional objector who "attached himself" to a plaintiff and holding that his objection was "not well reasoned and was not helpful"); In re Rent-Way Sec. Litig., 305 F. Supp. 2d 491, 520 n.12 (W.D. Pa. 2003) (denying objector Douglas A. Cole's application for attorneys' fees and noting an accusation by the plaintiffs' attorney that Cole tried to "strike a separate, more favorable settlement for [his] client in derogation of [lead counsel's] fiduciary responsibilities to the Class as a whole"); In re Twinlab Corp. Sec. Litig., 187 F. Supp. 2d 80, 88 (E.D.N.Y. 2002) (noting that Cole filed a sixteen-page objection which he later withdrew after plaintiffs' counsel agreed to pay him an amount "considerably more than [what] many, if not most, of the members of the class" received).

[20] Counsel for objectors West, Brickman, McKinney, and Sullivan also submitted opposition to the motion for final approval on July 12, 2010 based upon a claim that L.Civ.R. 7.1 governed the deadline for a response. (Dewey, Docket Entry No. 230.) Their brief will not be considered. First, the objectors had a time frame to submit their positions and the July 12, 2010 brief was filed after the deadline. Second, the deadlines for opposition to the motion for attorneys' fees and final approval were June 29, 2010, and June 28, 2010, respectively, not July 12, 2010. (Dewey, Docket Entry No. 178 ¶ 15; Docket Entry No. 185 at 2;  L. Civ. R. 7.1 (setting forth time frames for opposition Briefs that apply only if a court order does not modify them)). Since an order governed the briefing schedule, it supersedes Rule 7.1(d)(2) and as a result the West Objectors' July 12, 2010 brief is untimely.

Thirty-five class members question the merits of this case.[21]  Some state that they have experienced no water damage problems.  Others claim that any water damage is only attributable to an owner's failure to clean the car's roof.  These are the types of assertions a defendant may make to avoid liability.  The Court's obligation when evaluating a class settlement is not to protect the defendants but rather "to ensure that other unrepresented parties (absent class members) and the public interest are fairly treated by the settlement reached between the class representatives and the defendants."  Ehrheart, 2010 WL 2365867, at *2 (quoting Collins v. Thompson, 679 F.2d 168, 172 (9th Cir. 1982)).  The Court's "fiduciary protection," however, "does not extend to defendants in a class action, who are in a position to protect their own interests during negotiations."  Id.  Here, the defendants have had the opportunity to protect their own interests and have agreed to a settlement.  Moreover, for reasons stated elsewhere in this Opinion, the claims here survived motions to dismiss, and sufficient evidence has been developed to suggest that a design issue led to water ingress and that the design issue needed to be addressed.  Therefore, objections asserting that this suit lacks merit are themselves without merit.

### 2.    Attorneys' Fees

One hundred and six objectors[22] opposed the plaintiffs' multimillion dollar request for

---

[21] The thirty-five class members objecting to the merits of the suit are: Alan E. Peters, Anthony Joseph Ganino, Barbara Stevens, Bob Ellson, Brenda C. Rogers, Bruce Crain, Chris Hurdleston, Clyde Hart, Dennis D. Goodwin, Elliott L. Grosh, Frank R. Bacque, Gary Kueffer, Gene Zarwell, Georg H. Strasser, George H. Kuper, Gilbert Ribal, Greg Hammaren, Jacob Allen Fritz, Jill E. Knack, Jim Herman, Jocelyn M. Wychgram, John Clay, John Sabol, Kay Beth B. Roberts, Lewis F. Staples, Marianne Lisenko, Matthew Phillips, Maxine Hart, Nicholas Bentivegna, P. Aarne Vesilind, Robert D. Hilton, Daniel C. Hauk, Glenn Groeschel, and William G. Cottrell. One of the thirty-five objectors submitted concerns anonymously, and the Court has carefully considered those objections as well.

[22] One objector has the mistaken impression that she would be liable for attorneys' fees under the settlement agreement.  Since this is not the case, this objection does not provide a basis to reject the settlement.

attorneys' fees.[23]  Some objectors called the request "outrageous,"[24] "obscene,"[25] "astronomically ridiculous,"[26] "super-sized,"[27] and "legal blackmail."[28]  Distilled to their core, the objections concern: (1) the purported value of the settlement;[29] (2) the use of a multiplier to enhance the

