# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN M. DEWEY, *et al.*,<br><br>    Plaintiffs,<br><br>vs.<br><br>VOLKSWAGEN AG, *et al.*,<br><br>    Defendants. | Case Nos.:<br><br>07-CV-2249-FSH-PS<br>07-CV-2361-FSH-PS<br>(consolidated)<br><br>Date: November 9, 2012<br>Time: 9:00 a.m.<br>Courtroom: 10 (Newark) |

## SUPPLEMENTAL DECLARATION OF THEODORE H. FRANK
## RELATING TO SETTLEMENT NOTICE

Theodore H. Frank (*pro hac vice*)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW, No. 236
Washington, DC 20036
Telephone: (703) 203-3848
Email: tedfrank@gmail.com

David M. Nieporent
SAMUEL & STEIN
38 West 32nd Street, Suite 1110
New York, NY 10001
Phone: (212) 563-9884
Fax: (212) 563-9870
Email: dnieporent@samuelandstein.com

Attorneys for West Objectors

Theodore H. Frank declares as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. I am the attorney for objectors Joshua West, Lester Brickman, Darren McKinney, and Michael Sullivan (collectively the "West Objectors" or "West") in this matter. I write to supplement my declaration of November 8.

3. The Arturi declaration claims that the placement of the settlement information on the completely different website "wateringresssettlement2.com" than the website "wateringresssettlement.com" that the class was told about and the court required the settlement information to be available on is not a violation of the court order because both websites are on the "World Wide Web."

4. This proves too much. By Arturi's reasoning, it was acceptable to place the settlement information *anywhere* on the web, so long as a series of links would eventually reach there, and no matter how much misleading was placed in front of the class to discourage them from reaching that information.

5. For example, it is possible to have a "link" to a webpage by an invisible pixel hidden on a webpage; if the mouse doesn't happen to go over that pixel, no one will see the link. It is not enough to have a link to a page; users have to objectively understand where to find correct information.

6. It is factually false that the link to the correct website was "prominent." The only link to the correct settlement website was hidden on the fifteenth line in a single word in a block of small-type text on the right-hand side of the page. (Mr.

1

Gsovski calls this small-type "bold type," but it's plainly smaller than the rest of the text on the page; moreover, when one bolds fifteen lines of text, it's like bolding no text whatsoever—which is why no competent attorney uses bold type to emphasize a half-page of text in a brief.) No competent website designer ever puts an important link that he or she wants users to click buried in a block of text. It is understood that the most important links are to be placed in a menu on the top of the page or on the left-hand side of the page in larger than average text. *These* are prominent links.

    7.    Here, every single one of a dozen or so links on the menus of the front page of the settlement website—*all* of the links in the two menus on the top of the page and on the left-hand side of the page—would have given class members incorrect information. For example, if one clicked on the link entitled "court documents" on the left-hand side of the page, one was taken to a page that had no court documents after 2010. If one clicked on the link entitled "important dates," again there were no important dates listed after 2010.

    8.    We can see a refutation of Arturi's and Gsovski's claims of "prominence" on the English Volkswagen site, en.volkswagen.com: every link is displayed on one of three menus: a series of text menus at the top of the page; five links in prominent pictures; and then smaller, less important links in a menu on the bottom of the page. Volkswagen, when they want consumers to click on links, does not hide them in a fifteen-line block of text.

    9.    We can also see this on the Herzfeld & Rubin page, www.herzfeld-rubin.com. The only links to other pages are in large type on a menu on the left-hand

side of the page. On December 2, 2012, there is a block of text related to Hurricane Sandy, but no website links are posted there; a phone number is, but it is in a different color than the rest of the text. When Herzfeld & Rubin wants clients or potential clients to click on links, they do not hide them in a fifteen-line block of text.

10. Similarly, the Mazie Slater website, mskf.net, has a menu on the top of the page. When they include hyperlinks in blocks of text, the hyperlinks are in a different color and bolded or underlined text.

11. Even the D.N.J. website that Mr. Gsovski references, www.njd.uscourts.gov, uses the menu system: important links are either on the left-hand menu (including the link to "eJUROR," highlighted in red) or at the top of the page as a list of "quick links" (including the link to CM/ECF). There are no prominent links buried in fifteen lines of small text.

12. Moreover, "prominence" is not a question of debatable aesthetics. It's an empirical question whether the link placed on the website in September encouraged or discouraged people from reaching the correct information. Arturi fails to mention that, of the 4,970 people who accessed the first settlement website identified in the notice, 3,661 of them, nearly three quarters, failed to click on the small-text link to reach the website with the correct settlement information. He provides no explanation why, if the link was "prominent," only 26% of the people reading the website accessed the correct website; it's not even clear that he was made aware of the website metrics when he issued his opinion that the link was "prominent."