---

[23] The 106 class members objecting to the requested attorneys' fees are:  Alan E. Peters, Katherine Falkner, Robert Falkner, Tom Luther, Joshua West, Darren McKinney, Lester Brickman, Michael Sullivan, Orion Antique Importer, Inc., David Stevens, James E. Pentz, David T. Murray, Jennifer B. Murray, Richard L. Whynot, Andra T. Gailis, Andrew Stryker, W. Andrew Fry, Brenda C. Rogers, Eric B. Martin, Alison G. Monroe, Charles C. Soltan, Anthony Joseph Ganino, Barbara Stevens, Benjamin Herta, Bob Ellson, Bonnie J. Friedman, Bruce Crain, Carl S. Paganelli, Charles H. Powers, Charles T. Major, Chris Hurdleston, Clyde Hart, Cynthia A. Albert, Daniel Sibley, Daryl Cornell, David A. Hale, Dennis D. Goodwin, Douglas B. Quine, Edward F. Lowe, Elliott L. Grosh, Eva G. Jalakas, Frank Lipsius, Frank R. Bacque, Gareth W. Neumann, Gary Kueffer, Geoffrey C. Jones, Georg H. Strasser, George H. Kuper, George Jones, Gera L. Witte, Gilbert Ribal, Gordon K. Roth, Greg Hammaren, Holger Berndt, Jacob Allen Fritz, James A. Klimchuk, Jeff Van Horne, Jason T. Fry, Jill E. Knack, Joanna B. Strauss, John Roberts, John Baker, John Clay, John Dean Jude, John F. Malloy, John R. Miller, John Sabol, John Waldeisen, Kay Beth B. Roberts, Kevin Byrnes, Leah J. Hampton, Lewis F. Staples, Linda Lowe, Marianne Lisenko, Mark E. Merin, Matthew Phillips, Maxine Hart. Michael Balch, Glenn Groeschel, Michael A. Brusca, Nicholas Bentivegna, Norbert Lindenberg, Pamela Kulsrud Corey, Patrick Essen, Patrick H. Yanke, Paul M. Kaufman, Robert D. Hilton, Robert Giesen, Robert J. Leger, Ronald D. Geiszler, J.M. Cooper, Sally J. van Haitsma, Stephen Michelin, Stephen R. Christian, Stephen R. Marsh, Tara Castaldo, Thomas Dietterich, Thomas Ross, Thomas Ward, Timothy L. Burke, Troy Corey, Vincent L. Garlick, Wayne D. Klocko, William G. Cottrell, and William W. Galvin III.  One of the 106 objectors submitted concerns anonymously, and the Court has carefully considered those objections as well.

[24] Objection letter of Jill Knack.

[25] Objection letter of Dennis D. Goodwin.

[26] Objection letter of Jacob Allen Fritz.

[27] Objection letter of Daryl Cornell.

[28] Objection letter of William W. Galvin, III.

[29] Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, James E. Pentz, Timothy L. Burke, Sally J. van Haitsma, Tara Castaldo, and Chris Hurdleston.

lodestar;[30] (3) the failure to limit attorneys' fees pursuant to New Jersey state law;[31] (4) calculation of attorneys' fees using the maximum potential recovery of the settlement benefits; (5) designation of the settlement fund as a "common fund;"[32] (6) application of the percentage-of-recovery approach;[33] (7) the ratio of attorneys' fees to the settlement fund;[34] (8) the amount of attorneys' fees sought compared to awards in other cases; (9) the failure of the notice to state the basis of the fee request;[35] (10) the failure to notify the class members of class counsel's fee request pursuant to Rule 23(h);[36] and (11) the award of attorneys' fees as an amount independent of the settlement fund.[37]  The Court has considered each of these objections, applied the governing law to the facts, and, for the reasons set forth elsewhere in the Opinion, granted an award far less than the $22.5 million requested.

### 3.       Compensation for Class Representatives

Five class members objected to an award of $10,000 to each of the nine class

---

[30] Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

[31] Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

[32] Objectors who raised these concerns include Pamela Kulsrud Corey and Troy Corey.

[33] Objectors who raised these concerns include Pamela Kulsrud Corey and Troy Corey.

[34] Objectors who raised these concerns include Bonnie J. Friedman and David A. Hale.

[35] Objectors who raised these concerns include David T. Murray, Jennifer B. Murray, James E. Pentz, Joshua West, Lester Brickman, Darren McKinney, Glenn Groeschel, and Michael Sullivan.

[36] Objectors who raised these concerns include David T. Murray, Jennifer B.Murray, and James E. Pentz.

[37] Objectors who raised these concerns are: Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

representatives.[38]  Although the objectors assert that "ten thousand dollars for each plaintiff is far

too much,"[39] incentive awards are "not uncommon in class action litigation . . . particularly where

. . . a common fund has been created for the benefit of the entire class . . . .  In fact, [c]ourts

routinely approve incentive awards to compensate named plaintiffs for the services they provided

and the risks they incurred during the course of the class action litigation."  Cullen v. Whitman

Med Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000) (citing In re S. Ohio Corr. Facility, 175 F.R.D.