13.     We can also infer that the website confused customers not just from the website metrics—which none of the three declarants provides any explanation for—but from the claim rate. There were 1.92 million vehicles in Groups 1 through 6. These vehicles made 19,280 claims. See Docket No. 314-1. The 1.08 million vehicles in Group 7, which was not allowed to make reimbursement claims, would be about 29.3% as likely as the other 6 claims to have suffered water damage. *Dewey*, 728 F. Supp. 2d at 579 n.43. We would thus expect Group 7 to make at least 3,177 claims: 19,280 claims multiplied by 29.3% multiplied by the ratio of 1.08 million cars to 1.92 million cars. And, in fact, we would expect the Group 7 claim rate to be higher than this, because a disproportionate number of cars in Groups 1 through 6 were still under warranty, and thus would not have an out-of-warranty claim to file. But the number of actual claims received so far, 2,218, is far short of this 3,177 number.

14.     Gsovski asserts that one should only expect 1,195 claim forms. Dkt. 405 at ¶ 39. This is wrong for three reasons.

15.     First, it is incorrect to use the ratio of class members instead of the ratio of vehicles. A vehicle might have multiple class members associated with it, but it will have only one leak before it is fixed. It would be double-counting otherwise. Using the correct ratio of vehicles to vehicles, we get 3,177 expected claims.

16.     There is a second reason we know that Volkswagen did not expect only 1,195 claims. If there were only 1,195 expected claims, there would have been less than $500,000 in claims—at zero cost to Volkswagen, because the existing $8 million settlement fund would have been sufficient to cover these claims. Yet Volkswagen

4

spent far more than that designing a settlement that precluded these million vehicles from making claims (while ensuring that none of the vehicle-owners could sue Volkswagen), and then defending against an appeal over the unfair treatment of these million vehicles. This makes no sense—unless Volkswagen reasonably expected that an accurately notified class would make many more claims.

17. This ties into the third reason we know that Volkswagen expected more than 1,195 claims of less than $500,000 in compensable damages. Volkswagen (and class counsel) argued to this court through the testimony of Dr. Eads that the letter given to the million vehicles in "Subclass 7" would prevent $7.99 million in *future* damages. Dkt. 197-10 at 9. This Court adopted that figure. *Dewey v. Volkswagen of America*, 728 F. Supp. 2d 546, 595-97 (D.N.J. 2010). (The $7.99 million figure excludes the diminution of value figure that the court also excluded.) How is it possible that these cars, many of which are several years old, would have suffered more than sixteen times as much water leakage damage in the future as in the past? Either the Dr. Eads testimony (and the court's adoption of it in valuing the settlement) is wrong by a large multiple or the Gsovski calculation is wrong. Given that Volkswagen has already stipulated that the settlement is worth $90 million (Dkt. No. 238), they should be estopped from claiming that the two thousand claims received to date is larger than expected.

18. I am a solo practitioner assisted by a junior attorney and a part-time attorney. There are multiple law firms hypothetically representing the class, and in line for a payout of double lodestar of $10 million. Why is it that I am the one speaking

5

out in favor of the class getting the notice that was bargained for instead of the attorneys that actually owe a fiduciary duty to the class? Class counsel has been entirely silent in this matter.

19. Class counsel's position on this question should be heard. Do they agree with Mr. Gsovski that "Subclass 7" has less than a million dollars in claims? If so, how do they reconcile that figure with the valuation of the settlement at $69.3 million, much less the $90 million or $142 million they were arguing to the court?

20. The Court has already found in 2010 that "Subclass 7" has several times more claimants than has been reached by the notice. It should thus order new notice. If the Court is to hold that the thousands of people who visited the uncorrected settlement website without reaching the second settlement website did not file claims because they had no claims to file, then it should revisit its earlier findings and substantially reduce its calculation of the settlement benefits, and reduce the attorney-fee request accordingly. Class counsel should not be allowed to have it both ways, receiving nearly $10 million through an assertion that a settlement of a three-million vehicle class is worth between $69 million and $142 million, and then remaining silent as Volkswagen argues—in violation of their previous stipulation to the Court—that a million vehicles in the class can be expected to file less than half a million dollars in claims.

Executed on December 2, 2012, in Fairfax, Virginia.

_____
Theodore H. Frank