270, 272 (S.D. Ohio 1997)).  Courts have approved incentive awards for class representatives in

amounts similar to the amount requested here.  See In re Ins. Brokerage Antitrust Litig., 579 F.3d

241, 285 (3d Cir. 2009) (finding that the district court did not err in granting final approval of a

settlement that included $150,000 in incentive awards distributed amongst fifteen class

representatives); Bogosian v. Gulf Oil Corp., 621 F. Supp. 27, 32 (E.D. Pa. 1985) (granting

incentive awards of $20,000 to each class representative).  For reasons stated elsewhere in this

Opinion, the law permits incentive awards, the facts here support an award, the parties have

agreed to the amount, and the payment does not diminish the money available to the class.  For

these reasons, the objections to the award of $10,000 to each class representative are overruled.

### 4.    The Settlement Does Not Adequately Compensate Class Members

One hundred and four class members assert that the settlement provides inadequate relief

for their injuries.[40]  Many object to capping the reimbursement fund at $8 million and express

---

[38] The four class members objecting to compensation for class representatives include
Anthony Joseph Ganino, Kay Beth B. Roberts, and Stephen R. Christian.

[39] Objection letter of Kay Beth B. Roberts.

[40] The 104 class members who challenged the adequacy of the compensation are: Daniel
C. Hauck, Sean M. Mclain, Michael Pipito, Joshua West, Darren McKinney, Lester Brickman,
Michael Sullivan, Randy L. Warren, Orion Antique Importer, Inc., David Stevens, Robert L.
Carter, Alexandra Gardiner, Amanda J. White, Andra T. Gailis, Ann Christine Iglehart, Eric B.
Martin, Alison G. Monroe, Arianne Saeedi Hatton, Austin Myers, Bradley D. Patrick, Brian

-36-

concern that, given the size of the class, the settlement fund "may be insufficient to satisfy 100% of timely and legitimate reimbursement claims by class members."[41] Others indicated that the revised maintenance schedule and maintenance book insert are insufficient relief in light of the monetary damage they incurred as a result of water ingress. Still others listed expenses that they contend are not reimbursable under the terms of the settlement, including costs to replace or repair vehicle headliners, carpeting, transmissions, and electrical systems. Many provided documentation of expenses incurred trying to remove mold and mildew resulting from water ingress and requested that these expenses be covered in the settlement. Finally, two of the objectors assert that the defendants are not bearing future maintenance expenses related to water ingress. One objector was displeased that any remaining settlement funds will be donated to charity rather than being redistributed to class members.[42] Others complain that they are excluded from receiving compensation for insurance deductibles, repairs not yet performed, inspections to determine if the vehicle has suffered damage, car rentals, and the financial loss

---

McMillan, Bruce R. Broadhurst, Cecil Craycraft, Charles H. Powers, Cynthia Lewis, Daniel Sibley, Danyce Jacqueline Hill, David A. Hale, Diana R. Baird, Ed Cooke, Edna Youngblood, Edward A. Burkhart, Eric Levy, Eva M. Blackwell, Evie Maderios, Frances Pinkey, Frank Lipsius, George Jones, Heather Welch, Helen Remick Jason Maderios, Jeff Shain, John Gardiner, John Vincent Sirera, Jonathon Szumny, Kay DaSilva, Kevin A. Johnson, Heather Welch, Kathy Dalton, Laura Hagopian, Lee Katherine Stanford, Les Friedrich, Loretta L. Rankin, Louis F. Larsen, Marc DeFeo, Mark E. Merin, Mark Moussa, Merilyn Fogel, Mitchell Eisenberg, Nicholas Melisiotis, Norbert Lindenberg, Patricia Floyd, Patrick Essen, Patrick H. Yanke, R. Neil Russell, Randall David Burr, Raymond Chick, Richard Westlund, Robert C. Lahiere, Jr., Robin C. Broadhurst, Rose De Martino, Russell E. Bitzer, Shawna Kirk, Sigrid Johnson, Thomas Ross, Vincent P. Norpel, Walter G. Alspaugh, Alexander Lillo, Jenette Cupone, F.R. Horton, Judy Horton, Holly Hedgepeth, Jean Radtke, John F. Beauchemin, Keith Kanady, Letchas S. Caster, Marilyn Testa-Smith, Kris Shields, Sandra S. Beauchemin, Stephanie Snyder, Dylan Gill, Daniel V. Greechan, David F. Jones, Earl Smith, John W. Nilon, Katherine Butler, Nicholas Bentivegna, Penny S. Crampton, Robyn Bonnett, Timothy L. Burke, Virginia K. Matthews, Michael E. Gardiner, Elaine S. Gardiner, and the Attorney General for the State of Texas.

[41] Objection letter of Randy L. Warren.

[42] Objection letter of Nicholas Bentivegna.

incurred when the vehicle was salvaged.

While the Court recognizes the dissatisfaction these class members have expressed, their objections do not show that the settlement is unreasonable or unfair. When evaluating the fairness of settlements, courts have held that "full compensation is not a prerequisite for a fair settlement." Careccio v. BMW of N. Am. LLC, Civ. No. 08-2619, 2010 WL 1752347, at *6 (D.N.J. Apr. 29, 2010). Moreover, "complaining that the settlement should be 'better' . . . is not a valid objection." Browning v. Yahoo! Inc., Civ. No. 04-1463, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007). In this case, an examination of the monetary and non-monetary compensation that the settlement provides shows that the compromise benefitted a significant number of individuals. The actual benefit received depends on the frequency of problems the particular type of vehicle sustained and, thus, results in different tiers of relief. As the Hon. Katharine S. Hayden eloquently observed, "fashioning relief this way, lines inevitably are drawn. At the end of the day, the appropriate test [of] the adequacy of the settlement terms is whether they are 'fair and reasonable.'" Careccio, 2010 WL 1752347, at *6. In this case, the vehicles received different benefits under the settlement based upon the frequency each specific type of vehicle sustained water damage.[43] (Dewey, Docket Entry No. 197 Attach. 10 at 6–7.) Thus, the parties presented a reasoned basis to provide varying benefits, including monetary reimbursement for only certain class members. In the event that the settlement fund is not exhausted by reimbursements, the remaining funds can be used to pay for repairs on vehicles no longer under warranty on a case-by-case basis before being donated to charity. (See Dewey, Docket Entry No.

---

[43] According to Exhibits D–1 and D–2 offered at the Fairness Hearing, .29% of the vehicle models that are receiving only maintenance information experienced water damage and only .99% of the vehicle models that are receiving service action benefits experienced water damage. (See also Dewey, Docket Entry No. 197 Attach. 10 at 6.) Thus, the subclasses of vehicles receiving more than just maintenance information had more than three times the frequency of water damage compared to vehicles receiving just maintenance information, which demonstrates a need for greater relief than the other subclasses.

163 Attach. 2 ¶ 25(2).)  Additionally, assertions that the settlement agreement does not address future damage caused by water ingress are incorrect.  Section 6.1 of the Settlement Agreement provides five years of funding for VW's "goodwill" program to specifically cover future water damage claims.  (Dewey, Docket Entry No. 173 Attach. 1 ¶ 6.1; Dewey, Docket Entry No. 213 Attach. 3 at 27.)  Finally, and most significantly for these objectors, all class members may opt out of the settlement and pursue their claims individually against the defendants and seek compensation they contend the settlement does not provide.  Thus, since these objectors retain this right to opt out, the settlement is fair to them too.

### 5.      Division of the Class into Subclasses Creates Conflicts of Interest and Disparate Remedies

Several objectors asserted that the division of class members into subclasses produced conflicts of interest which led to inequitable remedies.[44]  These divisions and the resulting remedies are based on objective criteria, namely the past frequency of failure and the design of the vehicles.  (Dewey, Docket Entry No. 221 at 3–4.)  This is a reasonable basis to decide the relief to be provided, particularly where complete, individualized relief for each class member could not be negotiated.  All class members, even those in the subclass that receives only preventative care information, receive something of value.  Thus, the division of class members into subclasses receiving different benefits based upon the type of vehicle they own does not necessarily render the settlement unfair or unreasonable, nor does it show a conflict of interest that renders the class representatives unable to adequately represent the class.

### 6.      Notice of Settlement Inadequate

---

[44] Objectors who raised these concerns include Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

Fourteen class members objected to the adequacy of the notice provided to the class.[45] Specifically, these class members claim that: (1) they did not receive a plain-language notice informing them of their rights to make claims for reimbursement;[46] (2) they did not have a reasonable opportunity to review the entire settlement agreement before objecting to it in violation of Fed. R. Civ. P. 23(h)(2);[47] (3) they did not have sufficient time to respond to the motion for award of counsel fees in violation of Local Rule 7.1(d)(2);[48] (4) they were not informed of the basis for counsel's fee request or the date by which class counsel would file their application for attorneys' fees in violation of Fed. R. Civ. P. 23(h);[49] (5) they were not provided with a link to counsel's fee application on the settlement website in violation of Fed. R. Civ. P. 23(h);[50] (6) the notice provided was not the best notice practicable under the circumstances in light of the fact that cars have been resold;[51] and (7) the notice failed to inform class members that they could be excluded from reimbursement and have their recovery rights terminated even

---

[45] The fourteen objectors who raised concerns regarding notice include Jean Plunk, Joshua West, Darren McKinney, Lester Brickman, Michael Sullivan, Randy L. Warren, Orion Antique Importer, Inc., David Stevens, James E. Pentz, David T. Murray, Jennifer B. Murray, Paul M. Kaufman, Sally J. van Haitsma, and Tara Castaldo.

[46] Objectors who raise these concerns include Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan.

[47] Objectors who raise these concerns include Tara Castaldo, Sally J. van Haitsma, and Jean Plunk.

[48] The objector who raised this concern is Paul M. Kaufman.

[49] Objectors who raise these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

[50] Objectors who raise these concerns include David T. Murray, Jennifer B. Murray, and James E. Pentz.

[51] Objectors who raise these concerns include David Stevens and Orion Antique Importer, Inc.

if they suffered water damage.[52]

None of these concerns warrant rejection of the settlement.  First, the settlement and notice explained how to object, opt out, and make a claim.  (Dewey, Docket Entry No. 173-1 at 27, 30–32.)  The clarity of the notice is reflected in the language used and the number of putative class members who responded through 203 objections, 1,119 requests for exclusions, 14,918 claims, 1,961 emails, website inquiries from 19,891 unique visitors, and 18,137 telephone inquiries, which totaled more than 55,000 contacts.  (Dewey, Docket Entry No. 241 ¶¶ 5–6, 8–10.)  Second, the notice included a telephone number and the names of counsel to whom questions could be posed or from whom additional information could be secured.  Thus, the absence of a direct link to a brief does not mean the class lacked access to the information.  Third, mindful that the fee issue was in dispute, the Court issued an order available to all class members and parties that required the plaintiffs to file their fee petition on June 9, 2010, more than six weeks before the July 26, 2010 Fairness Hearing, and set a deadline for filing opposition of June 29, 2010, which superseded L. Civ. R. 7.1(d)(2) and which provided sufficient opportunity for review of the motion.  (Dewey, Docket Entry No. 185.)  Fourth, the class members had at least 39 days to file objections and 79 days notice of the final approval hearing, which are time frames viewed as adequate.  Weiss, 899 F. Supp. at 1302.  The record shows that the objectors clearly had an opportunity to provide their views and, indeed, many objectors specifically included arguments that responded to the plaintiffs' fee motion.[53]  For these reasons, none of these complaints requires rejection of the settlement.

### 7.    Filing an Objection is Too Onerous

One objector contested the procedure by which objections are made, proposing an online

---

[52] The objector who raised this concern is Randy L. Warren.

[53] Objectors who raise these concerns include: Joshua West, Lester Brickman, Darren McKinney, Paul Kaufman, and John Pentz.

system in its place.[54]  He found it onerous to class members, advantageous to class counsel, and reflective of a "biased system" that he was required to "spend an hour to write [his] objections on paper, print it out, place stamps on four envelops [sic], . . . and mail [his] response via snail mail."[55]  While alternative methods for asserting objections may exist, the method used to field class members' objections still satisfies Rule 23(e)(5). See Lonardo v. Travelers Indem. Co., Civ. No. 06-962, 2010 WL 1416698, at *13 (N.D. Ohio, Mar. 31, 2010) (approving a class settlement while acknowledging the possibility that "the paucity of objections is at least partially due to the procedures for submitting a claim and asserting an objection").  Rule 23(e)(5) only requires that "[any] class member may object."  The sheer number of objections here shows that the objectors exercised their prerogative to present their objections.  The Court received over 200 handwritten, typed, and electronically filed objections.  In addition, the claims administrator received more than 1,000 requests for exclusion.  Thus, more than one thousand putative class members communicated their positions without impediment and this volume undermines the sole complaint that the objection process was onerous.  Moreover, requiring "snail mail" submissions ensured that all came from an individual authorized to communicate a view and ensured that those without computers or email were able to participate.  Thus, the objection to the method used to make objections is overruled.

**8.      Requirements for Filing a Claim are Too Onerous**

Seven class members objected to the requirements for submitting a claim.[56]  Most of these class members argue that the documentary evidence needed to file a claim, particularly

---

[54] The objector who challenged the procedure for making objections is John Waldeisen.

[55] Objection letter of John Waldeisen.

[56] The seven class members objecting to the claim submission requirements are: George Jones, Joanna B. Strauss, Loretta Rankin, Stephen R. Marsh, Daniel C. Hauck, J.M. Cooper, and Thomas Ross.

repair receipts, is too burdensome in light of the fact that many class members made repairs without expecting to receive reimbursement.[57]  Another objects to the use of claims forms at all.[58]  Despite the objectors' assertion that the filing system is "calculated to discourage class members from making claims," these objections are without merit.[59]  First, the objectors are mistaken about the evidence needed to file a claim, as receipts are not required for claimants who sign and submit a declaration stating that a reimbursable repair was made and that the claimant paid for it. (Dewey, Docket Entry No. 173 ¶ 1.21.)  Second, class members have been given ample opportunity to opt out of the settlement and pursue their claims individually.  Thus, the objections to the claims process do not provide a basis to find that the settlement is unreasonable or unfair.

### 9.      Reversion of Uncashed Settlement Checks

The Attorney General for the State of Texas objects to the term of the settlement agreement that terminates the defendants' obligation to make payment to a class member if the class member fails to cash their reimbursement check within 120 days.  The State of Texas argues that, under Texas unclaimed property law, settlement checks that are not cashed should be turned over to the Texas Comptroller who would hold the property in trust and take affirmative action to locate the rightful owner.  See Tex. Prop. Code Ann. §§ 72.101(a), 74.101 (2010).

In this case, however, the distribution of unclaimed settlement funds is governed by Rule 23, not Texas state law.  In re Lease Oil Antitrust Litig. (No. II), MDL No. 1206, 2009 WL 5195977, at *5 (S.D. Tex. Dec. 22, 2009) (holding that application of federal law was proper in

---

[57] Objectors who raised these concerns include George Jones, Joanna B. Strauss, and Loretta Rankin.

[58] Objection letter of J.M. Cooper.

[59] Objection letters of Thomas Ross and Stephen R. Marsh.

-43-

governing distribution of unclaimed class action settlement funds given that Rule 23 and the Texas Unclaimed Property Statute are in direct conflict and that, even if the statutes did not conflict, application of federal law over the unclaimed settlement funds would not "disserve the so-called 'twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws'"). Therefore, Rule 23 governs and this Court need not withhold approval of this class action settlement based on the Texas Unclaimed Property Statute.

### 10.   Ethical Obligations of Class Counsel

During the Fairness Hearing, two objectors[60] repeated their objections to the fee request. One of the objectors claimed that the settlement here and the negotiations concerning the fee award present an ethical concern that is a matter of "first impression." Another objector asserted that the settlement reflected collusion. Neither of these comments supports rejecting the proposed settlement. First, the Court of Appeals for the Third Circuit has spoken about the ethical obligations of class counsel, In re Cmty. Bank of N. Va., 418 F.3d at 318-20; In re Gen. Motors., 55 F.3d at 801-04 (3d Cir.1995), and this Court has sought to discharge its fiduciary obligation mindful of the observations in those opinions. To this end, the Court ensured that the class received information about the fees that the plaintiffs' counsel intended to request and required filings on this topic in advance of the deadline to file objections and more than one month before the Fairness Hearing.

Second, there is no evidence of collusion. Indeed, the opposite is indicated. Although the defendants agreed to pay the plaintiffs' attorneys' fees and expenses, they have vigorously opposed the fees and expenses sought before, during, and after the Fairness Hearing,[61] objected

---

[60] The objectors who made these oral arguments are counsel for Joshua West, Darren McKinney, Lester Brickman, and Michael Sullivan and counsel for objector David Sacks.

[61] The day after the Fairness Hearing, the defendants filed yet another submission opposing the plaintiffs' fee request. (Dewey, Docket Entry No. 246.)

to the method that the plaintiffs have used to calculate the fees, the hourly rates the plaintiffs claim, and the amount of fees requested.  The vigor of the defendants' opposition is consistent with the arms-length manner in which the parties have dealt throughout their case.  The parties reported a settlement to the Court after more than two years of hard fought litigation, depositions of more than fifty witnesses, and production of 200,000 pages of documents.  Unlike cases where a "quick" settlement has raised a judicial eyebrow, this case was two weeks away from the close of fact discovery at the time the settlement was reported.  Moreover, the settlement took more than six months to finalize and the issue of attorneys' fees was not discussed until the settlement terms for the benefit of the class were reached and continue to be hotly contested.  Thus, the Circuit's concerns about concurrent discussions of fees and the settlement are not present here. See In re Gen. Motors, 55 F.3d at 804.

Furthermore, for the reasons set forth herein, the settlement reached is reasonable and there is nothing to show that the attorneys compromised the interests of the class to only further their own economic interests.  For all these reasons, none of the objections "presented sufficient basis for this Court to reject or modify the Settlement presently before the Court."  McCoy v. Health Net, Inc., 569 F. Supp. 2d 448, 475 (D.N.J. 2008) (approving settlement over nine objections raised by well over two million class members).

Given the method by which notice was provided, the fact that less than 1% of the class filed objections, and no objections warrant a finding that the settlement is unreasonable, the Court can infer that the supermajority of the class supports the settlement.

### iii.    The Stage of the Proceedings and the Amount of Discovery Completed

Under the third Girsh factor, the Court must consider the stage of the proceedings and the amount of discovery completed.  This factor "captures the degree of case development that class counsel have accomplished prior to settlement."  In re Cendant, 264 F.3d at 235 (quoting In re

-45-

Gen. Motors, 55 F.3d at 813).  This factor allows courts to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  In re Gen. Motors, 55 F.3d at 813.

Here, a nearly one-year investigation preceded the actual filing of the lawsuits.  After the lawsuits were filed, the parties engaged in significant motion practice, protracted and contentious discovery, which included more than fifty depositions throughout the United States, the exchange of thousands of documents, some of which were in a foreign language, and consultation with numerous automotive experts.  (Dewey, Docket Entry No. 163 Attach. 13 ¶ 3; DelGuercio, Docket Entry No. 121 Attach. 13 ¶ 3; Dewey, Docket Entry No. 163 Attach. 2 ¶¶ 16–18; DelGuercio, Docket Entry No. 121 Attach. 2 ¶¶ 16–18; Dewey, Docket Entry No. 196 Attach. 1 ¶ 7.)  In addition, more than two years of discovery produced more than 30,000 paid warranty claims and thousands of internal customer care records together with technical vehicle information and hundreds of schematics written in German.  (Dewey, Docket Entry No. 196 Attach. 1 ¶ 7; Dewey, Docket Entry No. 197 Attach. 1 ¶¶ 65–68.)  At the time the parties reported that they had reached a settlement, fact discovery was set to conclude in approximately two weeks and the parties were about to commence disclosure of expert reports.  (Dewey, Docket Entry No. 149 at 4; Dewey, Docket Entry No. 163 Attach. 2 ¶ 20; DelGuercio, Docket Entry No. 121 Attach. 2 ¶ 20.)

Given the information they gathered, class counsel clearly possessed sufficient information to assess the factual and legal strengths and weaknesses of their case, engage in arms-length negotiations, and secure confirmatory discovery to reach this agreement.  The settlement here reflects the result of their assessment of the facts and law critical to evaluating the case.  See Klingensmith v. Max & Erma's Rests., Inc., Civ. No. 07-318, 2007 WL 3118505, at *4 (W.D. Pa. Oct. 23, 2007).  Therefore, this factor weighs in favor of approving the settlement.

### iv & v.  The Risks of Establishing Liability and Damages

The fourth and fifth factors require the Court to consider the risk of establishing both liability and damages.  These factors "survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  In re Prudential, 148 F.3d at 319.  Stated differently:

> if it appears that further litigation would realistically risk dismissal of the case on summary judgment or an unsuccessful trial verdict, it is in the plaintiffs' interests to settle at a relatively early stage.  In contrast, if it appears that liability is extraordinarily strong, and it is highly likely that plaintiffs would prevail at trial, settlement might be less prudent.  On this issue, the court should avoid conducting a mini-trial and must to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.

In re Ikon II, 209 F.R.D. at 105–06 (quoting LaChance v. Harrington, 965 F. Supp. 630, 638 (E.D. Pa. 1997)) (internal quotation marks omitted).

In the present case, class counsel recognizes the challenge in establishing that New Jersey law should be applied to the claims of class members from states other than New Jersey.  (Dewey, Docket Entry No. 213 Attach. 3 at 12.)  These challenges have existed both before and since the enactment of CAFA for plaintiffs who file nationwide class actions based upon state law claims that may require application of the law of the homestate of a particular class member that may differ from the law of the forum.  See Chin v. Chrysler Corp., 182 F.R.D. 448, 454–55 (D.N.J. 1998).  For example, some state laws require proof of contractual privity to bring an implied warranty claim or proof of reliance to prove a fraud claim while others do not.  Id. at 460.  Similarly, the elements of an unjust enrichment claim vary among the states.  See Sullivan, 2010 WL 2736947, at *12.  In addition, at the Fairness Hearing, the plaintiffs conceded that certain states' consumer protection laws do not include a private right of action.  (Fairness Hearing.)  These differences could defeat class certification on such claims entirely or only

-47-

permit certification on certain issues. See id., at *18. Moreover, counsel also acknowledges that statute of limitations and limitations in the warranties may limit the ability of certain class members to recover. Furthermore, much of the relief sought is not easily or simply quantified.

Counsel also acknowledges that making claims based upon "a variety of defects in the 8 different automobile models built on at least 20 different platforms, [over 12 model years,] corresponding to over 100 vehicle variations, manufactured by 2 different entities," presents factual differences that may have made it difficult to secure a nationwide, multi-model, multi-year, multi-manufacturer class in the face of challenges to commonality and predominance. (Dewey, Docket Entry No. 213 Attach. 3 at 12, 15.). Moreover, there could be challenges to "[p]roving a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product." Chin, 182 F.R.D. at 455. At a minimum, this reality could require the creation of a series of subclasses or it may present a very real risk of the class not being certified at all.

Finally, even if the class were certified and succeeded at trial, class counsel astutely recognize that the defendants would likely appeal. All of these considerations may affect the chance of establishing liability, damages, or finality of the dispute, whereas the settlement guarantees recovery and a final disposition of the case. In light of these challenges, class counsel's analysis of the risks deserves some credence, see In re Ikon II, 209 F.R.D. at 108, and the balance of the costs of continued litigation against the benefits of settlement for each party weighs in favor of approving the settlement.

### vi.   The Risks of Maintaining the Class Action Through the Trial

Sixth, the Court must consider the risk of maintaining the class action through the trial. Courts in the Third Circuit previously approached this factor with the understanding that "[t]he value of a class action depends largely on the certification of the class because, not only does the

aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." In re Gen. Motors, 55 F.3d at 817. As a result, "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action." Id. Therefore, "this factor measures the likelihood of obtaining and keeping a class certifi[ed] if the action were to proceed to trial." In re Warfarin, 391 F.3d at 537.

Based upon the facts of this case, and for the reasons just recited, there is no guarantee that the class would be or would remain certified throughout future litigation. Although each member of the class could have the same complaint against the defendants, namely that their vehicles' sunroofs leaked, the defendants argue that continued litigation may reveal divergent interests, such as between vehicles that have sustained no problem and those that were damaged, see Hubbard v. Gen. Motors Corp., Civ. No. 95-4362, 1996 WL 274018, at *9 (S.D.N.Y. May 22, 1996) (noting that a vehicle that never exhibits the alleged defect is fit and hence cannot provide a basis for a breach of warranty claim), and that differences in the design of the drains on the different vehicle models may make a finding of commonality difficult. (Dewey, Docket Entry No. 217 at 2, 8–9, 12.) In addition, as stated above, there may be challenges arguing that New Jersey state law should govern the claims of non-New Jersey plaintiffs and that differences in the applicable law may make it impossible to maintain a nationwide class on every claim. See Sullivan, 2010 WL 2736947, at *8. Because "[a] district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable," In re Warfarin, 391 F.3d at 537 (citing In re Prudential, 148 F.3d at 321), the specter of decertification makes settlement an appealing alternative. As class certification is not a certainty and there is no guarantee that the certified class would be maintained throughout trial or on appeal, this factor weighs in favor of approving the settlement.

      vii.     **The Ability of the Defendants to Withstand a Greater Judgment**

The seventh factor for the Court's consideration, namely, the ability of the defendant to withstand a greater judgment, has been problematic for other courts within the Circuit to analyze. See, e.g., In re Prudential, 148 F.3d at 322 (noting it is "difficult to determine [the value of the proposed settlement] because both the compensatory relief available under the [alternative dispute processes] and the additional relief available through Basic Claim Relief are uncapped"). Regardless, the Court of Appeals has found that a defendant's ability to pay a larger settlement sum is not particularly damaging to the settlement agreement's fairness as long as the other factors favor settlement. See id. at 321–22; McGee, 2009 WL 539893, at *6 (noting that withholding approval because the defendant could withstand a greater judgment makes "little sense" where defendant is paying a large settlement and class counsel's fees and expenses).

In the present case, there is nothing before the Court that suggests that the defendants would be unable to withstand a judgment greater than the relief that will be provided under the settlement. This factor, therefore, does not dictate that a settlement is necessary to ensure that the plaintiffs obtain relief for their alleged injuries.

### viii & ix.   The Range of the Reasonableness of the Settlement Fund in Light of Both the Best Possible Recovery & All the Attendant Risks of Litigation

Finally, the Court must consider the range of the reasonableness of the settlement in light of both the best possible recovery and the attendant risks of litigation. These factors are used to "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." In re Warfarin, 391 F.3d at 538. In assessing this factor, the Court should determine "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." In re Prudential, 148 F.3d at 322.

Although the plaintiffs' economic expert valued the settlement at approximately $142 million, (Dewey, Docket Entry No. 197 Attach. 10 at 20), class counsel has asked the Court to